MARC J. FAGEL (Cal. Bar No. 154425)
JUDITH L. ANDERSON (Cal Bar No. 124281)
  andersonj@sec.gov
MARK P. FICKES (Cal. Bar No. 178570)
  fickesm@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CARL W. JASPER,<br><br>Defendant. | Case No. CV 07-6122 (HRL)<br><br>FIRST AMENDED COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY OF THE ACTION

1.      From at least 2000 through 2005, defendant Carl W. Jasper, the former Chief Financial Officer of Maxim Integrated Products, Inc. ("Maxim" or the "Company"), a Sunnyvale, California semiconductor company, engaged in a scheme to illegally backdate stock options granted to Maxim employees and directors, concealing millions of dollars in expenses from investors and significantly overstating the Company's income.  Jasper was aware of instances of backdating, and on repeated occasions prepared for the signature of Maxim's then Chief Executive Officer falsely dated option grant approval documents to make it appear as though the options had been granted at

the market price on an earlier date. Jasper also knew, or was reckless in not knowing, that the Company did not properly account for such options or accurately disclose Maxim's option granting practices.

2.    Under well-settled accounting principles in effect during the relevant period, Maxim did not need to record an expense for options granted to employees with an exercise price equal to the current market price ("at-the-money"), while the Company was required to record an expense in its financial statements for any options granted with an exercise price below the current market price ("in-the-money"). In order to provide Maxim's employees and outside directors with valuable "in-the-money" options without recording an expense, Maxim routinely backdated stock options to dates corresponding to historical lows in Maxim's stock price, and falsified records to make it appear as though the options were granted "at-the-money" on the earlier date. For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal year 2004, Maxim granted options to employees with an exercise price equal to the lowest price of the quarter. Maxim fraudulently failed to record compensation expenses for those backdated options, thus overstating its income by millions of dollars and falsely representing in certain filings that it had incurred no expense for option grants.

3.    Jasper was aware that Maxim granted options on purported dates that had been selected with hindsight, which resulted in the issuance of undisclosed "in-the-money" options to Maxim employees and directors. Jasper also knew, or was reckless in not knowing, that Maxim was failing to report expenses for its "in-the-money" stock options and was falsely reporting that it only granted options at fair market value.

4.    The Commission seeks an order enjoining Jasper from future violations of the securities laws, requiring him to disgorge ill-gotten gains with prejudgment interest, requiring him to pay a civil monetary penalty, requiring him pursuant to statute to repay bonuses and stock profits, barring him from serving as an officer or director of a public company, and providing other appropriate relief.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

5.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

6.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      Venue is proper in this district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Jasper resides in the Northern District of California.  Acts or transactions constituting violations of the federal securities laws occurred in this district.

8.      Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places in this district, in Santa Clara County.

**DEFENDANT**

9.      Carl W. Jasper, age 51, resides in San Jose, California.  Jasper served as Maxim's Principal Accounting Officer, Chief Financial Officer, and Vice President from April 1999 through January 31, 2007.  Jasper obtained his California Certified Public Accountant license in 1984. Before working at Maxim, Jasper worked as an auditor at Ernst & Young LLP from 1983 to 1995. During the Commission's investigation, Jasper asserted his Fifth Amendment right against self-incrimination and refused to answer the Commission staff's questions.

**RELEVANT ENTITY**

10.      Maxim is a Sunnyvale, California corporation that makes integrated circuits.  At all relevant times, Maxim's common stock was registered with the Commission pursuant to Section

1    12(g) of the Exchange Act and traded on the NASDAQ National Market under the symbol "MXIM."

2    At all times relevant to this action, Maxim used a fiscal year that ended on the last Saturday of June.

# FACTUAL ALLEGATIONS

**A.      Maxim Used Stock Options Liberally To Recruit And Retain Employees.**

11.      During the relevant period, Maxim regularly used employee stock options as a form of compensation to recruit, retain, and incentivize key employees.  Maxim also used stock options to compensate members of its Board of Directors.  Each option gave the grantee the right to buy Maxim common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested.  The option was "at-the-money" when granted if the trading price of Maxim's common stock on the date of the grant and the exercise price were the same.  The option was "in-the-money" when granted if the trading price of Maxim common stock on the date of the grant exceeded the option's exercise price.

12.      Stock options were the most important part of Maxim's compensation mix.  Maxim generally paid its employees lower salaries than its peers; it competed against other companies for employees by offering the potential gains provided by stock options.  Maxim's ability to recruit and retain the engineers who designed and produced its new products was closely tied to its stock option program.  In addition, Maxim attributed its earnings growth and positive stockholder returns in part to its option practices.  The Company repeatedly emphasized these facts in communications with its shareholders.  For example, in a 2004 proxy statement filed with the Commission, Maxim said: "Options are also used and are quite necessary to make up for the lower salaries Maxim pays."

13.      Maxim granted options to almost all new employees when they were hired.  Maxim also granted employees additional options every year as part of their annual performance review. Because it granted so many options, Maxim had to ask shareholders to approve increases in the number of shares available for issuance under its primary stock option plan every year from 1999 through 2005.

14.      Maxim's primary stock option plan authorized it to grant both "incentive" stock options and "non-qualified" stock options.  Maxim's plan defined an incentive stock option as an option intended to qualify as an incentive stock option within the meaning of certain provisions of the

Internal Revenue Code. Maxim's plan defined a "non-qualified" option as any option not intended to qualify as an incentive stock option.

**B.    Maxim Told The Public It Granted Stock Options At Fair Market Value.**

15.    From at least 2000 and continuing through June 30, 2004, Maxim's primary stock option plan prohibited granting incentive stock options with an exercise price less than the stock's fair market value on the date of grant. In other words, the plan did not allow incentive stock options to be granted "in-the-money."

16.    During the same time period, Maxim's primary stock option plan allowed some flexibility in granting non-qualified stock options with an exercise price less than the stock's fair market value on the date of grant, but only subject to certain conditions not satisfied here.

17.    Under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and the accounting principles in effect from 1997 through 2005, issuers were required to record an expense on their financial statements for the "in-the-money" portion of any options grant. According to APB 25, that difference must be recorded as a compensation expense to be recognized over the vesting period of the option. Consequently, granting "in-the-money" options to employees could have a significant impact on the expenses and income (or loss) reported to the shareholders of a public company. APB 25 allowed companies, where the key terms of an option grant were known, to grant employee stock options without recording any compensation expense so long as the option exercise price was not below the stock's market price on the date of the grant.

18.    Maxim publicly reported, in its annual reports and other filings with the Commission for fiscal years 2000 through 2005, that the Company accounted for its employee stock options in accordance with APB 25. Additionally, during the relevant time period, Maxim represented that the Company generally granted options "at-the-money," not "in-the-money." Hence, in its annual reports for fiscal years 2000 through 2005, Maxim did not report compensation expenses for stock options. Jasper prepared, with others, each of those reports and other filings.

**C.    Maxim and Jasper Backdated Employee And Director Option Grants.**

19. Maxim's primary stock option plan provided that it was to be administered by the Board of Directors or a committee designated by the Board. By 2000, Maxim's Board had delegated to Maxim's CEO the authority to grant stock options to non-officer employees as well as to outside directors.

20. Maxim, through Jasper and others, repeatedly backdated option grants made to current employees, to newly hired employees, and to outside directors. These backdated grants reflected historically low prices of Maxim stock for the weeks prior to the date on which the price actually was selected. For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal year 2004, Maxim granted options to current employees with an exercise price equal to the lowest price of the quarter. By backdating the option grants to make it falsely appear that "in-the-money" option grants had been "at-the-money" when granted, Maxim's management, including Jasper, avoided reporting in the Company's financial statements compensation expenses for the options.

21. Jasper concealed Maxim's backdating scheme from its Board. On at least two occasions, in 2004 and again in 2006, Jasper falsely told Maxim's directors that Maxim did not backdate stock options.

### a. Maxim's Option Grants To Employees

22. During the relevant time period, Maxim granted options to current employees on a quarterly basis. Each quarter, Maxim's managers proposed to Maxim's CEO the number of options to be granted to employees whose annual performance reviews fell within that quarter. Maxim's CEO either approved, or first revised and then approved, the number of proposed options for each employee. Maxim's stock administration department accumulated the employee options approved by Maxim's CEO until it learned the grant date for those options. Jasper communicated the grant date and price to Maxim's stock administration department.

23. Jasper repeatedly suggested to Maxim's CEO that the Company grant backdated stock options. Jasper was also aware that Maxim's CEO was using hindsight to grant stock options. As Jasper understood, grant dates used for options awarded to Maxim's current employees were

repeatedly selected with hindsight in order to grant options at the lowest possible price.  Yet, as Jasper further understood, no compensation expenses were recorded for the undisclosed "in-the-money" option grants to current employees.

24.    During the relevant time period, Maxim also granted options to new hires on a quarterly basis.  Similar to the current employee grants, Maxim's CEO approved the number of options to be granted to new hires.  Maxim's stock administration department accumulated the options approved by Maxim's CEO until it learned the applicable grant date.  Jasper communicated grant dates and prices for new hires to Maxim's stock administration department.

25.    As with stock options awarded to current employees, grant dates used for options awarded to new hires were selected with hindsight.  For some new hire grants, Maxim's stock administrator determined the grant date by selecting a date with a low stock price for the quarter after the date on which the employee was hired.  She confirmed these dates with Jasper.  Jasper was aware she was using hindsight to select those grant dates.  Jasper also, at times, provided the grant date and price to Maxim's stock administration department.  As Jasper understood, however, no compensation expenses were recorded for the undisclosed "in-the-money" grants to new hires.

26.    In connection with certain grants to current employees and new hires, Jasper drafted backdated memoranda for Maxim's CEO to sign indicating that the CEO had selected the grant date on the dates indicated in the memoranda.  One of the purposes of the grant approval memoranda was to serve as an audit trail and make it appear as though the options had been granted at the market price on the earlier date.  Jasper knew, or was reckless in not knowing, that these memoranda did not accurately reflect the dates on which decisions were made to grant options.

27.    With respect to at least four backdated option grants, Maxim's CEO in writing instructed Jasper to record compensation expenses for such grants.  However, as Jasper understood, no compensation expenses were recorded.

**b.    Examples Of Maxim's Backdated Employee Options**

28.    Maxim purportedly granted approximately 2.7 million options to employees on June 30, 2003, with an exercise price equal to that day's closing stock price of $34.10.  This was Maxim's

lowest stock price of the quarter.  In reality, the grant was not made until on or around August 26, 2003, when the stock was trading at $43.26.  On or around August 22, 2003, Maxim's CEO asked Jasper: "What is the lowest price we can use for Q1 options?"  Jasper responded: "The best price is the first day of the quarter – June 30, 2003.  The price was $34.10 on that date."  Maxim's CEO approved the grant using the June 30th price, but also instructed Jasper to record a compensation expense if it was material.  Although the options were "in-the-money" when granted, as Jasper understood, Maxim failed to record compensation expenses for the options.

29.    In another example, Maxim purportedly granted 2.4 million options to employees on October 2, 2001, with an exercise price equal to that day's closing stock price of $33.40.  This was Maxim's lowest stock price of the quarter.  In reality, the grant was not made until on or around December 28, 2001, when the stock was trading at $54.61.  On or around December 28, Jasper proposed to Maxim's CEO that Maxim use October 2 as the grant date for options awarded to certain current employees, and November 28 and December 24 for options awarded to certain new hires (depending on their hire date).  Maxim used the dates suggested by Jasper to grant options.  Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

30.    In another instance, Maxim purportedly granted options to new employees hired after February 28, 2002 on March 25, 2002, with an exercise price equal to the March 25 closing stock price of $51.81.  In reality, these grants were not made until sometime in late April 2002, after the quarter had ended.  On or about April 22, Jasper asked Maxim's CEO to sign a grant approval memorandum dated March 25, 2002, to "keep [Maxim's] documentation and records straight."  Maxim's CEO signed the memorandum, which stated:  "I want you to make sure that any new hire who started at Maxim between March 1, 2002 and today has their stock granted at today's closing price of $51.81."  Maxim's stock administration department did not learn of the supposed March 25th grant date until on or about April 24, 2002.

c.    **Maxim's Option Grants To Outside Directors**

31.     Maxim also backdated certain stock option grants to its outside directors.  For example, Maxim purportedly granted the directors 36,000 options on October 1, 2001, at an exercise price equal to that day's closing stock price of $34.06.  This grant was not actually made until on or around December 11, 2001, when Maxim's stock was trading at $57.90.  In or around December 2001, Jasper proposed to Maxim's CEO a range of historical dates for the outside director grants.  On or around December 11, Maxim's CEO approved using a grant date of October 1, 2001, but also in writing instructed Jasper to record an expense if it was material.  Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

### d.     Jasper Understood The Implications Of Backdating

32.     Jasper understood the accounting implications of awarding "in-the-money" options.  For example, he warned Maxim's CEO in writing that Maxim should record a compensation expense where it contemplated giving one employee a retroactively-priced option but noted that "for one person, we will just get it done."  Jasper also told Maxim's Board that he understood Maxim would have to record an expense if it backdated options to get a lower price.

33.     Maxim's CEO also instructed Jasper on several occasions to record a compensation expense for option grants.  Thus, in a handwritten note to Jasper, Maxim's CEO stated:  "I would like to use [a price from eight weeks ago] for our employees but we will have to expense the difference if it is material."  No compensation expense was recorded for any of Maxim's "in-the-money" option grants.

### D.     As A Result Of The Backdating, Maxim Publicly Reported False And Misleading Financial Information.

34.     Maxim is a public company.  Accordingly, it filed with the Commission annual reports on Form 10-K for the fiscal years ended June 24, 2000 (filed September 22, 2000), June 30, 2001 (filed September 24, 2001), June 29, 2002 (filed September 25, 2002), June 28, 2003 (filed September 22, 2003), June 26, 2004 (filed September 9, 2004), and June 25, 2005 (filed September 8, 2005) which included audited financial statements that were certified by the Company's outside auditors.

35.     Jasper drafted, reviewed, and signed Maxim's annual reports filed on Forms 10-K for its 2000 through 2005 fiscal years.  In connection with Maxim's 2003, 2004, and 2005 annual reports, Jasper signed certifications stating that he had reviewed the annual reports and that the annual reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

36.     In its audited financial statements, which were included in its annual reports to shareholders for fiscal years 2000 through 2005, Maxim affirmatively stated that the Company accounted for its employee stock option plans in accordance with APB 25, requiring the Company to record an expense for "in-the-money" options.  Additionally, in its annual reports for fiscal years 2000 through 2003, Maxim stated that under the Company's stock option plans, options generally were granted at prices not less than the fair market value of the Company's common stock on the grant date.  Similarly, Maxim's annual reports for fiscal years 2004 and 2005 stated that options were granted at prices not less than the fair market value of the Company's common stock on the grant date.  Further, in its annual report for fiscal year 2004, Maxim stated affirmatively that it was not required to record compensation expenses in connection with stock option grants to employees.  As Jasper understood, these statements were rendered false and misleading because options were repeatedly granted "in-the-money." but the necessary expense was concealed through backdating.

37.     As a result of the repeated backdating, Maxim materially understated its expenses and overstated its net income in the financial statements.  Thus, Maxim's financial statements included in its annual reports for its fiscal years 2003 through 2005 overstated the Company's net income by more than 10 percent.

38.     Maxim also filed with the Commission quarterly reports on Form 10-Q for the quarters ended September 28, 2002 (filed November 8, 2002); December 28, 2002 (filed February 11, 2003); March 29, 2003 (filed May 12, 2003); September 27, 2003 (filed November 6, 2003); December 27, 2003 (filed February 5, 2004); March 27, 2004 (filed May 6, 2004); September 25, 2004 (filed November 4, 2004); December 25, 2004 (filed February 3, 2004); and March 26, 2005

1    (filed May 5, 2005), which contained Maxim's quarterly financial statements.  As Jasper understood,

2    these financial statements were materially false or misleading because Maxim failed to record in its

3    quarterly financial statements compensation expenses associated with "in-the-money" options.

4          39.    Jasper reviewed the above Forms 10-Q before they were filed with the Commission.

5    Additionally, for the quarters ended September 28, 2002, December 28, 2002, and March 29, 2003,

6    he certified that the quarterly reports fairly presented Maxim's financial condition and results of

7    operation.  For the quarter ended September 27, 2003 through the quarter ended March 26, 2005, he

8    certified that he had reviewed the quarterly reports and that he was not aware of any material

9    misstatements of fact or omissions in those reports.

10         40.    In addition, Maxim filed with the Commission current reports on Form 8-K on April

11    29, 2003, August 12, 2003, October 28, 2003, February 5, 2004, April 27, 2004, August 6, 2004,

12    November 1, 2004, February 1, 2005, and May 3, 2005, each of which announced the Company's

13    financial results for the prior quarter.  As Jasper understood, these current reports contained

14    materially false and misleading financial information because Maxim failed to record compensation

15    expenses associated with undisclosed grants of "in-the-money" stock options.  Jasper signed each of

16    these current reports.

17         41.    Maxim also sold securities pursuant to offering documents, including registration

18    statements on Forms S-8, which incorporated Maxim's false and misleading financial statements.

19    Those Forms S-8 were filed with the Commission on April 12, 2001 (incorporating Maxim's annual

20    report on Form 10-K for the year ended June 24, 2000, Maxim's quarterly reports on Forms 10-Q for

21    the fiscal quarters ended September 23, 2000 and December 30, 2000, and Maxim's current reports

22    on Forms 8-K filed on January 30, 2001 and April 11, 2001); February 13, 2003 (incorporating

23    Maxim's annual report on Form 10-K for the year ended June 29, 2002 and Maxim's quarterly

24    reports on Forms 10-Q for the quarters ended September 28, 2002 and December 28, 2002); and

25    April 24, 2005 (incorporating Maxim's annual report on Form 10-K for the year ended June 26,

26    2004, Maxim's quarterly reports on Forms 10-Q for the quarterly periods ended September 25, 2004

27    and December 25, 2004, Maxim's current report on Form 8-K filed December 20, 2004, and

28

Maxim's proxy statements filed August 19, 2004 and October 18, 2004).  Jasper signed these Forms S-8.

42.    As Jasper understood, Maxim's proxy statements filed on or about August 19, 2004 and October 7, 2005 (which were sent to shareholders and filed with the Commission) also made materially false representations about Maxim's stock option grants.  For example, Maxim's August 19, 2004 proxy statement requested that Maxim's shareholders approve an additional 13 million shares for its option plan.  In urging shareholders to approve the additional shares, Maxim stated that its stock option plan was "managed for the best interest of the stockholders," in part because "all of Maxim's options are granted at fair market value."  In its October 7, 2005 proxy statement, Maxim again requested shareholders approve additional shares for its stock option plan, and stated that its stock option plan was "managed for the best interests of the stockholders" in part because "Maxim's stock options have always been granted with an exercise price equal to the fair market value of Maxim's stock."  Jasper drafted or reviewed Maxim's proxy statements before they were filed with the Commission.

43.    Jasper knew, or was reckless in not knowing, that Maxim did not properly account for its resulting stock option compensation expenses in its financial statements which were included in Maxim's annual reports on Forms 10-K, quarterly reports on Forms 10-Q, current reports on Forms 8-K, and registration statements on Forms S-8.  Jasper also knew, or was reckless in not knowing, that Maxim did not accurately describe its stock option grants in its proxy statements, and in its annual reports on Forms 10-K.

44.    As Jasper was further aware, the grant approval memoranda he drafted, which failed to disclose the true grant dates for options to employees and outside directors, were provided to the Company's external auditors in connection with audits of Maxim's financial statements.  In addition, Jasper signed management representation letters to the auditors that made misleading statements or omitted important information from them.  In connection with Maxim's fiscal year ended June 24, 2000, Jasper signed a management representation letter to the auditors falsely asserting that Maxim's financial statements were fairly presented.  In connection with Maxim's fiscal years ended June 29,

2002, June 28, 2003, and June 26, 2004, Jasper signed a management representation letter to the auditors falsely asserting that Maxim's financial statements were fairly presented in accordance with general accepted accounting principles. Additionally, Jasper signed management representation letters in connection with Maxim's quarterly periods ending March 29, 2003, September 27, 2003, March 27, 2004, September 25, 2004, and December 25, 2004 to the auditors falsely stating that Maxim's financial statements were prepared in conformity with generally accepted accounting principles and that the financial statements reflected all adjustments necessary for a fair presentation. Those statements were untrue, as Jasper understood, because the repeated, concealed backdating rendered the financial statements false and misleading.

45.    In June 2006, the Special Committee of Maxim's Board began to investigate the Company's historical option granting practices. As a result of the Special Committee investigation, Maxim in January 2007 announced that it believed the accounting adjustments needed to properly record expenses for options granted to employees and outside directors were material and that it expected to restate its financial statements for Maxim's fiscal years 2000 through 2005 and the related interim periods through March 25, 2006. Maxim also warned that its financial statements, related reports, and all earnings press releases and similar communications relating to those periods should not be relied upon.

46.    During the relevant period, Jasper received Maxim stock options and sold Maxim stock. Jasper also received annual bonuses tied in part to the Company's achievements and profitability.

**FIRST CLAIM FOR RELIEF**
*(Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder)*

47.    The Commission realleges and incorporates by reference paragraphs 1 through 47.

48.    By engaging in the conduct described above, Jasper, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

      a.    Employed devices, schemes, or artifices to defraud;

14

b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.   Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

49.   By reason of the foregoing, Jasper has violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
*(Violations of Securities Act Section 17(a)(1))*

50.   The Commission realleges and incorporates by reference Paragraphs 1 through 47.

51.   By engaging in the conduct described above, Jasper, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

52.   By reason of the foregoing, Jasper violated and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
*(Violations of Securities Act Section 17(a)(2) and (3))*

53.   The Commission realleges and incorporates by reference Paragraphs 1 through 47.

54.   By engaging in the conduct described above, Jasper, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

55.    By reason of the foregoing, Jasper has violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### FOURTH CLAIM FOR RELIEF

*(False Periodic Reports – Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder)*

56.    The Commission realleges and incorporates by reference Paragraphs 1 through 47.

57.    Based on the conduct alleged above, Maxim violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission accurate periodic reports, including annual, current, and quarterly reports.

58.    By engaging in the acts and conduct alleged above, Jasper knowingly provided substantial assistance to Maxim's filing of materially false and misleading reports with the Commission.

59.    By reason of the foregoing, Jasper aided and abetted Maxim's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.  Unless restrained and enjoined, Jasper will continue to aid and abet such violations.

### FIFTH CLAIM FOR RELIEF

*(False Books and Records – Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A))*

60.    The Commission realleges and incorporates by reference Paragraphs 1 through 47.

61.    Based on the conduct alleged above, Maxim violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

62.    By engaging in the acts and conduct alleged above, Jasper knowingly provided substantial assistance to Maxim's failure to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

63.    By reason of the foregoing, Jasper has aided and abetted violations by Maxim of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  Unless restrained and enjoined, Jasper will continue to aid and abet such violations.

### SIXTH CLAIM FOR RELIEF
*(Inadequate Internal Accounting Controls—Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act)*

64.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47.

65.    Based on the conduct alleged above, Maxim violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls.

66.    By engaging in the acts and conduct alleged above, Jasper knowingly provided substantial assistance to Maxim's failure to devise and maintain a sufficient system of internal accounting controls.

67.    By reason of the foregoing, Jasper aided and abetted violations by Maxim of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].  Unless restrained and enjoined, Jasper will continue to aid and abet such violations.

### SEVENTH CLAIM FOR RELIEF
*(Falsifying Books and Records or Circumventing Internal Accounting Controls—Violation of Section 13(b)(5) of the Exchange Act)*

68.    The Commission realleges and incorporates by reference Paragraphs 1 through 47.

69.    By the conduct alleged above, Jasper violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] which prohibits anyone from knowingly circumventing a system of internal accounting, or knowingly falsifying certain books, records, and accounts.

70.    Jasper has violated and, unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### EIGHTH CLAIM FOR RELIEF
*(Falsifying Books and Records—Violation of Rule 13b2-1 of the Exchange Act)*

17

71.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47.

72.     By engaging in the conduct described above, Jasper falsified or caused to be falsified Maxim's books, records, and accounts in violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

73.     Jasper has violated and, unless restrained and enjoined, will continue to violate Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

## NINTH CLAIM FOR RELIEF
*(False Statements and Omissions to Accountants and Auditors— Violation of Rule 13b2-2)*

74.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47.

75.     By engaging in the acts and conduct alleged above, Jasper, directly or indirectly, made or caused to be made a materially false or misleading statements or omitted to state or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Maxim required to be made or the preparation or filing of reports required to be filed by Maxim with the Commission.

76.     By reason of the foregoing, Jasper has violated and, unless restrained and enjoined, will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## TENTH CLAIM FOR RELIEF
*(Violations of Rule 13a-14 of the Exchange Act)*

77.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47.

78.     Jasper signed, as Maxim's principal accounting officer, false certifications pursuant to Rule 13a-14 of the Exchange Act that were included in Maxim's 2003, 2004, and 2005 annual reports filed on Forms 10-K, as well as its quarterly reports filed on Forms 10-Q for the quarters ended September 28, 2002 through March 26, 2005.

79.     In the certifications included with the annual reports, Jasper falsely stated, among other things, that:  (a) each report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of Maxim as of, and for, the periods presented in the report; and (c) he had disclosed to Maxim's auditor and audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that involved management or other employees who had a significant role in Maxim's internal control over financial reporting.

80.     For the quarters ended September 28, 2002, December 28, 2002, and March 29, 2003, Jasper falsely stated in the certifications, among other things, that the quarterly reports fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that information contained therein fairly presented in all material respects the financial condition and results of operations of Maxim.  For the quarters ended September 27, 2003, December 27, 2003, March 27, 2004, September 25, 2004, December 25, 2004, and March 26, 2005, Jasper falsely stated in the certifications, among other things, that:  (a) each report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) each financial statement, and other financial information included in each report, fairly presented in all material respects the financial condition, results of operations and cash flows of Maxim as of, and for, the period presented in the report; and (c) he had disclosed to Maxim's auditor and audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that involved management or other employees who had a significant role in Maxim's internal control over financial reporting.

81.     By reason of the foregoing, Jasper has violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## ELEVENTH CLAIM FOR RELIEF

*(False Proxy Statements—Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder)*

82.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47.

83.     Based on the conduct alleged above, Jasper violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibit solicitations by means of a proxy statement, form of proxy, notice of meeting, or other communication, written or oral, that contains a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

84.     By reason of the foregoing, Jasper violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder.  Unless restrained and enjoined, Jasper will continue to violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin Jasper from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act  [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78n(a)], and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 140.13b2-2, and 240.14a-9], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

II.

SEC v. JASPER, CV 07-6122 (HRL)
FIRST AMENDED COMPLAINT

Prohibit Jasper, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78*o*(d)].

III.

Order Jasper to disgorge any wrongfully obtained benefits, including prejudgment interest.

IV.

Order Jasper to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

V.

Order Jasper to repay bonuses and stock profits, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

VI..

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  December 21, 2007                    Respectfully Submitted,


                                             /s/ Judith L. Anderson
                                             Judith L. Anderson
                                             Attorney for Plaintiff
                                             SECURITIES AND EXCHANGE COMMISSION