1  MARC J. FAGEL (Cal. Bar No. 154425)
   MARK P. FICKES (Cal. Bar No. 178570)
2   (fickesm@sec.gov)
   ROBERT L. TASHJIAN (Cal Bar No. 191007)
3   (tashjianr@sec.gov)
   ROBERT S. LEACH (Cal. Bar No. 196191)
4   (leachr@sec.gov)
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
5   (schneidere@sec.gov)

6  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
7  44 Montgomery Street, Suite 2600
   San Francisco, California  94104
8  Telephone:  (415) 705-2500
   Facsimile:  (415) 705-2501

9

10                    **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12                        **SAN JOSE DIVISION**

13

14  SECURITIES AND EXCHANGE COMMISSION,      Case No. CV 07-6122 JW

15            Plaintiff,

16       v.                                   **SECURITIES AND EXCHANGE
                                              COMMISSION'S NOTICE OF MOTION
17  CARL W. JASPER,                           AND MOTION FOR SUMMARY
                                              JUDGMENT; MEMORANDUM OF
            Defendant.                        POINTS AND AUTHORITIES IN
18                                            SUPPORT THEREOF [REDACTED]**

19                                            Date:  November 9, 2009
                                              Time:  9:00 a.m.
20                                            Location:   Courtroom 8, Fourth Floor
                                                          Hon. James Ware
21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2    Please take notice that on November 9, 2009, at 9:00 a.m. or as soon thereafter as the matter

3 may be heard, in the courtroom of the Honorable James Ware, Courtroom 8, 4th Floor, United States

4 District Court, 280 South 1st Street, San Jose, CA 95113, Plaintiff Securities and Exchange

5 Commission will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure,

6 for summary judgment on all claims against Defendant Carl W. Jasper. In the alternative, the

7 Commission will and hereby does move for partial adjudication of issues under Rule 56(d).

8    November 9, 2009, is the date ordered by the Court as the last day for hearing on motions for

9 summary judgment. *See* Docket No. 60. Fact discovery in this matter closed on October 1.

10    The Commission's motion is made on the grounds that there is no material issue of fact to be

11 decided and the Commission is entitled to judgment as a matter of law against Jasper based on the

12 uncontroverted evidence in the record and the supporting papers.

13    The Commission's motion is based upon this Notice of Motion and Motion and the

14 supporting Memorandum of Points and Authorities; the supporting Declaration of Erin E. Schneider;

15 the pleadings on file; and such other evidence and oral argument as may be presented to the Court.

16

17 DATED:  October 5, 2009                    Respectfully submitted,

18

19                                            /s Robert S. Leach
                                              Robert S. Leach
20

21                                            Attorney for Plaintiff
                                              SECURITIES AND EXCHANGE COMMISSION
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT ........................................................................... 1

II.   ISSUES TO BE DECIDED ............................................................................... 2

III.  UNDISPUTED MATERIAL FACTS ............................................................... 2

    A.   Maxim Used Options to Recruit and Retain Employees ...................... 2

    B.   Jasper Was Responsible for Maxim's Accounting for Stock
        Options .................................................................................................. 3

    C.   Jasper Actively Participated in Maxim's Option Backdating
        Scheme .................................................................................................. 4

    D.   Jasper Understood the Accounting Rules Required Maxim to
        Record an Expense for Any Backdated Stock Options ......................... 8

    E.   Jasper Approved Maxim's False and Misleading Public
        Filings ................................................................................................. 10

    F.   Jasper Misled Maxim's Auditor and Board ....................................... 12

    G.   Maxim's $838 Million Restatement .................................................... 13

    H.   Jasper's Refusal to Respond to Discovery .......................................... 14

IV.   ARGUMENT ................................................................................................. 15

    A.   Summary Judgment Should Be Granted When There Is No
        Genuine  Issue for Trial ...................................................................... 15

    B.   Jasper Committed the Securities Law Violations Alleged
        Against Him ......................................................................................... 16

        1.   Jasper Committed Securities Fraud ......................................... 16

        2.   Jasper Aided and Abetted Maxim's Violations of the
            Periodic Reporting Provisions ................................................. 20

        3.   Jasper Falsified Maxim's Books and Records and
            Aided and Abetted Maxim's Books-and-Records
            Violations ................................................................................. 21

        4.   Jasper Aided and Abetted Maxim's Internal Control
            Violations ................................................................................. 22

        5.   Jasper Lied to Maxim's Auditor ............................................. 22

6.    Jasper Falsely Certified Maxim's Periodic Reports with the Commission ............................................................................ 23

7.    Jasper Committed Proxy Fraud Violations ............................................ 23

C.    Summary Judgment Is Particularly Appropriate Because the Court Should Draw Adverse Inferences from Jasper's Refusal to Testify and Preclude Him from Testifying at Trial ......................................... 23

V.    CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Aaron v. SEC,*
  446 U.S. 680 (1980) ................................................................................................ 16

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ........................................................................................... 18, 23

*Baxter v. Palmigiano,*
  425 U.S. 308 (1976) ................................................................................................ 23

*Beck v. Dobrowski,*
  559 F.3d 680 (7th Cir. 2009) .................................................................................. 23

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................ 15

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) ................................................................................................ 17

*Gebhardt v. ConAgra Foods, Inc.,*
  335 F.3d 824 (8th Cir. 2003) ............................................................................ 18, 19

*Hollinger v. Titan Capital Corp.,*
  914 F.2d 1564 (9th Cir. 1990) ................................................................................ 17

*Howard v. Everex Sys., Inc.,*
  228 F.3d 1057 (9th Cir. 2000) ................................................................................ 17

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997) (Alito, J.) ................................................................ 18

*In re CNET Networks, Inc.,*
  483 F. Supp. 2d 947 (N.D. Cal. 2007) ................................................................. 2, 8

*In re Comverse Tech., Inc. Sec. Litig.,*
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) .................................................................... 19

*In re Monster Worldwide, Inc. Sec. Litig.,*
  251 F.R.D. 132 (S.D.N.Y. 2008) ............................................................................ 19

*In re Zoran Corp. Derivative Litig.,*
  511 F. Supp. 2d 986 (N.D. Cal. 2007) ..................................................................... 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ........................................................................................... 15, 16

*McGann v. Ernst & Young,*
  102 F.3d 390 (9th Cir. 1996) .................................................................................. 20

*Nationwide Life Ins. Co. v. Richards,*
  541 F.3d 903 (9th Cir. 2008) ............................................................................... 2, 24

*No. 84 Employer-Teamster Joint Council*
*Pension Trust Fund v. Am. West Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003)................................................................................................... 19

*Ponce v. SEC,*
    345 F.3d 722 (9th Cir. 2003)....................................................................................... 16, 21, 22

*SEC v Koenig,*
    2007 WL 1074901, at *4 (N.D. Ill. Apr. 5, 2007) ....................................................... 18

*SEC v. Adler,*
    137 F.3d 1325 (11th Cir. 1998).......................................................................................... 20

*SEC v. Bausch & Lomb, Inc.,*
    565 F.2d 8 (2d Cir. 1977).................................................................................................... 19

*SEC v. Benson,*
    657 F. Supp. 1122 (S.D.N.Y. 1987)................................................................................... 24

*SEC v. Colello,*
    139 F.3d 674 (9th Cir. 1998)..................................................................................... 2, 23, 25

*SEC v. Cymaticolor Corp.,*
    106 F.R.D. 545 (S.D.N.Y. 1985) ....................................................................................... 25

*SEC v. Falstaff Brewing Corp.,*
    629 F.2d 62 (D.C. Cir. 1980) ............................................................................................ 20

*SEC v. Fehn,*
    97 F.3d 1276 (9th Cir. 1996)............................................................................................. 21

*SEC v. Global Telecom Servs. L.L.C.,*
    325 F. Supp. 2d 94 (D. Conn. 2004) ................................................................................. 25

*SEC v. Grossman,*
    887 F. Supp. 649 (S.D.N.Y. 1995)..................................................................................... 25

*SEC v. Interlink Data Network of Los Angeles, Inc.,*
    1993 WL 603274, at *7-8 (C.D. Cal. Nov. 15, 1993)....................................................... 25

*SEC v. M&A West Inc.,*
    538 F.3d 1043 (9th Cir. 2008)........................................................................................... 16

*SEC v. McNulty,*
    137 F.3d 732 (2d Cir. 1998).............................................................................................. 21

*SEC v. Merchant Capital, LLC,*
    483 F.3d 747 (11th Cir. 2007)........................................................................................... 19

*SEC v. Merrill Scott & Assocs., Ltd.,*
    505 F. Supp. 2d 1193 (D. Utah 2007) ............................................................................... 25

*SEC v. Murphy,*
    626 F.2d 633 (9th Cir. 1980)............................................................................................. 18

*SEC v. Musella,*
   748 F. Supp. 1028 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990) ................................. 17

*SEC v. Rana Research, Inc.,*
   8 F.3d 1358 (9th Cir. 1993)........................................................................................................ 20

*SEC v. Shapiro,*
   494 F.2d 1301 (2d Cir. 1974)..................................................................................................... 20

*SEC v. Softpoint, Inc.,*
   958 F. Supp. 846 (S.D.N.Y. 1997) (Sotomayor, J.)............................................................ 22, 25

*SEC v. Wolfson,*
   539 F.3d 1249 (10th Cir. 2008)................................................................................................. 20

*SEC v. World-Wide Coin Inv., Ltd.,*
   567 F. Supp. 724 (N.D. Ga. 1983) ............................................................................................ 21

*SEC v. Zimmerman,*
   854 F. Supp. 896 (N.D. Ga. 1993) ............................................................................................ 25

*Siemers v. Wells Fargo & Co.,*
   2007 WL 1140660, at *8 (N.D. Cal. Apr. 17. 2007) ................................................................. 19

*Takara Trust v. Molex Inc.,*
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ........................................................................................ 19

*United States v. 4003-4005 5th Ave., Brooklyn, NY,*
   55 F.3d 78 (2d Cir. 1995)........................................................................................................... 25

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991)..................................................................................................... 19

*United States v. Ferguson,*
   553 F. Supp. 2d 145 (D. Conn. 2008) ................................................................................... 19, 20

*United States v. Newman,*
   6 F.3d 623 (9th Cir. 1993).......................................................................................................... 17

*United States v. Reyes,*
   2007 WL 1574540, at *3 (N.D. Cal. May 30, 2007) .............................................................. 8, 20

*United States v. Ruehle,*
   __ F.3d __ (9th Cir. Sept. 30, 2009)........................................................................................... 18

*Zell v. InterCapital Income Sec., Inc.,*
   675 F.2d 1041 (9th Cir. 1982).................................................................................................... 19

Statutes

15 U.S.C. § 7243 ................................................................................................ 16

15 U.S.C. § 77q(a) ............................................................................................. 16

15 U.S.C. § 77q(a)(2) ........................................................................................ 16

15 U.S.C. § 77q (a)(3) ....................................................................................... 16

15 U.S.C. § 78j(b) .............................................................................................. 16

15 U.S.C. § 78m(a) ............................................................................................ 20

15 U.S.C. § 78m(b)(5) ................................................................................. 21, 22

15 U.S.C. § 78n(a) ............................................................................................. 23

Other Authorities

Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 15570, 44 Fed. Reg. 10964, 10968 (Feb. 15, 1979) ("Adopting Release") ................................................. 21

Rules

Fed. R. Civ. Proc. 1 ........................................................................................... 15

Fed. R. Civ. Proc. 56(c) .................................................................................... 15

Fed. R. Civ. Proc. 56(d)(1) ............................................................................... 16

Fed. R. Civ. Proc. 56(e) .................................................................................... 16

Regulations

17 C.F.R. § 240.10b-5 ....................................................................................... 16

17 C.F.R. § 240.12b-20 ..................................................................................... 21

17 C.F.R. § 240.13a-1 ....................................................................................... 20

17 C.F.R. § 240.13a-11 ..................................................................................... 20

17 C.F.R. § 240.13a-13 ..................................................................................... 20

17 C.F.R. § 240.13a-14 ..................................................................................... 23

17 C.F.R. § 240.13b2-1 ..................................................................................... 21

17 C.F.R. § 240.13b2-2 ..................................................................................... 22

17 C.F.R. § 240.14a-9 ....................................................................................... 23

1 **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.** **SUMMARY OF ARGUMENT**

3 Defendant Carl W. Jasper was the Chief Financial Officer and Principal Accounting Officer

4 of Maxim Integrated Products, Inc., a Silicon Valley semiconductor company that was particularly

5 dependent on stock options to attract and retain employees and fuel its dramatic growth. From at

6 least 2000 through 2005, in public filing after public filing signed and certified by Jasper, Maxim

7 represented that its practice was to grant "at-the-money" options – options with an exercise price

8 equal to the stock's trading price on the grant date – to motivate its employees to grow the stock price

9 for investors, not the more lucrative "in-the-money" options, which give employees a leg up on

10 ordinary investors and dilute the incentive Maxim said its options provided. Maxim disclosed no

11 expenses relating to its stock option program in its annual and quarterly income statements and

12 insisted it was following well-settled accounting principles that would require it to record an expense

13 if it granted in-the-money options.

14 The undisputed evidence, however, demonstrates that Maxim was engaged in a years-long

15 scheme to backdate stock options issued to Maxim employees and directors so that they would

16 receive more valuable options. Maxim consistently used hindsight to find dates corresponding to

17 low, historical stock prices to use as the grant date for stock options, and created paperwork making it

18 look like Maxim had actually decided to award options on that date. Jasper knew of and participated

19 in this backdating practice, and Jasper's stock administrator acknowledged Jasper's involvement.

20 Jasper, moreover, was a Certified Public Accountant with decades of experience and knew the

21 accounting rules required Maxim to record an expense for backdated, in-the-money options.

22 The evidentiary record submitted by the Commission, described in detail below, establishes

23 that there is no genuine issue of material fact and that Jasper committed the securities fraud and other

24 violations alleged by the Commission. Summary judgment is therefore appropriate. Indeed, it is

25 particularly appropriate in this case because Jasper has chosen to respond to the overwhelming

26 evidence of liability with silence. Rather than answer the Commission's discovery requests, Jasper

27 repeatedly has asserted his Fifth Amendment right against compelled self-incrimination. While he is

28 free to do so, the Court in this civil case "is equally free to draw adverse inferences from [his] failure

1  of proof," *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and to preclude him from testifying at

2  trial, *see Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008).

3       The Court should grant summary judgment in favor of the Commission. If summary

4  judgment is not rendered on the whole action, the Court should, to the extent practicable, determine

5  what material facts are not genuinely at issue.

6  **II.    ISSUES TO BE DECIDED**

7       1.    Whether the Court should grant summary judgment when undisputed facts show that

8  Jasper knew of and participated in Maxim's option backdating practice, knew the relevant accounting

9  rules required Maxim to record an expense for backdated options, and reviewed and approved

10  numerous SEC filings that omitted hundreds of millions of dollars in option-related expenses?

11      2.    Whether the Court should preclude Jasper from testifying and draw adverse inferences

12  from his repeated refusals to testify or otherwise respond substantively to discovery.

13  **III.   UNDISPUTED MATERIAL FACTS**

14      **A.    Maxim Used Options to Recruit and Retain Employees**

15      Maxim is a publicly traded company based in Sunnyvale that designs, manufactures, and sells

16  high-performance semiconductors. First Amended Compl. ¶ 10 (Docket No. 7); Answer ¶ 10

17  (Docket No. 36). During the relevant period, Maxim liberally used stock options as compensation to

18  recruit and retain employees in the competitive Silicon Valley marketplace.[1] Bergman Tr. at 16:23-

19  18:5.[2] Indeed, stock options were the most important part of Maxim's compensation structure. Ex. 1

20  at MXIM-SEC 994 & Ex. 2 at MXIM-SEC 1034; Hagopian Tr. at 60:5-25. Its compensation

21  program was heavily tilted toward performance-based compensation. Ex. 1 at MXIM-SEC 994 &

---

22  [1]    A stock option gives the recipient the right to buy company stock at a set price, called the
23  "exercise" or "strike" price, on a future date after the option vests. An option is "at-the-money" when
    granted if the trading price of the company's stock on the grant date equals the exercise price. It is
24  "in-the-money" when granted if the trading price of the company's stock on the grant date exceeds
    the exercise price. Answer ¶ 11; *see In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 996-
25  997 (N.D. Cal. 2007); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 949-950 (N.D. Cal. 2007).

26  [2]    All exhibits and transcripts cited in this memorandum are attached to the Declaration of Erin
    E. Schneider in Support of Plaintiff's Motion for Summary Judgment. The numbered exhibits bear
27  the exhibit number assigned at depositions in this case. Exhibits not previously marked in deposition
28  are exhibits A through CC and the deposition transcripts are exhibits DD through OO.

1  Ex. 2 at MXIM-SEC 1033; Hagopian Tr. at 43:13-45:18, 63:25-64:16; Bergman Tr. at 20:20-22:5,

2  31:18-32:9.  Because Maxim paid lower salaries than its competitors, options were "quite necessary"

3  to attract talent. Ex. 1 at MXIM-SEC 994 & Ex. 2 at MXIM-SEC 1034; Hagopian Tr. at 45:19-46:7,

4  51:24-53:21, 66:2-19; Bergman Tr. at 25:19-26:21, 33:5-23.  Maxim attributed its earnings growth

5  and positive returns in part to its option practices and repeatedly emphasized such facts in

6  communications with shareholders. Exs. 1 & 2; Bergman Tr. at 18:6-20; Gilbert Tr. at 163:12-

7  165:13 & Ex. 45 at BKH-SEC 165 ("Maxim believes that its option program has been a major

8  contributor to its extraordinary success over the years because of the plan's contribution to recruiting

9  and retaining employees and to aligning the interests of the employees with those of our stockholders

10  by motivating them to work long and hard to increase the value of Maxim."); Ex. 91 at 13 ("The

11  Company's success depends to a significant extent upon the continued use of stock options as a

12  compensation tool."); Ex. A at Slides 10-12 (noting options are key to recruitment goals and help

13  contain salary expense).

14  **B.      Jasper Was Responsible for Maxim's Accounting for Stock Options**

15  Jasper was Maxim's Principal Accounting Officer, Chief Financial Officer, and Vice

16  President from April 1999 through January 2007. First Amended Compl. ¶ 9; Answer ¶ 9.[3]  ▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hagopian Tr. at 133:18-21.  As CFO,

18  Jasper oversaw the company's stock administration department. *Id.* at 133:18-134:10, 244:6-246:2.

19  Maxim vested authority to grant employee and director stock options in an Interim Option

20  Committee, consisting of the CEO. Bergman Tr. at 41:9-42:22; Ex. 28; Raymond Tr. at 42:14-44:1;

21  Answer ¶ 19. As CFO and head of stock administration, Jasper was responsible for ensuring that

22  Maxim accounted for these option grants correctly. Bergman Tr. at 60:18-61:11; *see also* Gilbert Tr.

23  at 70:21-71:22 (describing how Jasper's stock administration group was responsible for ▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  _____

27  [3]      Jasper obtained a California Certified Public Accountant license in 1984. Before joining
    Maxim, he was an auditor at the Big Four accounting firm Ernst & Young from 1983 to 1995 and

28  Corporate Controller at Read Rite Corp. First Amended Compl. ¶ 9; Answer ¶ 9; Ex. 89 at 23.

1 ██████████████████████████████████████████████

2 ██████████████████████████ Hagopian Tr. at 244:21-246:2. Jasper transmitted to the

3 CEO for his signature paperwork purporting to document when a grant had been made. Raymond Tr.

4 at 63:25-64:17, 67:8-68:14, 69:1-18. He informed others within stock administration of the CEO's

5 approval of various grant dates. Raymond Tr. at 60:7-19. He recommended to the CEO, and

6 approved his direct reports' recommendations of, stock options for employees reporting to him. Exs.

7 130, 161, & 162; Flett Tr. at 77:5-80:2; 85:23-91:25; Ex. 136; Caron Tr. at 25:16-27:18, 150:11-

8 152:25. Jasper's office also communicated to certain employees the dates by which stock option

9 recommendations needed to be submitted to the CEO. Caron Tr. at 59:20-60:10.

10 ██████████████████████████████████████████████

11 ██████████████████████████████████ Bergman Tr. at 55:8-56:2.

12 Jasper implemented and articulated to others Maxim's internal controls over option granting; indeed,

13 he advised Maxim's Board that he personally reviewed all new option grants. Ex. 6; Hagopian Tr. at

14 122:22-123:11.[4] Jasper also assured the Board that Maxim's option granting process was "well

15 documented by . . . his group" and that he "closely monitor[ed] the closing price of Maxim stock each

16 day" in an attempt to time the market – i.e., contemporaneously grant options on days when the stock

17 was at a relative low price. Ex. 8; Bergman Tr. at 65:14-67:23, 70:1-5, 73:11-74:17, 78:4-21. Jasper

18 even authored a memo on how to structure Maxim's option program "to get the favorable accounting

19 treatment we want (i.e. no compensation expense related to bonus options)." Ex. 49; Gilbert Tr. at

20 173:11-174:13.

21     **C.**    **Jasper Actively Participated in Maxim's Option Backdating Scheme**

22     From at least 2000 through 2005, Maxim backdated stock option grants made to employees

23 and directors, using hindsight to select grant dates corresponding to historical low-points in its stock

24 price and then creating grant paperwork to make it look like Maxim's CEO had made the granting

25 decision on that date. Multiple witnesses from Maxim's stock administration department testified

26

27    [4]    Jasper also certified in multiple SEC filings that he was responsible for Maxim's internal

28 controls over financial reporting. *See* Exs. 15, 91, & 92 at Ex. 31.2.

1   that Maxim routinely used historical stock price information to pick favorable – i.e., low – stock

2   prices as recommended exercise prices for option grants to employees.  Wong Tr. at 69:3-72:22,

3   80:6-15, 99:3-22 (describing how stock administration "recommended the prices up . . . the chain");

4   *id.* at 146:5-147:9, 148:13-149:14 & Ex. 125 (describing how stock administration would generate

5   reports from which they would recommend low stock prices for options to employees); Raymond Tr.

6   at 116:4-16, 117:3-19, 121:12-15, 122:21-123:5, 143:18-144:15, 144:23-146:8, & Exs. 125 & 126.

7        For example, Sandy Wong, an assistant in stock administration from 1999 to 2007, testified:

8   "Maxim's general practice [was] to grant a favorable price, or in [other] words, the lowest possible

9   price to employees during a given quarter.  So that is why we [were] . . . waiting towards more the

10  end of the quarter to see what price that really [was] the lowest."  Wong Tr. at 148:13-149:14; 12:16-

11  25, 27:16-28:19.  This practice held true in every single quarter in which Wong served in stock

12  administration.  She could not recall a single exception, nor could she recall an instance where stock

13  administration received a memo from Maxim's CEO approving an option grant before running a

14  report of Maxim's historical stock prices.  *Id.* at 149:18-150:2, 159:1-16, 160:17-23.  Wong also

15  testified that the process – using hindsight to select favorable exercise prices – was the same for

16  grants to both new and existing employees.  *Id.* at 170:13-171:21, 173:9-174:7, 175:3-20, 177:8-16,

17  179:7-22, 184:22-185:15, & Ex. 128.[5]

18       Having used hindsight to select the favorable exercise price, stock administration also

19  prepared backdated memos from Carl Jasper for Maxim's CEO's signature, indicating his approval of

20  the date, recommended exercise price, and other details of the option grant.  *Id.* at 76:22-77:20,

21  79:24-80:21, 81:5-82:16, 84:5-85:4, 186:4-19; *see* Ex. 129 (memo dated March 11, 2003 stating

22  "[g]o ahead and grant options today to all new hires that have started since February 7, 2003 at

23  today's closing price").  *Cf.* Ex. 128 (reflecting price selection on April 4, 2003); Raymond Tr. at

24  143:18-144:15 (describing how after selecting low prices for grants stock administration would

25

26

---

27  [5]      For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter
    of fiscal year 2004, Maxim granted backdated options to current employees with an exercise price
28  equal to the lowest price of the quarter.  *Compare* Ex. B *with* Ex. C.

1    provide Jasper with memos to sign approving the grant).  Maxim's CEO returned signed approval

2    memos to Jasper, who returned them to stock administration.  Raymond Tr. at 69:1-21 & Ex. 31.

3         Wong's boss, stock administrator Sheila Raymond, described a similar process: "under

4    general practices, the lowest price was going to be the grant date, under the general practice." *Id.*

5    Exs. 125 & 126 & 116:4-16; *id.* at 117:3-19 (noting that by 2004 "it was pretty much the case that

6    whatever was the lowest price in the quarter, that was going to be the grant date"); *id.* at 121:12-15,

7    122:21-123:5, 143:18-144:2, 144:23-146:8 (stating that the practice may have existed in 2002 and

8    2003).  She testified that in instances where stock administration used a low stock price for the

9    exercise price of an option, she would have told Jasper or her immediate supervisor. *Id.* at 123:24-

10   124:16.  Raymond added later: "Carl knew what was happening." *Id.* at 224:12-226:7 & Ex. 174.[6]

11        Moreover, undisputed documentary evidence demonstrates Jasper not only knew about

12   Maxim's backdating practice, but actively suggested historical low prices to Maxim's CEO:

13        •    On August 22, 2003 (when Maxim's stock traded at $43.78), Maxim's CEO asked

14   Jasper in writing what was the lowest price Maxim could use for an option grant in the first quarter of

15   fiscal 2004. Ex. 56; Schneider Decl. ¶¶ 2-3, 24; Ex. B.  Jasper replied in writing: "The best price is

16   the first day of the quarter – June 30, 2003.  The price was $34.10 on that date. . . . I have attached a

17   listing of Maxim's closing stock prices for the quarter for your reference." Ex. 115; Schneider Decl.

18   ¶¶ 2-3, 69.  Maxim's CEO ultimately chose to use June 30, 2003 as the purported grant date. Ex. Z.

19        •    On December 28, 2001 (when Maxim's stock traded at $54.61), Jasper proposed the

20   CEO use low historical prices as exercise prices for option grants to Maxim employees, writing

21   "[g]iven the run up in our stock price this quarter, I would like to propose the following to set the

22   option price for Q202 activity." Ex. 61; Schneider Decl. ¶¶ 2-3, 28.  Maxim ultimately used the dates

23   and prices recommend by Jasper to grant options to certain employees. Ex. AA.

24

25   _____

26   [6]    Other documents confirm that the date reflected in grant approvals was not the date Maxim's
     CEO decided to make the grant. *See* Ex. 31 (memo to Jasper from Maxim's CEO dated February 28,
27   2002 stating "I have granted options today for all existing employee reviews for this quarter – the
     stock closed at $45.76"); Ex. 117 (March 18, 2002 e-mail reflecting reviews for the quarter had yet to
28   be submitted); Wong Tr. at 86:16-87:13, 91:6-22, 93:3-94:12, 95:20-96:1, 98:6-99:17.

1      •     On February 28, 2003 (when Maxim's stock traded at $34.54), Jasper proposed in

2  writing that Maxim's CEO grant a backdated option to a Maxim executive. He urged the CEO to

3  "grant him an option now at the Oct price so that he gets a favorable price. I believe this will go a

4  long way in ensuring he stays at Maxim." Ex. 81; Wong Tr. at 197:2-203:4, 204:21-205:1; Malae Tr.

5  at 33:12-34:6; Schneider Decl. ¶¶ 2-3, 40. Maxim's CEO approved the backdated grant with an

6  exercise price of $21.35. Ex. 149; Caron Tr. at 164:10-166:19.

7      •     On April 22 and 23, 2002, Jasper created and printed a memorandum to Maxim's

8  CEO attaching grant approval memos dated February 28, 2002, and March 25, 2002. Ex. 60;

9  Schneider Decl. ¶¶ 2-3, 27; *see also* Ex. 59 (signed March 25, 2002 approval memo to Jasper).[7]

10     •     On December 10, 2001, Jasper proposed that Maxim's CEO grant backdated options

11  to directors "before the price gets away from us" with prices in October 2001 and provided an

12  approval memo "to keep our audit trail straight." Ex. 36; Schneider Decl. ¶¶ 2-3, 18. Maxim's CEO

13  ultimately signed minutes backdated to October 1, 2001, stating he had granted options to the

14  directors on that date, but no expense was recognized. Ex. 39; Gilbert Tr. at 127:18-128:25.

15     •     On January 4, 2000, Jasper gave Maxim's CEO a range of low prices from October

16  1999 and suggested that the CEO grant options to directors with an October 21, 1999 date. Exs. 34 &

17  52; Schneider Decl. ¶¶ 2-3, 17; Gilbert Tr. at 181:1-182:24.[8] So that Maxim could have – in Jasper's

18  words – "a clean audit trail," Jasper also requested that Maxim's CEO sign a memorandum backdated

19  to October 21, 1999 stating that the CEO had granted the options on that date. Ex. 34.

20     •     On August 2, 2000, Jasper offered assistance to Maxim's CEO in changing the terms

21  and backdating a grant for a newly hired employee so that the employee could get a lower exercise

22  price. Jasper acknowledged it was improper to do so. Exs. 67 & 68; Schneider Decl. ¶¶ 2-3, 30-31.

23

24  [7]      Additional evidence demonstrates Jasper created, printed, or authored grant approval memos months after the purported grant date. For example, in February 2000 Jasper created and printed a

25  memo dated October 21, 1999, stating that the CEO had approved options to directors as of October 21, 1999. *See* Ex. 64; Schneider Decl. ¶¶ 2-3, 29; Ex. BB; *see also* Exs. 79 & 121 (undated Jasper

26  memo about options with October 2002 price); Malae Tr. at 29:19-32:14, 36:11-39:3.

27  [8]      On January 4, 2000, Maxim stock closed at $47.25. Ex. B. Maxim effected a 2-for-1 stock split on December 22, 1999. Ex. 89 at 67. Adjusting for the split, Jasper was proposing options be

28  granted with an exercise price of $34.63 – a nearly 27% discount to the then-current trading price.

1       •       On or around March 2, 2000, Jasper recommended to Maxim's CEO that Maxim use

2   grant dates in December 1999 for options for certain employees, despite the fact that the grant was

3   not finalized in December. Jasper suggested that Maxim "take the risk that the auditors will not

4   challenge" Maxim's decision. Ex. 69; Schneider Decl. ¶¶ 2-3, 32. Maxim ultimately used the

5   December dates to grant options to certain employees. Ex. CC.

6       •       Finally, in late November 2002, Jasper recommended in writing that Maxim's CEO

7   grant director options using October 10, 2002 as the grant date. Ex. 78; *see also* Ex. 77 (Jasper

8   advising directors on December 3, 2002 about grants); Schneider Decl. ¶¶ 2-3, 38.

9       Through its backdating practice, Maxim was secretly granting "in-the-money" options,

10  despite numerous public statements that it granted only "at-the-money" options. Moreover, under

11  Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees"* ("APB

12  25") and generally accepted accounting principles ("GAAP") in effect from 1997 through 2005,

13  Maxim was required to record an expense in its income statement for in-the-money options. Ex. E ¶

14  10(b). According to APB 25, when a company granted an option with an exercise price below the

15  stock's market price on the grant date, the difference was to be recorded as an expense recognized

16  over the vesting period of the option. *Id.* APB 25 allowed companies to grant employee options with

17  no expense, but only when the key terms of an option grant were known and the exercise price

18  equaled the stock's market price on the grant date (i.e., the option was at-the money). *Id.*; *In re*

19  *CNET Networks*, 483 F. Supp. 2d at 955.[9]

20          **D.      Jasper Understood the Accounting Rules Required Maxim to Record an Expense
                      for Any Backdated Stock Options**

21

22      Jasper, Maxim's CFO and a Certified Public Accountant, understood the accounting

23  implications of awarding backdated, in-the-money options. Ex. 3 & Hagopian Tr. at 113:3-114:20,

24

25  [9]    *See also United States v. Reyes*, 2007 WL 1574540, at *3 (N.D. Cal. May 30, 2007) ("It is
    impossible to square the deliberate retroactive pricing of stock options with the plain text of APB 25,
26  which instructs companies that the proper measurement date is the 'first' date on which the grantor
    knows 'the number of shares' and 'the option or purchase prices.' . . . If APB 25 precludes *anything*,
27  it prohibits . . . deliberately choosing a strike price based on a favorable historical date and then . . .
    pretending that the option was granted earlier than it actually was.").
28

246:17-247:22; Bergman Tr. at 58:25-59:10; Gilbert Tr. at 113:8-114:17, 136:4-22, & Ex. 41 at MXIM-SEC 88267 & 95 (noting Jasper was a "major contributor[]" to a "think piece" on option accounting that described APB 25's requirement that in-the-money options be expensed); Ex. 49 (Jasper writing "[a]s long as the options are granted at fair market value on the date the number of shares . . . and other pertinent information is known, then we do not need to record any compensation expense related to the options."). For example, he told Maxim's CEO in writing that Maxim should record an expense when giving a retroactively priced option. Exs. 67 & 68; *see also* Ex. 86 (memo to Jasper advising "unfortunately we can not grant [options] with hindsight"). Jasper advised others on "technical accounting" issues relating to expensing of employee stock options, Ex. 4; Hagopian Tr. at 117:6-118:25, and he told Maxim's Board that he understood Maxim would have to record an expense if it backdated options to get a lower price. Hagopian Tr. at 107:8-19, 128:14-129:19, 139:12-140:3; Ex. 7; *see also* Ex. 18 & Hagopian Tr. at 285:3-286:11. Jasper also authored or received numerous documents showing he understood the rules relating to option expensing. *See, e.g.*, Exs. 70, 71, 75, F (describing to a Maxim employee how compensation charges are determined), & G (assuring CEO the "Company is aware of the current accounting rules and pending rules especially as it relates to . . . the accounting consequences of option grants to non-employees. We will continue to monitor future changes and ensure our stock plans and practices are meeting the objectives . . . of the accounting profession"); Schneider Decl. ¶¶ 2-3, 92; Malae Tr. at 69:24-70:12.[10]

---

[10]    Jasper and Maxim monitored and fiercely resisted efforts to require technology companies to expense all options – even at-the-money options – in the income statement. Ex. 72; Schneider Decl. ¶¶ 2-3, 35; Ex. 84; Bergman Tr. at 129:14-130:24 (█████████████████████████████████████ █████████████████████████████); *see also* Gilbert Tr. at 23:9-24:14, 25:9-21, 27:25-30:3. They told investors that if Maxim were required to expense at-the-money options, it could have a material adverse impact on Maxim's ability to attract, retain, and motivate employees, as well as its financial condition and results of operations. Ex. 91 at 13-14; *id.* at 8 & 13 (identifying Maxim's continued ability to grant options without expense as a factor that investors should give "careful consideration"). Jasper even told Maxim's auditor, Ernst & Young, that it was interviewing other auditing firms because Ernst & Young publicly supported changes in the accounting rules that would require expensing for at-the-money options. Ex. 71.

1    **E.    Jasper Approved Maxim's False and Misleading Public Filings**

2    Despite actively participating in Maxim's backdating scheme, and knowing that Maxim

3    should have recorded an expense for its backdated options, Jasper reviewed, approved, and signed

4    Maxim's annual reports on Form 10-K for the fiscal years ended June 24, 2000, through June 25,

5    2005. Ex. 89 at 26; Ex. 114 at 27; Ex. 90 at 74; Ex. 15 at 56; Ex. 91 at 52; Ex. 92 at 63; Portnoy Tr.

6    154:21-155:17; Caron Tr. at 174:13-177:20. Jasper also signed certifications stating that he had

7    reviewed Maxim's 2002, 2003, 2004, and 2005 annual reports, that they did not contain any untrue

8    statements of material fact or omit to state a material fact, and that they fairly presented Maxim's

9    financial condition and results. Ex. 90 at 77 & Exs. 15, 91, & 92 at Exs. 31.2 & 32.2.

10    The annual reports omitted hundreds of millions of dollars in expenses for backdated options,

11    and thus overstated Maxim's operating income by hundreds of millions of dollars. Ex. 89 at 60-64;

12    Ex. 114 at 469-474; Ex. 90 at 40-47; Ex. 15 at 31-34; Ex. 91 at 31-34; Ex. 92 at 37-40; Portnoy Tr. at

13    145:22-147:4. When it restated its financial statements in September 2008, Maxim recorded more

14    than $600 million in negative pre-tax adjustments for stock-based compensation for fiscal years 2000

15    through 2005:

|  | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 |
|---|---|---|---|---|---|---|
| Pre-tax Adjustments for Stock-Based Compensation | $72,302,000 | $84,316,000 | $91,145,000 | $127,366,000 | $153,530,000 | $86,628,000 |
| Originally Reported Operating Income | $508,560,000 | $445,166,000 | $345,352,000 | $447,036,000 | $606,035,000 | $781,732,000 |
| Percentage Overstatement of Operating Income | 14.2% | 18.9% | 26.4% | 28.5% | 25.3% | 11.1% |

22    Ex. H at 95-101; Ex. I at 8. Considering only director, employee and new hire option grants in fiscal

23    years 2003, 2004, and 2005, Albert A. Vondra, a partner and Certified Public Accountant with

24    PricewaterhouseCoopers LLP who was retained as an expert in this matter, found overstatements of

25    operating income ranging from $135 million to $357 million:

|  | FY03 | FY04 | FY05 |
|---|---|---|---|
| Minimum Pre-Tax Adjustment for Stock-Based Compensation for Selected Stock Option Grants | $35,698,000 | $49,890,000 | $49,749,000 |

| | | | |
|---|---|---|---|
| Maximum Pre-Tax Adjustment for Stock-Based Compensation for Selected Stock Option Grants | $99,652,000 | $130,995,000 | $126,269,000 |
| Originally Reported Operating Income | $447,036,000 | $606,035,000 | $781,732,000 |
| Minimum/Maximum as Percent of Originally Reported Operating Income | 8.0% – 22.3% | 8.2% – 21.6% | 6.4% – 16.2% |

Ex. I at 6-10.

In addition to omitting vast amounts of expenses, the annual reports signed and certified by Jasper also falsely stated that:

- Maxim accounted for its employee stock option plans in accordance with APB 25. Ex. 89 at 66; Ex. 114 at 477; Ex. 90 at 51; Ex. 15 at 37; Ex. 91 at 38; Ex. 92 at 44.
- Maxim granted, or generally granted, options at prices not less than the fair market value of its common stock on the grant date. Ex. 89 at 73; Ex. 114 at 488; Ex. 90 at 60-61; Ex. 15 at 46; Ex. 91 at 45; Ex. 92 at 53.
- Maxim was not required to record compensation expenses in connection with stock option grants to employees. Ex. 91 at 13.

Jasper also reviewed, commented on, signed, and certified Maxim's quarterly reports on Form 10-Q during its fiscal years 2003 through 2005, which like the annual reports omitted millions of dollars in expenses for backdated options and thus overstated Maxim's operating income. Ex. 93 at 3-5, 22, 24; Ex. 94 at 3-5, 23, 25, & Ex. 99.2; Ex. 95 at 3-5, 26, 28, & Ex. 99.2; Ex. 96 at 3-5, 22, 24, & 26; Ex. 97 at 3-5, 23, & Exs. 31.2 & 32.2; Ex. 98 at 3-5, 22, 24, & 26; Ex. 99 at 3-5, 21, & Exs. 31.2 & 32.2; Ex. 100 at 3-5, 24, & Exs. 31.2 & 32.2; Ex. 101 at 3-5, 24, & Exs. 31.2 & 32.2; Caron Tr. at 189:24-191:12; Ex. I at 25 & 27 (detailing quarterly understatements of expenses). Beginning with the Form 10-Q for the third quarter of fiscal 2003, the quarterly reports falsely stated that Maxim accounted for its stock option plans in accordance with APB 25. *See* Exs. 95-101 at 6-7.

In addition, Jasper drafted or reviewed Maxim's 2004 and 2005 proxy statements filed with the Commission. Gilbert Tr. at 36:25-37:4; Exs. J at 55 & K at 68 (allowing investors to appoint Jasper as their proxy); Ex. A at Slide 22 (directing investors to obtain the proxy from Jasper). But, as Jasper understood, Maxim's proxy statements made materially false representations about Maxim's stock option grants. For example, Maxim's 2004 proxy statement requested shareholders approve

1   additional shares for its option plan, and stated falsely that the Company's plan was "managed for the

2   best interests of the stockholders" in part because "[a]ll of Maxim's options are granted at fair market

3   value." Bergman Tr. at 18:21-19:12, 26:22-27:22; Ex. 1 at MXIM-SEC 994; Ex. J at 6; *see also* Ex.

4   A at Appendix Script re Slide 3.  Maxim's October 7, 2005 proxy statement, which also requested

5   shareholders approve more shares for the option plan, similarly misrepresented that the plan was

6   "managed for the best interest of the stockholders" because "Maxim's stock options have always

7   been granted with an exercise price equal to the fair market value of Maxim's stock."  Bergman Tr. at

8   30:16-31:17, 33:24-34:19; Ex. 2 at MXIM-SEC1034; Ex. K at 5.[11]

9        Furthermore, Jasper reviewed and signed Maxim's current reports on Form 8-K during fiscal

10  years 2003 though 2005 announcing Maxim's financial results. Exs. 102-110; Caron Tr. at 192:13-

11  193:20.  As Jasper understood, these current reports, like the quarterly and annual reports Maxim

12  ultimately filed, were materially false and misleading because Maxim recorded no expense for its

13  undisclosed in-the-money option grants. *Id.*  Finally, Jasper signed Maxim's registration statements

14  on Forms S-8, which incorporated Maxim's false and misleading financial statements. Exs. 111-113.

15        **F.    Jasper Misled Maxim's Auditor and Board**

16        In addition to lying to Maxim's shareholders about Maxim's backdating practice, Jasper lied

17  to Maxim's outside auditor, Ernst & Young. As part of its audits of Maxim's fiscal 2003 and 2004

18  financial statements, Ernst & Young required Jasper to sign management representation letters

19  stating, among other things, that Maxim's fiscal 2003 and 2004 financial statements were fairly

20  presented in conformity with GAAP, that no material transaction had been improperly recorded in the

21  accounting records underlying the financial statements, and that he knew of no fraud affecting

22  management with significant roles in Maxim's internal controls. Ex. 151 at MXIM-SEC30505, 06,

23  _____

24  [11]    Jasper monitored how Maxim shareholders voted on proposals in proxy statements to increase
     the authorized number of options Maxim could award. *See, e.g.*, Exs. 24 & 73; Schneider Decl. ¶¶ 2-
25  3, 15, 36; Malae Tr. at 78:15-83:14. One of Maxim's largest shareholders, Capital Research,
     maintained written policies stating it negatively viewed option plans and generally voted *against*
26  plans allowing in-the-money options. Chapman Tr. at 27:2-12, 29:12-32:22, 37:16-38:16, 39:22-
     41:13; Ex. 235; Ex. J at 4. ISS, a leading corporate governance research firm that provides proxy
27  advising services, recommended shareholders support proxy proposals that firms expense at-the-
28  money options. Carter Tr. at 16:10-15, 66:1-70:5; Ex. 225.

1  & 10; Ex. 152 at EY8413, 415, & 418; Caron Tr. at 199:5-200:2; Portnoy Tr. at 149:2-153:11. These

2  representations were false. Jasper never disclosed to Ernst & Young that it was using hindsight to

3  price options; had Jasper done so, it would have affected Ernst & Young's opinion that Maxim's

4  financial statements conformed with GAAP. Portnoy Tr. at 157:21-160:12.

5       Jasper also repeatedly lied to Maxim's Board about Maxim's stock option granting process.

6  First, in 2004, Jasper separately told two Maxim Board members that Maxim did not backdate option

7  grants and if it did, it would need to record an expense. Ex. 7 & 8; Hagopian Tr. at 128:14-129:19,

8  138:8-139:7, 143:5-144:13, 146:16-147:6; Bergman Tr. at 65:14-67:23, 70:1-5, 74:23-77:21.

9  Second, in 2006, after news reports of possible options backdating at technology companies surfaced,

10  Jasper again concealed the backdating scheme. Despite the fact that Jasper had direct knowledge of

11  numerous backdated grants, he "assured [a Maxim board member] in no uncertain terms that Maxim

12  has *never* backdated any option grants to either officers or rank and file employees." Exs. 9 & 10;

13  Hagopian Tr. at 145:15-153:1, 155:6-156:18.

14      **G.**    **Maxim's $838 Million Restatement**

15       On May 22, 2006, an equity analyst published a report entitled "Options Pricing – Hindsight

16  is 20/20" noting that the timing of options pricing for certain semiconductor companies (including

17  Maxim) had been very advantageous. Ex. L. That day, Maxim's stock price declined to $31.56 from

18  the previous day's closing of $32.97, a decline of $1.41 or 4.28%. Ex. M ¶ 87. This decline was

19  statistically significant. *Id.* ¶ 84. Maxim formed a special committee of its directors to investigate its

20  stock-option practices. Ex. N. On September 8, 2006, Maxim reported that it would be unable to

21  timely file its annual report on Form 10-K because of the ongoing investigation. *Id.* By the end of

22  the trading day, Maxim's stock price declined to $28.56 from the previous day's close of $29.20, a

23  statistically significant decline of $0.64 or 2.19%. Ex. M ¶ 87-88.

24       On January 17, 2008, Maxim confirmed that it needed to restate its financial statements to

25  record additional stock-based compensation charges and, for the first time, disclosed its preliminary

26  conclusions regarding the restatement. Exs. O & M ¶¶ 94-100. Maxim reported that it expected to

27  restate financial statements from fiscal 1997 through fiscal 2005 and interim periods through March

28  25, 2006, and to record additional expenses ranging from $550 to $650 million on a pre-tax basis. *Id.*

1   Maxim also announced that its restatement would take much longer than expected. *Id.* That day,

2   Maxim's stock price declined to $20.80 from $23.63, a decline of $2.83 or 11.98%. This decline too

3   was statistically significant. *Id.*

4        Finally, on September 30, 2008, more than 28 months after forming a special committee to

5   investigate its option granting practices, Maxim filed its restated financial restatements.[12] Almost ten

6   years of financial results were restated or adjusted. Maxim recorded an additional $838.3 million

7   charge to pre-tax income, including a pre-tax charge for stock-based compensation expense totaling

8   $773.5 million. Exs. Q & H. The filing included management's report on internal control over

9   financial reporting, which concluded, among other things, that two material weaknesses existed in

10  Maxim's internal control over financial reporting as of June 24, 2006, due to the effect of not

11  maintaining an effective control environment and, separately, not maintaining effective controls over

12  stock option practices and the related accounting for stock option transactions. Ex. H at 69-75.

13  Maxim's new outside auditor, Deloitte & Touche, audited management's assessment and opined that

14  because of these material weaknesses, Maxim did not maintain effective control over financial

15  reporting as of June 2006. *Id.*

16      **H.**    **Jasper's Refusal to Respond to Discovery**

17       For over two years, Jasper has rebuffed the Commission's efforts to obtain information from

18  him about his participation in the backdating scheme. During the Commission's investigation, Jasper

19  declined to answer substantive questions based on his Fifth Amendment right against compelled self-

20  incrimination. First Amended Compl. ¶ 9; Answer ¶ 9. During the course of this litigation, between

21  May 2008 and August 2009, Jasper refused to provide substantive answers to three sets of written

22  interrogatories and requests for admission propounded by the Commission. Exs. R-T & U-W.

23       Jasper also declined to answer anything but routine background questions at his deposition in

24  September 2008, invoking the Fifth Amendment on all questions relating to his knowledge of the

25  backdating, the accounting rules, and Maxim's SEC filings. *See generally* Jasper Tr. For example,

26  Jasper refused to answer questions such as:

27  _____

28  [12]    Maxim's stock was delisted from NASDAQ because of the delay in the restatement. Ex. P.



Jasper declined to ███████████████. *See, e.g.*, Jasper Tr. at 26:19-27:16

(████████████████████████████████████████████);

*id.* at 37:14-39:6, 42:25-44:8, 49:4-53:8. 73:7-75:21 (███████████████████

███████); *id.* at 58:20-61:17, 61:24-62:25 (███████████████████

███████); Exs. U & W.

On the night of the October 1, 2009 discovery cut-off, Jasper again invoked the Fifth

Amendment.  Exs. X & Y.

## IV.  ARGUMENT

### A.  Summary Judgment Should Be Granted When There Is No Genuine Issue for Trial

Summary judgment should be rendered "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).  Summary

judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part

of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R.

Civ. Proc. 1).  Once the moving party has identified portions of the record that show the absence of a

genuine issue of material fact, the opposing party has the burden to controvert that showing.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The opposing party

1   cannot rely "merely on allegations or denials," but must, by affidavit or otherwise, "set out specific

2   facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment

3   should, if appropriate, be entered against that party." Fed. R. Civ. Proc. 56(e). If "the record taken as

4   a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

5   issue for trial.'" *Matsushita*, 475 U.S. at 587.

6        Rule 56(d) also provides that, if summary judgment is not rendered on the whole action, the

7   Court should, to the extent practicable, determine what material facts are not genuinely at issue.

8   After examining the pleadings and evidence before it and interrogating the attorneys, the Court

9   should "issue an order specifying what facts . . . are not genuinely at issue. The facts so specified

10  must be treated as established in the action." Fed. R. Civ. Proc. 56(d)(1).

11       In this case, the evidentiary record submitted by the Commission establishes that there is no

12  genuine issue of material fact and that Jasper committed the violations alleged against him. Thus, the

13  Court should grant summary judgment. In the alternative, the Court should issue an order specifying

14  what facts are not genuinely at issue.[13]

15       **B.      Jasper Committed the Securities Law Violations Alleged Against Him**

16            **1.      Jasper Committed Securities Fraud**

17       Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5

18  thereunder prohibit material misstatements or omissions made with scienter in connection with the

19  purchase or sale, or in the offer or sale, of any security. *See* 15 U.S.C. § 77q(a) (prohibiting fraud

20  in the offer or sale of securities); 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5 (prohibiting fraud in

21  connection with the purchase or sale of securities); *Ponce v. SEC*, 345 F.3d 722, 729 (9th Cir.

22  2003).[14] These elements are satisfied here.

23  _____

24  [13]     In its prayer, the Commission seeks injunctive relief, forfeiture of bonuses and stock sales
    under Sarbanes-Oxley Act Section 304 (15 U.S.C. § 7243), disgorgement with pre-judgment interest,

25  civil penalties, and an officer-and-director bar. The Commission requests that these remedies be
    determined by the Court in subsequent proceedings. *See SEC v. M&A West Inc.*, 538 F.3d 1043 (9th

26  Cir. 2008) (affirming summary judgment but remanding for proceedings on remedies).

27  [14]     The Commission's third claim for relief alleges violations of Section 17(a)(2) and 17(a)(3) of
    the Securities Act, 15 U.S.C. § 77q(a)(2) and (a)(3). The Commission need not prove scienter for

28  this claim. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

1    Jasper repeatedly made false statements to investors. Maxim's annual, quarterly, and
2  current reports falsely stated that Maxim recorded stock option expenses in accordance with APB
3  25 and that it granted only at-the-money options. In truth, Maxim flouted APB 25, routinely
4  granted in-the-money options disguised through backdating as at-the-money options, and omitted
5  hundreds of millions in expenses required by GAAP. As the CFO who reviewed, signed, and
6  certified these filings, Jasper is primarily liable for them. *Howard v. Everex Sys., Inc.*, 228 F.3d
7  1057, 1061-62 (9th Cir. 2000) (§ 10(b) liability extends to those who sign false SEC filings).

8    Overwhelming evidence also demonstrates Jasper acted with scienter – i.e., that he knew or
9  was reckless in not knowing his representations were false. Scienter is "a mental state embracing
10  intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12
11  (1976). Recklessness satisfies the scienter element. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564,
12  1568-59 (9th Cir. 1990) (en banc). Here, documentary evidence shows that Jasper not only knew
13  about Maxim's backdating practice, but actively participated in it. On multiple occasions, over many
14  years, Jasper suggested historical low prices to Maxim's CEO. *See, e.g.*, Ex. 115 (Jasper writing in
15  late August "[t]he best price is the first day of the quarter – June 30, 2003"); Ex. 81 (urging CEO in
16  February 2003 to grant an option dated October "so that [the employee] gets a favorable price").
17  Jasper's subordinates Shelia Raymond and Sandy Wong testified that the stock administration
18  department Jasper ran was backdating for as long as they could remember, and in Raymond's words:
19  "Carl knew what was happening." Raymond Tr. at 224:12-226:7 & Ex. 174. There is no doubt
20  Jasper knew the accounting rules required Maxim to expense in-the-money options; numerous
21  witnesses and documents attest to his knowledge. *See infra* III.D. Finally, when confronted about
22  backdating, Jasper lied to the Board, insisting in "no uncertain terms" that Maxim had *never*
23  backdated. Such false exculpatory statements are evidence of Jasper's consciousness of guilt and
24  have independent probative value of scienter. *United States v. Newman*, 6 F.3d 623, 628-29 (9th Cir.
25  1993); *SEC v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990).
26    Jasper, moreover, was no ordinary Maxim employee. He was the Principal Accounting
27  Officer and Chief Financial Officer of a billion-dollar public company, with decades of experience as
28

1    a Certified Public Accountant.  The Ninth Circuit recently emphasized the significant role a CFO like

2    Jasper plays:

3            [The defendant] was no ordinary [public company] employee.  He served
         as the public company's CFO – the senior corporate executive charged with
         primary responsibility for [the company's] financial affairs.  This was a
4        sophisticated corporate enterprise with billions of dollars in sales worldwide . . . .
         The duties undertaken by [the CFO] broadly encompassed not only accurately and
5        completely reporting the company's historical and current stock option granting
         practices, but also [the company's] strict compliance with reporting and record
6        keeping requirements imposed through the Securities Exchange Act of 1934 and
         the Sarbanes-Oxley Act of 2002, among many other federal and state rules and
7        regulations. As the head of finance, [the CFO] cannot now credibly claim
         ignorance of the general disclosure requirements imposed on a publicly traded
8        company with respect to its outside auditors or the need to truthfully report
         corporate information to the SEC.
9

10   *United States v. Ruehle*, __ F.3d __ (9th Cir. Sept. 30, 2009) (citation omitted).

11           Jasper's misrepresentations and omissions were material.  Information is material if there is a

12   substantial likelihood that a reasonable shareholder would consider it important – i.e., that a

13   reasonable investor would have viewed disclosure of the misstated or omitted fact as significantly

14   altering the "total mix" of information available. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

15   (1988).  As the Ninth Circuit has long stated, "[s]urely the materiality of information relating to [a

16   company's] financial condition, solvency and profitability is not subject to serious challenge." *See*

17   *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).  Jasper's backdating scheme resulted in the

18   omission of hundreds of millions of dollars in expenses and caused Maxim's annual reports to

19   overstate annual net income, the company's bottom line.  Numerous courts have underscored the

20   significance of net income to investors. *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830

21   (8th Cir. 2003) ("Most investors would consider it significant, no matter what the mix of information

22   available, that a company was not earning as much as it was claiming to earn."); *In re Burlington*

23   *Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997) (Alito, J.) ("[E]arnings reports are

24   among the pieces of data that investors find most relevant to their investment decisions. . . .

25   Information concerning the firm's current and past earnings is likely to be relevant in predicting what

26   future earnings might be.  Thus, information about a company's past and current earnings is likely to

27   be highly 'material.'" (citations omitted)); *SEC v Koenig*, 2007 WL 1074901, at *4 (N.D. Ill. Apr. 5,

28

1  2007) ("A GAAP violation is presumptively a false or misleading statement of material fact under

2  Rule 10b-5.").

3      The stock price reaction to news revealing Maxim's backdating practice further demonstrates

4  materiality. *See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (stock price drop is a

5  factor relevant to materiality); *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 15-16 (2d Cir. 1977); *United*

6  *States v. Ferguson*, 553·F. Supp. 2d 145, 152-53, 156-57 (D. Conn. 2008).[15] Here, Maxim's stock

7  price declined in statistically significant amounts in response to initial revelations of backdating, the

8  delay in the 10-K due to Maxim's options backdating investigation, and the first disclosure of the size

9  of the restatement.

10     Jasper's willingness to misstate Maxim's financial statements in violation of GAAP and SEC

11  requirements also reflected negatively on management's integrity and thus rendered the

12  misstatements material. *See Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1045 (9th Cir.

13  1982) ("[V]iolations of securities statutes and regulations may have a direct bearing on managerial

14  integrity."); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 771 (11th Cir. 2007) ("[A] reasonable

15  investor . . . is naturally interested in whether management is following the law in marketing the

16  securities."); *Gebhardt*, 335 F.3d at 830 ("Management's integrity would probably be important to

17  investors.").[16]

---

18  [15]     *See also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding*

19  *Corp.*, 320 F.3d 920, 948-949 (9th Cir. 2003) (Tallman, J., dissenting) ("Stock price changes . . . are
    also relevant to the determination of materiality. . . . The *Basic* materiality test asks what a

20  reasonable investor would consider significant; the market demonstrates the reactions of reasonable
    investors. At a minimum, the static or dynamic nature of a stock price after the disclosure of

21  previously withheld information is strong evidence of how reasonable investors view the significance

22  of the information.").

23  [16]     *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 139 (S.D.N.Y. 2008) (finding
    materiality in stock option backdating case and reasoning the CEO's personal certification of "the

24  false statements . . . can be seen as 'impugn[ing] the integrity of management,' which in itself [is]
    material to investors") (quoting *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 151-52

25  (E.D.N.Y. 2008)) (alteration in original); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 978 (N.D.
    Ill. 2006) ("If a company's leaders knowingly misrepresented their earnings, investors may

26  reasonably question the integrity of the company's management, and thus cause an alleged
    misstatement or omission to be material."); *Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, at *8

27  (N.D. Cal. Apr. 17, 2007) ("The integrity of management is always of importance to investors. That

28  a fiduciary has been misappropriating the common fund – even in small amounts – would be
    Footnote continued on next page

1    One of Maxim's largest shareholders had express written policies disapproving of in-the-

2 money options and indicating it generally voted against proposals allowing in-the-money options. A

3 leading corporate governance firm took a similar position. *See infra* n.11. Before invoking the Fifth

4 Amendment, Jasper himself acknowledged that expensing at-the-money options could have a

5 material adverse impact on Maxim's ability to attract, retain, and motivate employees and on its

6 financial condition. Ex. 91 at 8 & 13-14. He suggested changing accounting firms when Ernst &

7 Young publicly advocated changes in the accounting rules requiring expensing of at-the-money

8 options. Ex. 71. Moreover, his efforts to backdate documents to avoid the expense speaks volumes

9 that he and Maxim believed the expense to be significant to investors. *See United States v. Reyes*,

10 2007 WL 2288120, at *4 (N.D. Cal. Aug. 7, 2007) (noting materiality could be inferred from

11 management's belief and actions); *Ferguson*, 553 F. Supp. 2d at 153; *SEC v. Adler*, 137 F.3d 1325,

12 1340-41 (11th Cir. 1998); *SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir. 1974).

13    Finally, Jasper's misstatements and omissions, contained in periodic filings with the

14 Commission, registration statements, and press releases, were made in connection with the purchase

15 and sale, and in the offer and sale, of securities. *See McGann v. Ernst & Young*, 102 F.3d 390, 397

16 (9th Cir. 1996) ("Fraudulent Forms 10-K . . . fall within the ambit of § 10(b)."); *SEC v. Rana*

17 *Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (§ 10(b) liability extends to a document like a press

18 release on which an investor would presumably rely); *SEC v. Wolfson*, 539 F.3d 1249, 1263-64 (10th

19 Cir. 2008).

20    **2.    Jasper Aided and Abetted Maxim's Violations of the Periodic**
      **Reporting Provisions**

21

22    Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder require

23 public companies to file with the Commission accurate annual, quarterly, and current reports. 15

24 U.S.C. § 78m(a) & 17 C.F.R. §§ 240.13a-1, 240.13a-11, & 240.13a-13; *see SEC v. Falstaff Brewing*

25 *Corp.*, 629 F.2d 62, 72 (D.C. Cir. 1980). Rule 12b-20 similarly requires that these reports contain

26 any material information necessary to make the requisite statements made in the reports not

27 _____

important to investors, for the next misappropriation or defalcation could be larger.  Intentional

28 misappropriation would always be a red flag, a negative risk factor of material interest to investors.").

1  misleading. 17 C.F.R. § 240.12b-20. Section 13(a) does not require proof of scienter. *See SEC v.*

2  *McNulty*, 137 F.3d 732, 740-741 (2d Cir. 1998).

3      Aiding and abetting liability is established by (1) an independent primary violation; (2)

4  knowledge by the aider and abettor of the primary violation and of his role in furthering it; and (3)

5  "substantial assistance." *See SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996).

6      Maxim violated these provisions by filing with the Commission false and misleading annual,

7  quarterly, and current reports. These reports falsely stated that Maxim recorded stock option

8  expenses in accordance with APB 25 and granted only at-the-money options. They also significantly

9  overstated Maxim's net income. Maxim ultimately restated its false and misleading filings. As

10  demonstrated above, *see infra* IV.B.1, Jasper knew the reports were false and misleading. He

11  provided substantial assistance to Maxim's violations by reviewing, signing, and certifying the false

12  and misleading filings. *Cf. Fehn*, 97 F.3d at 1293-94.

13      **3.   Jasper Falsified Maxim's Books and Records and Aided and Abetted**
14                   **Maxim's Books-and-Records Violations**

15      Exchange Act Section 13(b)(2)(A) requires public companies to "make and keep books,

16  records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions . . . of

17  the issuer." Scienter is not required for a Section 13(b)(2)(A) violation. *McNulty*, 137 F.3d at 740-

18  741; *Ponce*, 345 F.3d at 737; *SEC v. World-Wide Coin Inv., Ltd.*, 567 F. Supp. 724, 749 & 751 (N.D.

19  Ga. 1983).

20      Section 13(b)(5) of the Exchange Act prohibits persons from knowingly falsifying books and

21  records subject to Section 13(b)(2)(A). 15 U.S.C. § 78m(b)(5). In addition, Rule 13b2-1 contains a

22  separate prohibition on falsifying books and records. It provides: "No person shall, directly or

23  indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A)

24  of the Exchange Act." 17 C.F.R. § 240.13b2-1. Scienter is not required for a Rule 13b2-1 violation.

25  *Ponce*, 345 F.3d at 737 n.10 ("a plain reading of Section 13(b) reveals that it also does not impose a

26  scienter requirement"); Promotion of the Reliability of Financial Information and Prevention of the

27  Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release

28  No. 15570, 44 Fed. Reg. 10964, 10968 (Feb. 15, 1979) ("Adopting Release") ("[T]he Commission

1    has determined that a '*scienter*' requirement should not be included in the Rule."); *SEC v. Softpoint,*

2    *Inc.*, 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997) (Sotomayor, J.).

3         Jasper violated Section 13(b)(5) and Rule 13b2-1, and aided and abetted Maxim's violations

4    of Section 13(b)(2)(A).  As described above, Jasper signed, reviewed, and certified numerous false

5    SEC filings that omitted hundreds of millions in expenses.  He prepared backdated paperwork for

6    Maxim's CEO, *see e.g.*, Exs. 31, 34, 36, 52, & 59, and he assisted the CEO in selecting with

7    hindsight grant dates corresponding to low points in the stock price, knowing that the grants would be

8    recorded in the books as at-the-money grants and that no expense was recorded, *see infra* p. III.C.

9              **4.    Jasper Aided and Abetted Maxim's Internal Control Violations**

10        Section 13(b)(2)(B) requires public companies to devise and maintain an adequate system of

11    internal accounting controls.  Maxim has admitted it violated these provisions.  *See* Ex. H at 69-75

12    (disclosing material weaknesses in its internal controls).  Jasper aided and abetted Maxim's

13    violations.[17]  Jasper admitted he was responsible for Maxim's internal controls.  *See infra* n.4.

14    Maxim's deficient internal controls resulted in hundreds of millions of omitted expenses and the

15    firm's delisting from NASDAQ.  Jasper knew that Maxim was backdating and not recording the

16    requisite expense.  *See infra* III.C-E.  For these reasons, liability on the Commission's internal

17    controls claims is established.

18              **5.    Jasper Lied to Maxim's Auditor**

19        Exchange Act Rule 13b2-2 prohibits public company officers from making false or

20    misleading statements to accountants in connection with audits, reviews, or examinations of financial

21    statements or the preparation or filing of SEC documents or reports.  17 C.F.R. § 240.13b2-2.

22    Scienter is not an element of a Rule 13b2-2 claim.  *See Ponce*, 345 F.3d at 737 n.10; *Softpoint*, 958 F.

23    Supp. at 865-66; Adopting Release at 10969-70.

24        The facts show Jasper made false and misleading statements to Maxim's outside auditor.  In

25    representation letters to Ernst & Young, Jasper stated that Maxim's financial statements were fairly

26

27    _____

    [17]    Jasper is also directly liable under Section 13(b)(5), which prohibits persons from knowingly
28    circumventing or failing to implement an adequate system of internal controls. 15 U.S.C. §78m(b)(5).

1 | stated in conformity with GAAP. *See* Exs. 151-152. They were not. Jasper thus violated the Rule.

2 |       **6. Jasper Falsely Certified Maxim's Periodic Reports with the Commission**

3 |       Exchange Act Rule 13a-14 requires annual and quarterly reports filed with the Commission to

4 | include certifications by the CEO and CFO that, among other things, the reports include no material

5 | misstatements and omit no material information. 17 C.F.R. § 240.13a-14. Jasper violated these

6 | provisions by falsely certifying that Maxim's annual and quarterly reports fairly stated Maxim's

7 | financial condition.

8 |       **7. Jasper Committed Proxy Fraud Violations**

9 |       Exchange Act Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits

10 | materially false or misleading statements or omissions in proxy statements. 15 U.S.C. § 78n(a); 17

11 | C.F.R. § 240.14a-9. "There is no required state of mind for a violation of section 14(a); a proxy

12 | solicitation that contains a misleading misrepresentation or omission violates the section even if the

13 | issuer believed in perfect good faith that there was nothing misleading in the proxy materials." *Beck*

14 | *v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). The materiality standard is the same as that for

15 | Section 10(b) claims. *See Basic*, 485 U.S. at 231-32.

16 |       Jasper is liable on the Commission's proxy claim. Maxim's 2004 and 2005 proxy statements,

17 | which Jasper reviewed, falsely assured investors asked to approve Maxim's stock option plans that

18 | Maxim only granted at-the-money options. In fact, Maxim's routine practice was to grant backdated

19 | in-the-money options. These misstatements were material. *See infra* IV.B.1.

20 |     **C. Summary Judgment Is Particularly Appropriate Because the Court Should Draw
         Adverse Inferences from Jasper's Refusal to Testify and Preclude Him from**

21 |          **Testifying at Trial**

22 |       There are additional reasons why summary judgment is warranted. In response to the

23 | overwhelming evidence of liability, Jasper has chosen not to respond. This choice has consequences

24 | in this civil litigation.

25 |       When a party in a civil proceeding invokes the Fifth Amendment and refuses to testify, a

26 | district court is "free to draw adverse inferences from [his] failure of proof." *SEC v. Colello*, 139

27 | F.3d 674, 677 (9th Cir. 1998) (affirming summary judgment against a silent party); *see, e.g., Baxter*

28 | *v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse

1   inferences against parties to civil actions when they refuse to testify in response to probative evidence

2   offered against them . . . ."). The inference may be drawn if there is a substantial need for the

3   information, there is not another less burdensome way of obtaining it, and there is independent

4   evidence of the fact about which the party refuses to testify. *See Nationwide Life Ins. Co. v.*

5   *Richards*, 541 F.3d 903, 911-12 (9th Cir. 2008) (affirming district court decision to draw inference

6   where defendant refused to answer questions going "to the central question in [the] case").

7        In this case, Jasper failed to provide any substantive response to discovery. He asserted the

8   Fifth Amendment and provided no substantive response to the SEC's questions at deposition and

9   written discovery. *Infra* III.H. & Exs. R-Y. The Court should therefore draw an adverse inference

10   from Jasper's refusal to testify. Jasper's first-hand recollection of Maxim's backdating practice, the

11   need to expense in-the-money options, Maxim's public filings, Maxim's communications with

12   investors, and Maxim's view of expensing options go directly to the central questions in this case,

13   and thus there is a substantial need for the information. *Cf. Nationwide*, 541 F.3d at 911-13. There is

14   substantial independent evidence of Jasper's fraudulent conduct, particularly his scienter. Documents

15   and testimony demonstrate Jasper knew an expense was required for in-the-money options, yet

16   repeatedly suggested to Maxim's CEO that the company backdate options. Documents and

17   testimony also show Jasper knew Maxim's CEO was selecting certain grant dates with hindsight.

18   Jasper also swore he read Maxim's annual and quarterly reports, which omitted the required expense

19   and falsely assured investors Maxim had granted no in-the-money options. The adverse inference is

20   yet another reason why, on this record, no rational trier of fact could find in favor of Jasper.

21        Jasper also should not be permitted to present evidence in opposition to summary judgment or

22   testify at trial. "Trial courts generally will not permit a party to invoke the privilege against self-

23   incrimination with respect to deposition questions and then later testify about the same subject matter

24   at trial." *Nationwide*, 541 F.3d at 910. In a civil case, a defendant "cannot have it both ways. By

25   hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to

26   prove them . . . forfeit[ing] the right to offer evidence disputing the plaintiff's evidence or supporting

27   his own denials." *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987), *cited in SEC v. Colello*,

28

1    139 F.3d 674 (9th Cir. 1998).[18] By completely stonewalling in response to discovery and providing

2    no information that the SEC sought to help develop the case, Jasper has given up the right to testify.

3    The SEC's evidence thus stands unrebutted, and with Jasper unable to present new evidence at trial,

4    judgment is appropriate now.

5    **V.    CONCLUSION**

6        The Court should grant summary judgment and find Jasper liable for the securities law

7    violations alleged against him. If summary judgment is not rendered on the whole action, the Court

8    should, to the extent practicable, determine what material facts are not genuinely at issue.

9    Dated: October 5, 2009           Respectfully Submitted,

10

11                                         /s/   Robert S. Leach

12                                         Robert S. Leach

13                                         Attorney for Plaintiff
                                           SECURITIES AND EXCHANGE COMMISSION

14

15

16

17

18

—————————

19    [18]      In awarding summary judgment to the SEC, numerous courts have prohibited defendants who invoked the Fifth Amendment from presenting evidence in opposition. *See, e.g., SEC v. Merrill Scott*

20    *& Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1209-12 (D. Utah 2007) (striking sworn discovery responses for purposes of summary judgment based on defendant's prior assertion of privilege); *SEC v. Global*

21    *Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109-11 (D. Conn. 2004) (declining to consider SEC investigative testimony where defendant asserted Fifth Amendment during deposition); *Softpoint,* 958

22    F. Supp. at 855-59 (precluding defendant from offering testimony in opposition to summary judgment), *aff'd*, 159 F.3d 1348 (2d Cir. 1998); *SEC v. Grossman*, 887 F. Supp. 649, 660 (S.D.N.Y.

23    1995) (having exercised the Fifth Amendment privilege defendants "cannot now complain that they are precluded from offering evidence on the very issues for which they have declined to provide

24    discovery for several years"); *SEC v. Interlink Data Network of Los Angeles, Inc.*, 1993 WL 603274, at *7-8 & n.97 (C.D. Cal. Nov. 15, 1993); *see also United States v. 4003-4005 5th Ave., Brooklyn,*

25    *NY*, 55 F.3d 78, 80 (2d Cir. 1995) ("[T]he District Court did not exceed its discretion when it barred [claimant] from testifying as to matters covered by his prior Fifth Amendment claim."); *SEC v.*

26    *Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (precluding defendant from offering evidence at trial that he had withheld on Fifth Amendment grounds); *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545,

27    550 (S.D.N.Y. 1985).

28