# Exhibit 26

Page 1

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4                            ---o0o---

5     SECURITIES AND EXCHANGE          )

6     COMMISSION,                      )

7             Plaintiff,               )

8       vs.                            ) No. C-07-6122-JW

9     CARL W. JASPER,                  )

10            Defendant.               ) Volume I

11    _____   )

12

13

14              VIDEOTAPE DEPOSITION OF ANDREW COOK

15                   FRIDAY, JUNE 5, 2009

16

17

18

19

20

21

22

23

24

25    PAGES 1 - 127

1

2

3

4

5

6

7

8           Videotaped Deposition of ANDREW COOK, taken on

9      behalf of Defendant, at Latham & Watkins, 140 Scott

10     Drive, Menlo Park, California, commencing at 9:54 a.m.,

11     Friday, June 5, 2009, before Kelli Combs, CSR 7705.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1     APPEARANCE OF COUNSEL:

 2

 3     FOR PLAINTIFF:

 4              SECURITIES AND EXCHANGE COMMISSION

 5              BY:  MARK P. FICKES, ESQ.

 6              ERIN E. SCHNEIDER, ESQ.

 7              44 Montgomery Street, Suite 1100

 8              San Francisco, California 94104

 9              (415) 705-8103

10              fickesm@sec.gov

11     FOR DEFENDANT CARL JASPER:

12              LATHAM & WATKINS

13              BY:  RISHA N. JAMISON, ESQ.

14              505 Montgomery Street, Suite 1900

15              San Francisco, California 94111-2562

16              (415) 391-0600

17              risha.jamison@lw.com

18     FOR NONPARTY MAXIM INTEGRATED PRODUCTS:

19              QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP

20              BY:  PATRICK DOOLITTLE, ESQ.

21              50 California Street, 22nd Floor

22              San Francisco, California 94111

23              (415) 875-6600

24              patrickdoolittle@quinnemanuel.com

25
```

1    APPEARANCES OF COUNSEL CONTINUED:

2

3    FOR NONPARTY MAXIM INTEGRATED PRODUCTS IN CLASS ACTION:

4            WEIL, GOTSHAL & MANGES, LLP

5            BY:  LAVELL MALLOY, ESQ.

6            767 Fifth Avenue

7            New York, New York 10153-0119

8            (212) 310-8709

9            lavell.malloy@weil.com

10

11        Also present: Arik Kerhoulas, Videographer

12        Matt MacDonald, Summer Associate with Quinn

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52

| | | |
|---|---|---|
| 1 | MS. JAMISON:  Are you good? | 10:59:35AM |
| 2 | THE WITNESS:  Uh-huh. | |
| 3 | MS. JAMISON:  Okay. | |
| 4 | BY MS. JAMISON: | |
| 5 | Q    You said earlier that you collected | 10:59:41AM |
| 6 | documents in connection with an internal | |
| 7 | investigation and that you collected documents from | |
| 8 | Mr. Gifford's files; is that correct? | |
| 9 | A    I collected documents, yes. | |
| 10 | Q    Okay. | 10:59:58AM |
| 11 | This is previously marked Exhibit 16. | |
| 12 | Have you ever seen this document? | |
| 13 | A    I don't recall. | |
| 14 | Q    Okay.  I'm done with that. | |
| 15 | Let me show you exhibit -- | 11:00:41AM |
| 16 | previously-marked Exhibit 22. | |
| 17 | Have you ever seen this document? | |
| 18 | A    Not that I recall. | |
| 19 | Q    Okay.  I'm done with that. | |
| 20 | MS. JAMISON:  I don't believe this one has | 11:01:11AM |
| 21 | been marked. | |
| 22 | (Defendant's Exhibit 135 marked | |
| 23 | for identification.) | |
| 24 | BY MS. JAMISON: | |
| 25 | Q    Do you recall ever seeing this document? | 11:01:37AM |

STATE OF CALIFORNIA      )
                         ) :ss
COUNTY OF SAN FRANCISCO  )

I, KELLI COMBS, CSR NO. 7705, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that the verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 6-16-09

KELLI COMBS, CSR NO. 7705

# Exhibit 27

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5    _____

6    SECURITIES AND EXCHANGE COMMISSION,   )

7                    Plaintiff,            )

8        vs.                               ) No. C-07-6122-JW

9    CARL W. JASPER,                       ) VOLUME I

10                   Defendant.            )

11   _____)

12

13

14       VIDEOTAPED DEPOSITION OF SHEILA RAYMOND

15             TUESDAY, JULY 14, 2009

16

17

18

19

20

21

22

23

24

25   PAGES 1 - 269

1

2

3

4

5

6

7

8          Videotaped Deposition of SHEILA RAYMOND,

9          taken at 44 Montgomery Street, 26th Floor,

10         San Francisco, California, commencing at

11         9:10 a.m., Tuesday, July 14, 2009, before

12         Deborah Lee Lubin, CSR No. 3234, RPR, CRP.

13

14

15

16

17

18

19

20

21

22

23

24

25

1   APPEARANCES OF COUNSEL:

2

3   FOR THE SEC:

4

5       UNITED STATES SECURITIES AND

6       EXCHANGE COMMISSION

7       BY:  MARK FICKES, ESQ.

8            ERIN E. SCHNEIDER, ESQ.

9            ROBERT L. TASHJIAN, ESQ.

10      44 Montgomery Street

11      26th Floor

12      San Francisco, California 94104

13      415.705.8103

14      415.705.2501 (Facsimile)

15      fickesm@sec.gov

16      schneidere@sec.gov

17      tashjianr@sec.gov

18

19

20

21

22

23

24

25

Page 4

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR CARL JASPER:

 4          LATHAM & WATKINS LLP

 5          BY:  STEVEN M. BAUER, ESQ.

 6               DAVID M. FRIEDMAN, ESQ.

 7          505 Montgomery Street

 8          Suite 2000

 9          San Francisco, California 94111-6538

10          415.391.0600

11          415.395.8095 (Facsimile)

12          steve.bauer@lw.com

13          david.friedman@lw.com

14

15    FOR MAXIM INTEGRATED PRODUCTS:

16          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

17          BY:  SCOTT G. LAWSON, ESQ.

18               MICHAEL PORTANOVA, Intern

19          50 California Street

20          22nd Floor

21          San Francisco, California 94111

22          415.875.6600

23          415.875.6700 (Facsimile)

24          scottlawson@quinnemanuel.com

25
```

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR MAXIM INTEGRATED PRODUCTS:

 4         WEIL, GOTSHAL & MANGES LLP

 5         BY:  LAVELL MALLOY, ESQ.

 6         767 Fifth Avenue

 7         New York, New York 10153

 8         212.310.8709

 9         212.310.8007 (Facsimile)

10         lavell.malloy@weil.com

11         (Appeared via telphone)

12

13    FOR THE WITNESS:

14         MORGAN, LEWIS & BOCKIUS LLP

15         BY:  WILLIAM H. KIMBALL, ESQ.

16         One Market Street

17         Spear Street Tower

18         San Francisco, California 94105

19         415.442.1277

20         415.442.1001 (Facsimile)

21         wkimball@morganlewis.com

22

23    ALSO PRESENT:

24         NICK KASIMATIS, Videographer

25
```

1          Q.  Is it true that you don't recall ever

2    receiving an instruction from Gifford to expense any

3    options?

4          A.  I would say it's probably true.

5          Q.  And that Mr. Gifford didn't like to expense    04:20:34PM

6    options, correct?

7          A.  That is correct.

8          Q.  In fact, isn't it true that it was part of

9    his culture not to have any expenses related to

10   options, right?                                          04:20:47PM

11         A.  That is true.

12         Q.  And you understood that, correct?

13         A.  I did.

14         Q.  And as far as you know, Ruehle, Jasper,

15   Rigg, Medlin, all those folks knew that as well?         04:20:56PM

16         A.  Yes.

17         Q.  Did Sandy Wong know that, too?

18         A.  Sandy wasn't -- she didn't really have any

19   -- she wasn't involved in any of that.  She didn't

20   really have an understanding of the expensing rules.     04:21:12PM

21         Q.  When was the first time that you saw this

22   document, including this handwritten note here by

23   Gifford, if you can recall?

24         A.  Well, you know, I am not 100 percent sure

25   I've seen this memo -- this particular memo before.      04:21:30PM

1   STATE OF CALIFORNIA      )

                             )  ss.

2   COUNTY OF SAN FRANCISCO)

3

4        I hereby certify that the witness in the

5   foregoing deposition, SHEILA RAYMOND, was by me duly

6   sworn to testify to the truth, the whole truth and

7   nothing but the truth, in the within-entitled cause;

8   that said deposition was taken at the time and place

9   herein named; that the deposition is a true record of

10  the witness's testimony as reported by me, a duly

11  Certified Shorthand Reporter and a disinterested

12  person, and was thereafter transcribed into

13  typewriting by computer.

14       I further certify that I am not interested in

15  the outcome of said action, nor connected with, nor

16  related to, any of the parties in said action, nor to

17  their respective counsel.

18       IN WITNESS WHEREOF, I have hereunto set my hand

19  and affixed my signature this 24th day of July, 2009.

20

21

22

23  _____

24  DEBORAH LEE LUBIN, CSR No. 3234, RPR, CRP

25

                                                        261

# Exhibit 28

**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111 | TEL: (415) 875-6600 FAX: (415) 875-6700

RECEIVED

SEP 11 2007

SEC San Francisco

September 10, 2007

*Confidential Settlement Communication*
*FOIA Confidential Treatment Requested*[1]

Cary S. Robnett
Assistant Regional Director
United States Securities & Exchange
Commission
44 Montgomery Street, Suite 2600
San Francisco, California 94104

Re:    Maxim Integrated Products

Dear Ms. Robnett:

Thank you and your colleagues again for meeting with us on Wednesday, August 1, 2007 regarding Maxim Integrated Products ("Maxim" or the "Company"), its Special Committee investigation and its ongoing accounting restatement. I write to follow-up regarding some of the questions raised on a call recently with the Staff concerning the remedial measures Maxim has implemented. Specifically, you have asked us to document for the Staff the remedial measures

---

[1]    This letter is a confidential settlement communication pursuant to Federal Rule of Evidence 408. We do not believe that this letter is an "agency record" within the meaning of the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), or under the relevant rules of the Commission, 17 C.F.R. § 200.80 et seq. Accordingly, we believe that it may not be disclosed to third parties without Maxim's prior consent. We respectfully request notice of any demand for this letter made upon the Commission, pursuant to FOIA or otherwise, and request that the Commission deny any such request.

**quinn emanuel urquhart oliver & hedges, llp**

51106/2214936.2

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL (650) 801-5000 FAX (650) 801-5100

SEC 000262

*FOIA Confidential Treatment Requested*

undertaken to date around stock option grants and administration at Maxim.  The following is a description of these remedial measures.

## Maxim's Expanded Investigation and Voluntary Cooperation

As we have discussed, the remedial measures Maxim has instituted resulted from a Special Committee investigation that the Company voluntarily expanded.  Maxim promptly initiated an investigation regarding its stock options program and spared no expense or resource in pursuing that investigation.

Unlike other companies, Maxim commenced a Special Committee investigation almost immediately after being apprised of potential issues concerning the Company's stock option program.  Maxim appointed its Special Committee on June 14, 2006.

The Special Committee engaged a highly reputable law firm and a highly reputable forensic accounting firm as its advisors.  The scope of the Special Committee's investigation was initially focused on grants to officers.  The Company voluntarily and proactively expanded that scope, however, to investigate grants to "rank and file" employees and directors after it noticed some disquieting patterns with respect to such grants.  Later, it voluntarily broadened its scope again to analyze other discrete issues, including the timing of cash exercises by Mr. Gifford, Maxim's former CEO and Chairman of the Board, and the circumstances of a grant to Tim Ruehle, Maxim's former Treasurer.  Accordingly, rather than turn a blind eye, the Company proactively dug deeper.

Throughout the investigation, the Special Committee of Maxim voluntarily provided cooperation with the Staff.  Before its investigation was even over – and before any report had been given to Maxim's Board of Directors – the Special Committee provided binders of "hot documents" to the Staff.  The Special Committee has provided periodic updates to these binders.  Counsel for the Special Committee reported the results of its investigation to the SEC in almost real time; it met in person with the Staff on November 3, 2006, January 3, 2007, February 21, 2007, and June 7 and 21, 2007 to discuss the investigation and the findings of the investigation.  Moreover, we understand Counsel for the Special Committee has had a number of phone calls to clarify issues for the Staff.

The Company also voluntarily provided tens of thousands of pages of documents to the SEC in response to the SEC's voluntary requests for production.  Two members of Maxim's board of directors, Kip Hagopian and Jim Bergman, provided testimony to the SEC.  Maxim also produced four employees, Alan Hale, Dave Caron, Sandy Wong, and Robyn Harris, to provide voluntary testimony.  With respect to each of these interviews, the Company devoted considerable resources to reviewing voluminous materials for the purpose of identifying key documents to be incorporated into witness binders.  The Company provided these witness binders to the Staff in advance of each interview to assist the SEC's questioning and investigation.

51106/2214936.2

2

SEC 000263

*FOIA Confidential Treatment Requested*

The Company's current General Counsel, Charles Rigg, is scheduled to be interviewed either on September 14, 2007 or sometime the week of September 17, 2007. Moreover, we understand that the Staff is currently working with counsel for Maxim's former General Counsel, Tony Gilbert, to schedule an interview. Although the SEC did not request a waiver of the attorney-client privilege, Messrs. Rigg and Gilbert will be allowed to speak freely about Maxim's historical stock option program and the Company will not be asserting privilege with respect to any arguably privileged matter in these interviews. The Company has taken a similar approach with potentially privileged written materials.

## Personnel Changes

### Departure of Jack Gifford

The Company has implemented a number of personnel changes, the most significant of which concerns Mr. Gifford. Mr. Gifford resigned from the Company upon the conclusion of the Special Committee's investigation.

The board of directors struggled with its decision concerning Mr. Gifford. The case against Mr. Gifford was not clear-cut, and the board wrestled with somewhat ambiguous circumstantial evidence. Ultimately, however, the board would not tolerate even the appearance of impropriety, and the relationship with Mr. Gifford has been severed.

### Departure of Carl Jasper

Mr. Jasper is Maxim's former CFO. Mr. Jasper resigned from the Company following the investigation by the Special Committee and the reporting of the Special Committee's findings. The Board of Directors accepted his resignation.

### Tim Ruehle

The Company has asked for the resignation of Mr. Ruehle, Maxim's Treasurer. Barring his resignation, he will be terminated by the Company.

### Sheila Raymond & Sandy Wong

Ms. Raymond was a former Manager of Stock Option Administration. Ms. Raymond has been re-assigned to a new position. Ms. Wong, who worked under Ms. Raymond, is actively looking for a new position within the Company (outside of stock administration).

## Board Changes

Kip Hagopian has become Interim Chairman of the Board. There is now a separation between the CEO and Chairmanship. In the past, the CEO was also the Chairman. Tunc Doluca has joined the Board of Directors.

SEC 000264

*FOIA Confidential Treatment Requested*

The Board has put in place formal corporate governance guidelines. The process of instituting these guidelines started in February 2007 and was completed in May 2007. The Board now has a Nominating Committee and a Corporate Governance Committee. A new Compensation Committee charter was also put in place.

The Company's insider trading policy was also formalized. There is now a formalized pre-clearance policy. Trading activity needs to be cleared through Mark Casper, an in-house counsel, as the compliance officer under the policy.

### Restatement

As we discussed at our meeting, Maxim is presently restating its financial statements, to take account of the errors in accounting for stock option and compensation expenses. We will of course be happy to meet or speak with the Staff further as the restatement proceeds and is finalized.

### Changes in Stock Administration

Stock Option Administration is in the process of being transferred down to a Maxim facility in Dallas. The Company is aggressively trying to add headcount to the department to strengthen it.

### New Practice for Grants to New Employees and Special Recognition Grants (Promotions, etc.)

The Company has substantially modified the way in which it grants equity. The Compensation Committee meets the first Tuesday of every month to grant equity. Company policy is for the auditors to attend these meetings. A list of people (using requests to hire, offer letters, etc.) is compiled by Human Resources. This list is then transmitted to stock administration. Stock administration transmits it to Mark Casper, a Maxim in-house attorney. Mark Casper then transmits it to the Compensation Committee and the auditors. The compilation of this list takes approximately 40 person hours. The Compensation Committee uses that day's close as the price for any equity being granted. Mark Casper then sends an email to the auditors and to stock administration to inform them that the list has been approved. The auditors are directed to review these lists/information in both the quarterly reviews and the annual audits.

### New Practice for Granting Options to Existing Employees

The Interim Option Committee ("IOC") procedure is no longer being used. Equity is granted by the Compensation Committee on an annual basis. The grants can only be made during an open trading window.

SEC 000265

*FOIA Confidential Treatment Requested*

## Practice for Granting Equity to Existing Officers of the Company

The Compensation Committee decides the amount of equity to be granted and grants the equity. Company policy is for the auditors to be present at the Compensation Committee meetings.

## Practice for Granting Equity to Outside Directors

For existing outside directors who are reelected, equity is granted at the annual meeting. For new outside directors, equity is granted at the first regularly-scheduled Compensation Committee meeting (i.e., a Tuesday) after election. Equity is only granted so long as the Company is in an open trading window.

## Aspects of Maxim's Stock Option Practices Have Been Abandoned

Certain aspects of Maxim's stock option practices are no longer being used by the Company. As noted, the "Interim Option Committee" procedure is no longer being used. In addition, the "2-day window" is no longer being used. The part-time employee program is also no longer in practice.

## Compliance Officer

The Company has appointed a Chief Compliance Officer. This officer will work to ensure laws and regulations are being followed. The Company also already has in place an Audit Committee whistleblower hotline.

\* \* \* \* \*

I hope that the information above is useful for your counseling the Commission with regard to Maxim. Please let me know if we can furnish additional information in this regard or on any topic.

Very truly yours,

*John M. Potter/ cw*

John M. Potter

JMP:PD
51106/2214936.2

cc:    Ed Medlin, Esq.

SEC 000266

# Exhibit 29

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4                      ---oOo---

5

6   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
7                                    )
                   Plaintiff,        )
8                                    )      Case No.
         vs.                         )      C-07-6122-JW
9                                    )
    CARL W. JASPER,                  )
10                                   )
                   Defendant.        )
11   _____ )

12

13        PORTIONS OF THIS TRANSCRIPT ARE CONFIDENTIAL

14

15            DEPOSITION OF WALTER F. BROWN, JR.

16                FRIDAY, SEPTEMBER 25, 2009

16

17

18

19

20

21

22

23

24   Pages 1 - 48

25   Pages 24 - 30 and 33 - 36 are Confidential

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10   Deposition of WALTER F. BROWN, JR., taken on behalf

11   of Defendant, at 140 Scott Drive, Menlo Park,

12   California 94025, commencing at 2:22 p.m., Friday,

13   September 25, 2009, before Deborah Lee Lubin, CSR No.

14   3234, RPR, CRP.

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

1    APPEARANCES OF COUNSEL:

2

3    FOR THE SEC:

4         UNITED STATES SECURITIES AND

5         EXCHANGE COMMISSION

6         BY:  MARK FICKES, ESQ.

7              ERIN E. SCHNEIDER, ESQ.

8         44 Montgomery Street

9         26th Floor

10        San Francisco, California 94104

11        415.705.8103

12        415.705.2501 (Facsimile)

13        fickesm@sec.gov

14        schneidere@sec.gov

15        (Ms. Schneider appeared via telephone)

16

17   FOR CARL JASPER:

18        LATHAM & WATKINS LLP

19        BY:  STEVEN M. BAUER, ESQ.

20        505 Montgomery Street

21        Suite 2000

22        San Francisco, California 94111-6538

23        415.391.0600

24        415.395.8095 (Facsimile)

25        steve.bauer@lw.com

CONFIDENTIAL

Page 4

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR MAXIM INTEGRATED PRODUCTS:

4         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5         BY:  PATRICK DOOLITTLE, ESQ.

6         50 California Street

7         22nd Floor

8         San Francisco, California 94111

9         415.875.6600

10        415.875.6700 (Facsimile)

11        patrickdoolittle@quinnemanuel.com

12

13    FOR MAXIM INTEGRATED PRODUCTS:

14        WEIL, GOTSHAL & MANGES LLP

15        BY:  ROBERT V. SPAKE, ESQ.

16        767 Fifth Avenue

17        New York, New York 10153

18        212.310.8794

19        212.310.8007 (Facsimile)

20        robert.spake@weil.com

21        (Appeared via telphone)

22

23

24

25

CONFIDENTIAL

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR THE WITNESS:

 4        ORRICK, HERRINGTON & SUTCLIFFE LLP

 5        BY:  JAMES N. KRAMER, ESQ.

 6        405 Howard Street

 7        The Orrick Building

 8        San Francisco, California 94105-2669

 9        415.773.5923

10        415.773.5759 (Facsimile)

11        jkramer@orrick.com

12        -and-

13        ORRICK, HERRINGTON & SUTCLIFFE LLP

14        BY:  ROBIN A. LINSENMAYER, ESQ.

15             DANIELLE VAN WERT, ESQ.

16        1000 Marsh Road

17        Menlo Park, California 94025-1015

18        650.614.7423

19        650.614.7401 (Facsimile)

20        rlinsenmayer@orrick.com

21        dvanwert@orrick.com

22

23

24

25
```

CONFIDENTIAL

1       Q.  And were those meetings all in person?

2       A.  The four or five that I was referring to

3   would have been in-person meetings.  I also had

4   telephone conversations with the SEC staff at various

5   times as well.

6       Q.  During any of these meetings was the

7   subject of Mr. Gifford's handwritten notes discussed?

8       A.  Yes.

9       Q.  At approximately how many of these

10  meetings?

11          MR. KRAMER:  Again, you're including by

12  meetings in its broadest sense phone calls and

13  in-person meetings?

14          MR. BAUER:  The question was in-person

15  meetings, but I should ask about phone calls.  I'll

16  do that in a moment.

17          MR. KRAMER:  So you are now focused on just

18  in-person meetings?

19          MR. BAUER:  Yes.

20          THE WITNESS:  I believe two.

21          BY MR. BAUER:

22      Q.  Can you give me approximate times for those

23  two meetings?

24      A.  Yes.  The first meeting that I recall where

25  the subject of Mr. Gifford's handwritten notes would

CONFIDENTIAL

1    have been discussed would have been the meeting we

2    had with the SEC in early February after we had

3    completed what I will call the first phase of our

4    investigation, the stock options backdating phase of

5    the investigation, and we met with the SEC staff in

6    San Francisco for the purpose of describing for them

7    the investigation.

8         Q.  So that is early February 2007?

9         A.  Correct.

10        Q.  Who was present?

11        A.  My best recollection is that Susan

12   Fleischmann was present.  Mike Fortunata was present.

13   There may have been another staff attorney from the

14   SEC.  I am not recalling right now that Erin

15   Schneider was present.  I believe she had not become

16   involved in the case yet.  I could be wrong about

17   that.  I was present.  I believe Susan Resley was

18   present.  I believe Ms. Van Wert was present.  I

19   believe we had a representative from LECG, but I

20   can't remember whether it was Mr. Westerman or

21   Ms. Gee.

22        Q.  About how long did that meeting last?

23        A.  I am not remembering with any clarity how

24   long it was.  My best recollection would be three to

25   four hours.

CONFIDENTIAL

1          Q.  I just want to ask you about discussions

2    about those Gifford handwritten notes during that

3    meeting.

4          Can you give me your best memory of what

5    you said about those notes and what, you know, was

6    said by other people at the meeting about the notes?

7          A.  I have a -- not a clear recollection of

8    what was said either by me or anyone in response to

9    what I said.  I don't recall any specific words.

10   What I can give you is my general recollection of the

11   gist of what I said.

12         Q.  Please do.

13         A.  In the course of our discussion we

14   described various categories of grants:  Officer

15   grants, director grants and then rank-and-file

16   grants.  During the course of the discussion about

17   director grants, the concept of these notes would

18   have come up for the first time because, as I recall,

19   we were sharing some discussion about specific grants

20   to illuminate what we had found.

21         In one of those grants, as I recall, there

22   was evidence of a handwritten note that had some

23   bearing on the grant, and I would have taken that

24   occasion to describe for them what we had found in

25   the way of this handwritten note and other

CONFIDENTIAL

1    handwritten notes, concerns we had about those notes,

2    and work we had done with respect to forensic

3    analysis of the notes to understand them better.

4          Q.   What concerns about the Gifford handwritten

5    notes did you express to the Securities and Exchange

6    Commission in your meeting in February 2007?

7          A.   I recall expressing concerns about whether

8    the notes were authentic or not.  That was the

9    general nature of the concern.

10         Q.   What do you mean by that?

11         A.   Whether they had been prepared by

12   Mr. Gifford at or about the time they purported to

13   have been prepared or whether they were prepared at

14   some later date.

15         Q.   Did you give the persons at the SEC any

16   details about why you had that concern?

17         A.   My recollection is I did.

18         Q.   And what is your best recollection of what

19   you told them?

20         A.   I recall articulating for them a couple of

21   different reasons why we had concern, some of which I

22   had independently formed and some which others had

23   communicated to me during the course of our

24   investigation.

25              The concerns that I had were, first of all,

CONFIDENTIAL

1  based upon the investigation we had done at the time

2  these notes first surfaced and thereafter, for that

3  matter, the notion of Mr. Gifford proposing that the

4  company take an expense charge was very much at odds

5  with what I had come to learn about Mr. Gifford's

6  nature, that he was very opposed to expense.  So to

7  see such a proposal in a note raised a question in my

8  mind.

9        Secondly, by the time we'd met with the SEC

10 we had attempted to look at the original notes,

11 whatever that may have meant.  And as you know, with

12 respect to most of these notes we were not able to

13 find any original ink, and that was something that

14 was of concern.

15       Third, I conveyed to them concerns that

16 someone else had raised about the clarity of the

17 handwriting, that Mr. Gifford was known to have very

18 sloppy handwriting, and the fact that these notes

19 appeared to be more legible than his handwriting

20 typically was raised a question as to whether they

21 were written in such a fashion that they could be

22 read.  And so that raised a question.

23       Fourth, that the notes were written on

24 separate sheets of paper in some instances as opposed

25 to on a document that was the subject of the note.

CONFIDENTIAL

1   In other words, a memo that would have had a note

2   scrawled on it as opposed to a separate piece of

3   paper.  At least one witness had expressed concern

4   that that was not consistent with his regular course

5   of business.

6           And then, fifth, in at least one instance I

7   think we had concluded that while a version of the

8   handwritten note had been located in the stock

9   administration binders, it had been located in a

10  binder for a quarter later than the actual grant, and

11  I think there was at least some concern that it would

12  have been -- it could have been prepared and then

13  filed at the time it was prepared rather than at the

14  time it was actually created as reflected by the

15  grant date.

16          Those are the concerns I recall having and

17  I believe articulating at the time.  I also -- so

18  those were the concerns.

19      Q.  Did you tell the representatives of the SEC

20  whether or not the Special Committee had done any

21  additional investigation to investigate your

22  concerns?

23      A.  I did.

24      Q.  Tell us about those, please.

25      A.  Well, I told them that because of those

CONFIDENTIAL

1    concerns and also because in late November I was not

2    confident we would have an opportunity to interview

3    Mr. Gifford again to attempt to authenticate the

4    notes, we decided to conduct forensic analysis of the

5    notes, to do everything we could to determine their

6    authenticity, and I thereafter described for them our

7    retention of Mr. Speckin and at a fairly high level,

8    as I recall, described for them the work that he did

9    and his inability to reach a conclusion.

10        Q.  What is your best memory, at least sitting

11   here today, of the high-level description that you

12   gave the SEC about the work that Mr. Speckin did?

13        A.  I don't have any detailed recollection.  I

14   am not sure -- I am quite certain I didn't give them

15   detail about specific steps he took from a forensic

16   standpoint, but rather he looked at them.  Because

17   they were not original ink, he couldn't reach a

18   conclusion.  That was the gist of what I told them.

19        Q.  Did anyone from the Securities and Exchange

20   Commission's side of the table say anything or make

21   any comments in response to your statements about

22   these handwritten notes?

23        A.  I don't remember.  They may have.  I just

24   don't remember.  There may have been questions, but

25   if there were, I can't remember.

CONFIDENTIAL

1      Q.  Do you have any memory of how much time

2  during this meeting was devoted to talking about

3  these notes?

4      A.  A couple of minutes.

5      Q.  Following this meeting were there any

6  questions from the SEC given to you regarding these

7  handwritten notes?

8      A.  Other than the discussions we had with the

9  Commission staff in the spring of this year with

10  respect to authenticating the notes, I do not recall

11  any further questions that were raised about the

12  notes after meeting with the SEC in 2007.

13          I should note that we had a subsequent

14  meeting with them in 2007, and I believe the notes

15  would have come up in that discussion as well, but

16  beyond that, no.

17      Q.  Aside from the second meeting that we

18  haven't talked about yet, the SEC never asked any

19  follow-up questions to you or your team regarding the

20  authenticity of these notes, other than what led to

21  Ms. Van Wert's declaration that we've heard testimony

22  about today, right?

23      A.  To my recollection, that's correct.

24      Q.  Let's talk about the second meeting that

25  you had with the SEC.  Approximately when was that?

CONFIDENTIAL

1           A.   I can't remember the specific date, but at

2    some point an assistant United States Attorney became

3    more involved in the case, and we went to the

4    U.S. Attorney's Office and, as I recall, gave a very

5    similar presentation to the one we'd given earlier,

6    largely for the benefit of the Assistant

7    U.S. Attorney, and Ms. Schneider was in attendance at

8    that meeting as well.

9           Q.   Ms. Schneider is a staff attorney for the

10   SEC?

11          A.   Correct.   Erin Schneider.

12          Q.   Who was at the meeting with the criminal

13   prosecutors?

14          A.   I am remembering Erin Schneider.   I am

15   remembering Laurel Beeler, Assistant United States

16   Attorney Laurel Beeler, and myself.   I believe

17   Ms. Van Wert and a representative from LECG, and

18   that's all I am remembering.

19          Q.   Do you remember an FBI agent?

20          A.   I am not remembering an FBI agent.   That

21   doesn't mean there wasn't one there, but I would be

22   saying that, you know, based in part upon my own

23   experience with investigations.   I just don't

24   remember.

25          Q.   Do you have any memory of how long that

CONFIDENTIAL

1    meeting was?

2        A.   It would have been about the same length as

3    the first meeting.

4        Q.   Is there any discussion about the notes in

5    the second meeting that stands out in your mind as

6    different than the discussion in the first meeting

7    with the SEC?

8        A.   No.

9        Q.   Were there any follow-up questions asked by

10   the SEC regarding those notes during the meeting?

11       A.   Not that I am recalling.

12       Q.   How about after the meeting, were there any

13   follow-up questions asked by the SEC about the

14   Gifford handwritten notes?

15       A.   I don't recall any.

16       Q.   And so your best memory then is the next

17   time you heard from the SEC about these handwritten

18   notes was in the spring of this year when there was a

19   contact made to authenticate 71 documents; is that

20   right?

21       A.   A contact that ultimately led to that

22   request, but that's correct.

23       Q.   Did you have any of the contacts personally

24   regarding that subject?

25       A.   Yes.

1    STATE OF CALIFORNIA      )

                             )   ss.

2    COUNTY OF SAN FRANCISCO)

3

4        I hereby certify that the witness in the

5    foregoing deposition, WALTER F. BROWN, JR., was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth, in the within-entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported by me,

11   a duly Certified Shorthand Reporter and a

12   disinterested person, and was thereafter transcribed

13   into typewriting by computer.

14       I further certify that I am not interested in

15   the outcome of said action, nor connected with, nor

16   related to, any of the parties in said action, nor to

17   their respective counsel.

18       IN WITNESS WHEREOF, I have hereunto set my hand

19   and affixed my signature this 28th day of September,

20   2009.

21

22

23   _____

24   DEBORAH LEE LUBIN, CSR No. 3234, RPR, CRP

25

                                                        46

# Exhibit 30

CONFIDENTIAL

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4                  ---oOo---

5

6   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
7                                  )
                 Plaintiff,        )
8                                  )  Case No.
         vs.                       )  C-07-6122-JW
9                                  )
    CARL W. JASPER,                )
10                                 )
                 Defendant.        )
11  _____ )

12

13

14

            DEPOSITION OF DANIELLE VAN WERT
15
            FRIDAY, SEPTEMBER 25, 2009
16

17

18

19

20

21

22

23

24   Pages 1 - 147

25   PAGES 93 - 101, 103 AND 108 - 109 ARE CONFIDENTIAL

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10    Deposition of DANIELLE VAN WERT, taken on behalf of

11    Defendant, at 140 Scott Drive, Menlo Park, California

12    94025, commencing at 10:13 a.m., Friday, September

13    25, 2009, before Deborah Lee Lubin, CSR No. 3234,

14    RPR, CRP.

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE SEC:

 4         UNITED STATES SECURITIES AND

 5         EXCHANGE COMMISSION

 6         BY:  MARK FICKES, ESQ.

 7               ERIN E. SCHNEIDER, ESQ.

 8         44 Montgomery Street

 9         26th Floor

10         San Francisco, California 94104

11         415.705.8103

12         415.705.2501 (Facsimile)

13         fickesm@sec.gov

14         schneidere@sec.gov

15         (Ms. Schneider appeared via telephone)

16

17    FOR CARL JASPER:

18         LATHAM & WATKINS LLP

19         BY:  STEVEN M. BAUER, ESQ.

20         505 Montgomery Street

21         Suite 2000

22         San Francisco, California 94111-6538

23         415.391.0600

24         415.395.8095 (Facsimile)

25         steve.bauer@lw.com
```

CONFIDENTIAL

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR MAXIM INTEGRATED PRODUCTS:

4        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5        BY:  PATRICK DOOLITTLE, ESQ.

6        50 California Street

7        22nd Floor

8        San Francisco, California 94111

9        415.875.6600

10       415.875.6700 (Facsimile)

11       patrickdoolittle@quinnemanuel.com

12

13   FOR MAXIM INTEGRATED PRODUCTS:

14       WEIL, GOTSHAL & MANGES LLP

15       BY:  ROBERT V. SPAKE, ESQ.

16       767 Fifth Avenue

17       New York, New York 10153

18       212.310.8794

19       212.310.8007 (Facsimile)

20       robert.spake@weil.com

21       (Appeared via telephone)

22

23

24

25
```

CONFIDENTIAL

Page 5

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR THE WITNESS:

 4        ORRICK, HERRINGTON & SUTCLIFFE LLP

 5        BY:  JAMES N. KRAMER, ESQ.

 6             WALTER F. BROWN, JR., ESQ.

 7        405 Howard Street

 8        The Orrick Building

 9        San Francisco, California 94105-2669

10        415.773.5923

11        415.773.5759 (Facsimile)

12        jkramer@orrick.com

13        wbrown@orrick.com

14        -and-

15        ORRICK, HERRINGTON & SUTCLIFFE LLP

16        BY:  ROBIN A. LINSENMAYER, ESQ.

17        1000 Marsh Road

18        Menlo Park, California 94025-1015

19        650.614.7423

20        650.614.7401 (Facsimile)

21        rlinsenmayer@orrick.com

22

23

24

25
```

CONFIDENTIAL

1      A.  Yes.  We spoke with our contact at Quinn

2   who was there that day, and she indicated that she

3   would need to coordinate with perhaps somebody else

4   at Quinn or the company to get the documents for us.

5      Q.  Okay.  When you received the documents back

6   from the company -- I don't know if I am asking a

7   privileged question now or not.

8          MR. KRAMER:  Go ahead and we'll find out.

9          BY MR. BAUER:

10     Q.  When you received those documents did you

11  do any forensic tests or have any experts look at

12  them or do anything in an investigative sense

13  regarding those documents that are Exhibit 255?

14         MR. KRAMER:  I will allow her to answer

15  because I think it's been discussed with people

16  outside the Special Committee, so you can answer.

17         THE WITNESS:  Yes, we did.

18         BY MR. BAUER:

19     Q.  What did you do?

20     A.  We had retained a gentleman by the name of

21  Erich Speckin, who is kind of a handwriting and

22  document analyst.  We sent these documents to him as

23  you see them in Exhibit 255.  He reviewed them.  In

24  addition to reviewing them -- he is out of state.  In

25  addition to reviewing them at his residence or at his

CONFIDENTIAL

1    place of business, he also flew out to Sunnyvale and

2    went to Maxim and reviewed the documents -- reviewed

3    the files from which these documents came.

4         Q.   What was the purpose of having Mr. Speckin

5    do this work?

6         A.   We were trying to do whatever we could to

7    determine their authenticity.

8         Q.   And hiring Mr. Speckin was part of that

9    effort to determine whether those documents were

10   authentic, right?

11        A.   Yes.

12        Q.   What was the result of Mr. Speckin's work?

13        A.   I recall that his -- his results were

14   inconclusive.

15        Q.   Do you know what that means?

16        A.   He engaged in a rather detailed analysis

17   that I couldn't articulate to the same level that he

18   could, but it involved -- because these weren't

19   original ink, he had to compare --

20             MR. KRAMER:  I think he is asking for the

21   conclusion, where it ended up.

22             THE WITNESS:  Inconclusive.  He couldn't

23   say whether or not they were made at or about the

24   time they were purported to have been made.

25

CONFIDENTIAL

1          BY MR. BAUER:

2          Q.   Were you personally involved in any

3     discussions with anyone from the Securities and

4     Exchange Commission regarding Mr. Speckin's work?

5          A.   I attended a meeting at which his

6     conclusions were discussed.

7          Q.   And who attended that meeting?

8          A.   That meeting was also attended by Walt

9     Brown as well as Susan Resley and a gentleman from

10    LECG, Ed Westerman.

11         Q.   Do you remember who from the SEC was there?

12         A.   I recall Erin Schneider was there and

13    Mr. Fortunato.

14         Q.   Can you give me a ballpark estimate of when

15    that meeting took place?

16         A.   In early February of 2007.

17              MR. KRAMER:  Are we close, Steve?

18              MR. BAUER:  To what?

19              MR. KRAMER:  You being done?

20              MR. BAUER:  No.  I have to run through some

21    more documents.  If you want to take a break --

22              MR. KRAMER:  No.

23              MR. BAUER:  I just jumped out of order

24    because we had these and I am trying to see if I can

25    cut it shorter.

CONFIDENTIAL

1              MR. KRAMER:  I understand.

2              BY MR. BAUER:

3         Q.  Let's talk about this meeting with the SEC,

4     and really all I want to ask about are discussions

5     regarding the handwritten notes.  So I'd like to get

6     your best memory of what was said regarding the

7     handwritten notes in the meeting in early February

8     2007 with the Special Committee's lawyers on the one

9     hand and the SEC folks on the other.

10        A.  I don't have a very strong recollection of

11    what was said.  I generally recall that they were

12    discussed and the fact that we had retained

13    Mr. Speckin was discussed.  But I believe that my

14    colleague Walt Brown would be better -- in a better

15    position to answer those questions.

16             (Exhibit 257 marked for identification.)

17             MR. KRAMER:  Off the record.

18             (Whereupon, a recess was taken from

19             12:18 p.m. until until 12:44 p.m.)

20             BY MR. BAUER:

21        Q.  Would you take a look at Exhibit 257 and

22    tell us what that is, please.

23        A.  Yes.  This appears to be a letter from

24    Christina Wu at Quinn Emanuel to my colleague Robin

25    Linsenmayer as well as Jeanne Gee of LECG dated

```
1    STATE OF CALIFORNIA      )

                              )  ss.
2    COUNTY OF SAN FRANCISCO)

3

4        I hereby certify that the witness in the

5    foregoing deposition, DANIELLE VAN WERT, was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth, in the within-entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported by me,

11   a duly Certified Shorthand Reporter and a

12   disinterested person, and was thereafter transcribed

13   into typewriting by computer.

14       I further certify that I am not interested in

15   the outcome of said action, nor connected with, nor

16   related to, any of the parties in said action, nor to

17   their respective counsel.

18       IN WITNESS WHEREOF, I have hereunto set my hand

19   and affixed my signature this 28th day of September,

20   2009.

21

22

23   _____

24   DEBORAH LEE LUBIN, CSR No. 3234, RPR, CRP

25
                                                      139
```

# Exhibit 31

Gifford -- Proposed Edits and Other Complaints Alleging 17(a)(3)                    Page 1 of 1

## Schneider, Erin

| | |
|---|---|
| **From:** | Arevian, Shaunt [SArevian@irell.com] |
| **Sent:** | Wednesday, September 19, 2007 12:30 PM |
| **To:** | Schneider, Erin |
| **Subject:** | Gifford -- Proposed Edits and Other Complaints Alleging 17(a)(3) |
| **Attachments:** | 1753358_1 (4).DOC |

Erin:

As promised, attached below are (1) our proposed changes in track changes to the draft complaint; and (2) links to the complaints in *SEC v. Zaepfel*, Case No. 06-CV-5967 (N.D. III. 2006) and *SEC v. Moran and Sievers*, Case No. 06-CV-5968 (N.D. III. 2006).

Best,

-Shaunt

Shaunt T. Arevian, Esq.
Irell & Manella LLP
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 203-7532
Fax: (310) 203-7199
<<1753358_1 (4).DOC>>
Zaepfel -- http://sec.gov/litigation/complaints/2006/comp19897mz.pdf

Moran and Sievers -- http://sec.gov/litigation/complaints/2006/comp19897mmjs.pdf

ccmailg.irell.com made the following annotations
--------------------------------------------------------------------
PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you. --------------------
--------------------------------------------------------------------

SEC  000027

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1  HELANE L. MORRISON (Cal. Bar No. 127752)
   MARC J. FAGEL (Cal. Bar No. 154425)
2  CARY S. ROBNETT (Cal. Bar No. 160585)
   ROBERT S. LEACH (Cal. Bar No. 196191)
3    leachr@sec.gov
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
4    schneidere@sec.gov

5  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
6  44 Montgomery Street, Suite 2600
   San Francisco, California 941 04
7  Telephone: (415) 705-2500
   Facsimile: (415) 705-2501

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12

| | |
|---|---|
| 13  SECURITIES AND EXCHANGE | )  Case No. _____ |
| 14  COMMISSION, | ) |
| | )  COMPLAINT |
| 15          Plaintiff, | ) |
| | ) |
| 16     vs. | ) |
| | ) |
| 17  MAXIM INTEGRATED PRODUCTS, INC. | ) |
| 18  and JOHN F. GIFFORD, | ) |
| | ) |
| 19          Defendants. | ) |

20

21    Plaintiff Securities and Exchange Commission (the "Commission") alleges:

                        SUMMARY OF THE ACTION

22

23    1.      From at least 1999 through 2005, Maxim Integrated Products, Inc. ("Maxim" or the

"Company"), a Sunnyvale, California semiconductor company, engaged in a scheme to illegally

24

backdate stock options granted to Maxim employees and directors, concealing millions of dollars

25

in expenses from investors and significantly overstating the Company's income.  Defendant

26

John F. Gifford, Maxim's former Chief Executive Officer, was aware of instances of backdating,

27

and should have known that the Company did not properly account for or accurately disclose its       Deleted: knew or

28

resulting stock option compensation expenses.

SEC  000028

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

2.    Under well-settled accounting principles in effect during the relevant period, Maxim did not need to record an expense for options granted to employees with an exercise price equal to the current market price ("at-the-money"), while the Company was required to record an expense in its financial statements for any options granted with an exercise price below the current market price ("in-the-money").  In order to provide Maxim's employees and outside directors with valuable "in- the-money" options without recording an expense, Maxim routinely backdated stock options to dates corresponding to historical lows in Maxim's stock price, and falsified records to make it appear as though the options were granted "at-the-money."  For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal year 2004, Maxim granted options to current employees with an exercise price equal to the lowest price of the quarter.  Maxim then fraudulently failed to record compensation expenses for those options, thus overstating its income by millions of dollars and falsely representing in certain filings that it had incurred no expense for option grants.

3.    Gifford several times authorized the granting of options on purported dates that had been selected with hindsight but, because he believed there might be accounting implications for granting "in-the-money" options, he instructed other Maxim executives to record compensation expenses if material and/or consult with Maxim's outside auditors.  Gifford should have been more diligent and therefore should have known that the Company was failing to report expenses for these "in-the-money" stock options and was falsely reporting that it only granted options at fair market value.

| Deleted: , which resulted in the issuance of undisclosed "in-the-money" options to Maxim employees and directors. Gifford |
| Deleted: . |
| Deleted: was aware there were |
| Deleted: H |
| Deleted: they were |
| Deleted: knew or |

4.    The Commission seeks an order enjoining Maxim and Gifford from future violations of the securities laws, requiring Gifford to disgorge excess bonus compensation to which he was not entitled with prejudgment interest, requiring Gifford to pay a civil monetary penalty, and providing other appropriate relief.

| Deleted: ill-gotten gains |

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

5.    The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

SEC 000029

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1     6.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of

2   the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the

3   Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

4     7.      Venue is proper in this district pursuant to Section 22 of the Securities Act

5   [15 U.S.C. §§ 77v] and Section 27 of the Exchange Act [15 U.S.C. §§ 78aa].  Maxim's principal

6   place of business is in the Northern District of California.  Gifford resides in the Northern District

7   of California.  Acts or transactions constituting violations of the federal securities laws occurred in

8   this district.

9     8.      Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules

10  3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred,

11  among other places in this district, in Santa Clara County.

## DEFENDANTS

13    9.      Maxim is a Sunnyvale, California corporation that makes integrated circuits.  At all

14  relevant times, Maxim's common stock was registered with the Commission pursuant to Section

15  12(g) of the Exchange Act and traded on the NASDAQ National Market under the symbol

16  "MXIM." At all times relevant to this action, Maxim used a fiscal year that ended on the last

17  Saturday of June.

18    10.     John F. Gifford, age 67, resides in Menlo Park, California.  Gifford served as

19  Maxim's President, Chief Executive Officer, and Chairman of the Board from April 1983 through

20  December 2006.

## FACTUAL ALLEGATIONS

22    A.    **Maxim Used Stock Options Liberally To Recruit And Retain Employees.**

23    11.     During the relevant period, Maxim regularly used employee stock options as a form

24  of compensation to recruit, retain, and incentivize key employees.  Maxim also used stock options

25  to compensate members of its Board of Directors.  Each option gave the grantee the right to buy

26  Maxim common stock from the Company at a set price, called the "exercise" or "strike" price, on

27  a future date after the option vested.  The option was "in-the-money" when granted if the trading

28  price of Maxim common stock on the date of the grant exceeded the option's exercise price.  The

175335R.1 08                          - 3 -          SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
                                                     COMPLAINT

SEC 000030

DRAFT\*CONFIDENTIAL\* FOR SETTLEMENT PURPOSES ONLY

1  option was "at-the-money" when granted if the trading price of Maxim's common stock on the

2  date of the grant and the exercise price were the same.

3      12.    Stock options were the most important part of Maxim's compensation mix.  Maxim

4  generally paid its officers and technical employees lower salaries than its peers; it competed

5  against other companies for employees by offering the potential gains provided by stock options.

6  Maxim's ability to recruit and retain the engineers who designed and produced its new products

7  was closely tied to its stock option program.  In addition, Maxim attributed its earnings growth

8  and positive stockholder returns in part to its option practices.  The Company repeatedly

9  emphasized these facts in communications with its shareholders.

10      13.    Maxim granted options to almost all new employees when they were hired.  Maxim

11  also granted employees additional options every year as part of their annual performance review.

12  Because it granted so many options, Maxim had to ask shareholders to approve increases in the

13  number of shares available for issuance under its primary stock option plan every year from 1999

14  through 2005.

15      14.    Maxim's primary stock option plan authorized it to grant both "incentive" stock

16  options and "non-qualified" stock options.  Maxim's plan defined an incentive stock option as an

17  option intended to qualify as an incentive stock option within the meaning of certain provisions of

18  the Internal Revenue Code.  Maxim's plan defined a "non-qualified" option as any option not

19  intended to qualify as an incentive stock option.

20      **B.    Maxim Told The Public It Granted Stock Options At Fair Market Value.**

21      15.    From at least 1999 and continuing through June 30, 2004, Maxim's primary stock

22  option plan limited the Company's ability to grant incentive stock options with an exercise price

23  less than the stock's fair market value on the date of grant.  In other words, the plan did not allow

24  incentive stock options to be granted "in-the-money."

25      16.    During the same time period, Maxim's primary stock option plan similarly allowed

26  some flexibility in granting non-qualified stock options with an exercise price less than the stock's

27  fair market value on the date of grant (subject to certain limitations not applicable here).

28

> Deleted: allowed some flexibility
> Deleted: prohibited it from
> Deleted: in
> Deleted: ing

> Deleted: prohibited it from
> Deleted:
> Deleted: (subject to certain limited exceptions not applicable here)

SEC 000031

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

17.     Under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and the accounting rules in effect from 1997 through 2005, issuers were required to record an expense on their financial statements for the "in-the-money" portion of any option grant.  According to APB 25, that difference must be recorded as a compensation expense to be recognized over the vesting period of the option.  Consequently, granting "in-the-money" options to employees could have a significant impact on the expenses and income (or loss) reported to the shareholders of a public company.  APB 25 allowed companies, where the key terms of an option grant were known, to grant employee stock options without recording any compensation expense so long as the option exercise price was not below the stock's market price on the date of the grant.

18.     Maxim publicly reported, in its annual reports on Form 10-K for fiscal years 2000 through 2005, that the Company accounted for its employee stock options in accordance with APB 25.  Additionally, during the relevant time period, Maxim represented that the Company generally granted options "at-the-money," not "in-the-money." Hence, in its annual reports for fiscal years 2000 through 2005, Maxim did not report any compensation expenses for stock options.

**C.     Maxim Backdated Employee And Director Option Grants.**

19.     Maxim's primary stock option plan provided that it was to be administered by the Board of Directors or a committee designated by the Board.  The Board had the ability to select employees, directors, and consultants to whom options would be granted, to determine the number of shares to be covered by each option, and to determine the terms and conditions of any option granted under the plan.

20.     In 1999, Maxim's Board delegated to Gifford the authority to grant stock options to non-officer employees as well as to outside directors.  After that, and continuing through at least Maxim's 2004 fiscal year, Gifford approved all option grants made to non-officer employees and outside directors.

| Deleted: the mid-1990s |
| --- |

21.     Maxim repeatedly backdated option grants made to current employees, to newly hired employees, and to outside directors.  These backdated grants reflected historically low prices of Maxim stock for the weeks prior to the date on which the price actually was selected.  For ten

SEC  000032

**DRAFT\*CONFIDENTIAL\* FOR SETTLEMENT PURPOSES ONLY**

1  consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal

2  year 2004, Maxim granted options to current employees with an exercise price equal to the lowest

3  price of the quarter.  By backdating the option grants to make it falsely appear that "in-the-money"

4  option grants had been "at-the-money" when granted, Maxim avoided reporting in its financial

5  statements compensation expenses for the options.

6        a.   **Maxim's Option Grants To Employees**

7        22.   During the relevant time period, Maxim granted options to current employees on a

8  quarterly basis.  Each quarter, Maxim's managers proposed to Gifford the number of options to be

9  granted to employees whose annual performance reviews fell within that quarter.  Gifford either

10  approved, or first revised and then approved, the number of proposed options for each employee.

11  Maxim's stock administration department accumulated the employee options approved by Gifford

12  until it learned the grant date for those options.

13        23.   Gifford approved the grant date and price for some but not all options awarded to

14  current employees.  The grant date was communicated to Maxim's stock administration

15  department so that the grants could be recorded in Maxim's books and records.

16        24.   A number of grant dates used for options awarded to Maxim's current employees

17  were selected with hindsight.  This allowed Maxim to select the lowest possible price for the

18  options.  No compensation expenses were recorded for the undisclosed "in-the-money" option

19  grants to current employees.

20        25.   During the relevant time period, Maxim also granted options to new hires on a

21  quarterly basis.  Similar to the current employee grants, Gifford approved the number of options to

22  be granted to new hires.  Maxim's stock administration department accumulated the options

23  approved by Gifford until it learned the applicable grant date.

24        26.   As with stock options awarded to current employees, grant dates used for options

25  awarded to new hires were selected with hindsight.  Maxim determined the grant dates by

26  determining a date with a low stock price for the quarter after the date on which the employee was

27  hired.  No compensation expenses were recorded for the undisclosed "in-the-money" grants to

28  new hires.

1753358.1 08                     - 6 -          SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
                                                COMPLAINT

Deleted: then

Deleted: G

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1      27.    In connection with certain grants to current employees and new hires, Gifford

2  signed backdated memoranda (drafted by Maxim's Chief Financial Officer and, at times, other

3  Maxim employees) indicating that he had selected the grant date on the dates indicated in the

4  memoranda.  One of the purposes of the grant approval memoranda was to serve as an audit trail

5  and make it appear as though the options had been granted at the market price on the earlier date.

6  Gifford signed these memoranda and similar documents without making any effort to confirm that

7  they accurately reflected the actual date on which the selection of the grant date had in fact been

8  made. These memoranda did not accurately reflect the dates on which decisions were made to

9  grant options.

10      28.    With respect to at least four backdated option grants, Gifford in writing instructed

11  Maxim's CFO to record compensation expenses.  But no compensation expenses were recorded.

12      **b.**    **Examples Of Maxim's Backdated Employee Options**

13      29.    Maxim purportedly granted approximately 2.7 million options to employees on

14  June 30, 2003, with an exercise price equal to that day's closing stock price of $34.10.  This was

15  Maxim's lowest stock price of the quarter.  In reality, the grant was not made until on or around

16  August 26, 2003, when the stock was trading at $43.26.  On or around August 22, 2003, Gifford

17  asked Maxim's CFO:  "What is the lowest price we can use for Q1 options?" The CFO responded:

18  "The best price is the first day of the quarter – June 30, 2003.  The price was $34.10 on that date."

19  Gifford approved the grant using the June 30th price, but also instructed the CFO to record a                    ⌐ **Deleted:** and then ⌐

20  compensation expense if it was material.  Although the options were "in-the-money" when

21  granted, Maxim failed to record compensation expenses for the options.

22      30.    In another example, Maxim purportedly granted 2.4 million options to employees

23  on October 2, 2001, with an exercise price equal to that day's closing stock price of $33.40.  This

24  was Maxim's lowest stock price of the quarter.  In reality, the grant was not made until on or

25  around December 28, 2001, when the stock was trading at $54.61.  On or around December 28,

26  Maxim's CFO proposed to Gifford that Maxim use October 2 as the grant date for options

27  awarded to certain current employees, and November 28 and December 24 for options awarded to

28  certain new hires (depending on their hire date).  Maxim used the dates suggested by its CFO to

SEC 000034

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1   grant options.  Although the options were in-the-money when granted, Maxim failed to record

2   compensation expenses for the options.

3       31.     Additionally, Maxim purportedly granted 3.2 million options to existing employees

4   on September 30, 2003, with an exercise price equal to that day's closing stock price of $39.39.

5   This was Maxim's lowest stock price of the quarter.  In reality, the grant was not made until

6   significantly later in the quarter.  Maxim's stock administration department did not learn about the

7   grant date until on or about November 25, 2003, when Maxim's stock was trading at $51.47.

8   Gifford later signed a memorandum (drafted by another Maxim employee) dated September 30,

9   2003, that stated: "I have granted options today for all existing employees for this quarter, and

10  for new hires up through this date – the stock closed at $39.39."  Although the options were

11  "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

12      32.     Maxim purportedly granted options to new employees hired after February 28,

13  2002 on March 25, 2002, with an exercise price equal to the March 25th closing stock price

14  of $51.81.  In reality, these grants were not made until sometime in late April 2002, after the

15  quarter had ended.  On or about April 22, Maxim's CFO asked Gifford to sign a grant approval

16  memorandum dated March 25, 2002, to "keep [Maxim's] documentation and records straight."

17  Gifford signed the memorandum, which stated:  "I want you to make sure that any new hire who

18  started at Maxim between March 1, 2002 and today has their stock granted at today's closing price

19  of $51.81."  Maxim's stock administration department did not learn of the supposed March 25th

20  grant date until on or about April 24, 2002.

21          c.     **Maxim's Option Grants To Outside Directors**

22      33.     Maxim also backdated certain stock option grants to its outside directors.  For

23  example, Maxim purportedly granted the directors 36,000 options on October 1, 2001, at an

24  exercise price equal to that day's closing stock price of $34.06.  This grant was not actually made

25  until on or around December 11, 2001, when Maxim's stock was trading at $57.90.  In or around

26  December 2001, Maxim's CFO proposed to Gifford a range of historical dates for the outside

27  director grants.  On or around December 11, Gifford approved using a grant date of October 1,

28  2001, <u>but also</u> in writing instructed the CFO to record an expense if it was material.  Gifford later

Deleted: and

SEC  000035

DRAFT\*CONFIDENTIAL\* FOR SETTLEMENT PURPOSES ONLY

1 signed meeting minutes stating that he held a meeting on October 1, 2001, and granted options at

2 the fair market value on that date.  Although the options were "in-the-money" when granted,

3 Maxim failed to record compensation expenses for the options.

4         **d.**    **Maxim Executives Understood The Implications Of Backdating**

5     34.    Gifford understood there were accounting implications for awarding

6 "in-the-money" options.  Indeed, Gifford told Maxim employees that Maxim's stock option

7 program helped Maxim's bottom line because "an option granted at fair market value does not

8 result in expense for profit & loss purposes, so profit is increased."

9     35.    Maxim's CFO also understood the accounting implications of awarding

10 "in-the-money" options.  For example, he warned Gifford in writing that Maxim should record a

11 compensation expense where it contemplated giving one employee a retroactively-priced option

12 but noted that "for one person, we will just get it done."

13     36.    Gifford instructed Maxim's CFO on several occasions to record a compensation

14 expense for option grants, demonstrating familiarity with stock option accounting principles.  In

15 one handwritten note to the CFO, Gifford stated: "I would like to use [a price from eight weeks

16 ago] for our employees but we will have to expense the difference if it is material."

17 **D.**    **As A Result Of The Backdating, Maxim Publicly Reported False**
18         **And Misleading Financial Information.**

19     37.    Maxim is a public company.  Accordingly, it filed with the Commission annual

20 reports on Form 10-K for the fiscal years ended June 24, 2000 (filed September 22, 2000),

21 June 30, 2001 (filed September 24, 2001), June 29, 2002 (filed September 25, 2002), June 28,

22 2003 (filed September 22, 2003), June 26, 2004 (filed September 9, 2004), and June 25, 2005

23 (filed September 8, 2005) which included audited financial statements that were certified by the

24 Company's outside auditors.

25     38.    Both Gifford and Maxim's CFO reviewed Maxim's annual reports filed on

26 Forms 10-K before they were filed with the Commission for its 2000 through 2005 fiscal years.

27 In connection with Maxim's 2003, 2004, and 2005 annual reports, Gifford and Maxim's CFO

28 signed certifications stating that they had reviewed the annual reports and that the annual reports

1753358.1  08       - 9 -    SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
COMPLAINT

SEC  000036

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1   did not contain any untrue statements of a material fact or omit to state a material fact necessary to

2   make the statements made, in light of the circumstances under which such statements were made,

3   not misleading.

4       39.    In the notes to its audited financial statements, which were included in its annual

5   reports for fiscal years 2000 through 2005, Maxim affirmatively stated that the Company

6   accounted for its employee stock option plans in accordance with APB 25.  Additionally, in its

7   annual reports for fiscal years 2000 through 2003, Maxim stated that under the Company's stock

8   option plans, options generally were granted at prices not less than the fair market value of the

9   Company's common stock on the grant date.  Maxim's annual reports for fiscal years 2004 and

10  2005 stated that options were granted at prices not less than the fair market value of the

11  Company's common stock on the grant date.  In its annual report for fiscal year 2004, Maxim

12  stated affirmatively that it was not required to record compensation expenses in connection with

13  stock option grants to employees.  Maxim knew or was reckless in not knowing that these

14  statements were false and misleading, because Maxim was aware it granted "in-the-money"

15  options but concealed them through the use of backdating.

16      40.    In its financial statements accompanying its annual reports, Maxim failed to record

17  compensation expenses in connection with the backdated, "in-the-money" option grants.  It was

18  aware it granted "in-the-money" options and was aware it was required to record compensation

19  expenses for these options, yet it failed to do so.  Maxim materially understated its expenses and

20  overstated its net income in the financial statements included in its annual reports by more than

21  10% for its fiscal years 2003 through 2005.

22      41.    Maxim also filed with the Commission quarterly reports on Form 10-Q for

23  the quarters ended September 28, 2002 (filed November 8, 2002), December 28, 2002 (filed

24  February 11, 2003), March 29, 2003 (filed May 12, 2003), September 27, 2003 (filed November 6,

25  2003), December 27, 2003 (filed February 5, 2004), March 27, 2004 (filed May 6,2 004),

26  September 25, 2004 (filed November 4, 2004), December 25, 2004 (filed February 3, 2004), and

27  March 26, 2005 (filed May 5, 2005), which contained Maxim's quarterly financial statements.

28

SEC 000037

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1    These financial statements were materially false or misleading because Maxim failed to record in

2    its quarterly financial statements compensation expenses associated with "in-the-money" options.

3         42.    Both Gifford and Maxim's CFO reviewed the above Forms 10-Q before they

4    were filed with the Commission. Additionally, for the quarters ended September 28, 2002,

5    December 28, 2002, and March 29, 2003, they certified that the quarterly reports fairly presented

6    Maxim's financial condition and results of operation. For the quarter ended September 27, 2003

7    through the quarter ended March 26, 2005, they certified that they had reviewed the quarterly

8    reports and that they were not aware of any material misstatements of fact or omissions in

9    those reports.

10        43.    In addition, Maxim filed with the Commission current reports on Form 8-K on

11   April 29, 2003, August 12, 2003, October 28, 2003, February 5, 2004, April 27, 2004, August 6,

12   2004, November 1, 2004, February 1, 2005, and May 3, 2005, each of which announced the

13   Company's financial results for the prior quarter. These current reports contained materially false

14   and misleading financial information because Maxim failed to record compensation expenses

15   associated with undisclosed grants of "in-the-money" stock options.

16        44.    Maxim's proxy statements (which were sent to its shareholders) also made

17   materially false representations about Maxim's stock option grants. Gifford reviewed and edited

18   Maxim's proxy statements before they were filed with the Commission. In Maxim's proxy

19   statement filed August 19, 2004, Gifford signed an introductory letter discussing Maxim's request

20   that its shareholders approve an additional 13 million shares for its stock option plan. In urging

21   shareholders to approve the additional shares, the letter stated that Maxim's stock option plan was

22   "managed for the best interest of the stockholders," in part because "all of Maxim's options are

23   granted at fair market value." These statements were repeated elsewhere in the proxy statement.

24        45.    In Maxim's proxy statement filed October 7, 2005, Gifford signed an introductory

25   letter discussing Maxim's request that its shareholders authorize an additional 10.8 million shares

26   for its option plan. In urging shareholders to approve the additional shares, the letter similarly

27   stated that Maxim's stock option plan was "managed for the best interests of the stockholders" in

28   part because "Maxim's stock options have always been granted with an exercise price equal to

**Deleted: requesting**

1753358.1 08

- 11 -

SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
COMPLAINT

SEC 000038

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1  the fair market value of Maxim's stock." These statements were repeated elsewhere in the

2  proxy statement.

3      46.     Maxim also sold securities pursuant to offering documents, including registration

4  statements on Forms S-8, which incorporated Maxim's false and misleading financial statements.

5  Those Forms S-8 were filed with the Commission on April 12, 2001 (incorporating Maxim's

6  annual report on Form 10-K for the year ended June 24, 2000, Maxim's quarterly reports on

7  Forms 10-Q for the quarters ended September 23, 2000 and December 30, 2000, and Maxim's

8  current reports on Forms 8-K filed on January 30, 2001 and April 11, 2001); February 13, 2003

9  (incorporating Maxim's annual report on Form 10-K for the year ended June 29, 2002 and

10 Maxim's quarterly reports on Forms 10-Q for the quarters ended September 28, 2002 and

11 December 28, 2002); and April 24, 2005 (incorporating Maxim's annual report on Form 10-K for

12 the year ended June 26, 2004, Maxim's quarterly reports on Forms 10-Q for the quarterly periods

13 ended September 25, 2004 and December 25, 2004, Maxim's current report on Form 8-K filed

14 December 20, 2004, and Maxim's proxy statements filed August 19, 2004 and October 18, 2004).

15 Both Gifford and Maxim's CFO signed these Form S-8s.

16     47.     Gifford was aware that Maxim used hindsight to select grant dates for some

17 options.  He also was aware there were accounting implications for granting "in-the-money"

18 options.  In connection with at least four backdated option grants, he instructed Maxim executives

19 to record compensation expenses for "in-the-money" options but then failed to take steps to assure

20 that this instruction had been followed.  Based on these actions, Gifford should have known that         [Deleted: knew or]

21 Maxim did not properly account for its resulting stock option compensation expenses in its

22 financial statements which were included in its Forms 10-K, Forms 10-Q, Forms 8-K, and Forms

23 S-8.  Gifford also should have known that Maxim did not accurately describe its stock option       [Deleted: knew or]

24 grants in its proxy statements and annual reports on Forms 10-K.

25     48.     Maxim's executives were aware that it used hindsight to select grant dates for

26 options.  Its executives also were aware of the accounting implications of granting "in-the-money"

27 options.  Maxim knew, or was reckless in not knowing, that its annual reports on Forms 10-K,

28

SEC 000039

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1  quarterly reports on Form 10-Q, Forms 8-K, Forms S-8, and proxy statements contained false and

2  misleading statements and omissions regarding Maxim's stock option grants.

3      49.   Maxim provided documentation, which failed to disclose the true grant dates for

4  options to employees and outside directors, to the Company's external auditors in connection with

5  audits of Maxim's financial statements.

**[Deleted: Relying on the false documentation supplied to them, the auditors concurred with Maxim's assessment that no compensation expenses should be recorded for the options granted to employees and directors.]**

6      50.   In June 2006, the Special Committee of Maxim's Board began to investigate the

7  Company's historical option granting practices.  As a result of the Special Committee

8  investigation, Maxim in January 2007 announced that it believed the accounting adjustments

9  needed to properly record expenses for options granted to employees and outside directors were

10  material and that it expected to restate its financial statements for Maxim's fiscal years 2000

11  through 2005 and the related interim periods through March 25, 2006.  Maxim also warned that its

12  financial statements, related reports, and all earnings press releases and similar communications

13  relating to those periods should not be relied upon.

14      51.   During the relevant period, Gifford received annual bonuses tied in part to the

**[Deleted: Maxim stock options and sold Maxim stock. Gifford also received]**

15  Company's achievements and reported profitability.

16                **FIRST CLAIM FOR RELIEF**

17      *(Violations of Exchange Act Section 10(6) and Rule 10b-5 Thereunder by Maxim)*

18      52.   The Commission realleges and incorporates by reference paragraphs 1 through 51.

19      53.   By engaging in the conduct described above, Maxim, directly or indirectly, in

20  connection with the purchase or sale of securities, by the use of means or instrumentalities of

21  interstate commerce, or the mails, with scienter:

22      a.   Employed devices, schemes, or artifices to defraud;

23      b.   Made untrue statements of material facts or omitted to state material facts

24          necessary in order to make the statements made, in the light of the

25          circumstances under which they were made, not misleading; and

26      c.   Engaged in acts, practices, or courses of business which operated or would

27          operate as a fraud or deceit upon other persons, including purchasers and

28          sellers of securities.

1753358.1 08

SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
COMPLAINT

SEC 000040

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1     54.    By reason of the foregoing, Maxim has violated and, unless restrained and

2 enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.§ 78j(b)] and

3 Rule 10b-5 [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF

5     *(Violations of Securities Act Section 17(a)(l) by Maxim)*

6     55.    The Commission realleges and incorporates by reference Paragraphs 1 through 51.

7     56.    By engaging in the conduct described above, Maxim, directly or indirectly, in the

8 offer or sale of securities, by use of the means or instruments of transportation or communication

9 in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or

10 artifices to defraud.

11     57.    By reason of the foregoing, Maxim violated and, unless restrained and enjoined,

12 will continue to violate Section 17(a)(l) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

14     *(Violations of Securities Act Section 17(a)(2) by Maxim)*

15     58.    The Commission realleges and incorporates by reference Paragraphs 1 through 51.

16     59.    By engaging in the conduct described above, Maxim, directly or indirectly, in the

17 offer or sale of securities, by use of the means or instruments of transportation or communication

18 in interstate commerce or by use of the mails obtained money or property by means of untrue

19 statements of material fact or by omitting to state a material fact necessary in order to make the

20 statements made, in light of the circumstances under which they were made, not misleading.

21     60.    By reason of the foregoing, Maxim has violated and, unless restrained and

22 enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### FOURTH CLAIM FOR RELIEF

24     *(Violations of Section 17(a)(3) of the Securities Act by Defendants)*

25     61.    The Commission realleges and incorporates by this reference Paragraphs 1

26 through 51.

27     62.    By engaging in the acts and conduct alleged above, Maxim and Gifford, directly or

28 indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or

SEC  000041

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1   communication in interstate commerce or by use of the mails, engaged in transactions, practices,

2   or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

3   To establish a violation of Section 17(a)(3), scienter is not required; Gifford's negligence as

4   alleged herein is sufficient. *See Aaron v. S.E.C.,* 446 U.S. 680, 701-702 (1980); *S.E.C. v. Dain*

5   *Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir. 2001). [Note: this language is identical to other

6   language the SEC has pled in other recent cases.]

7          63.     [Alternative] Maxim and Gifford, directly or indirectly, by use of the means or

8   instruments of transportation or communication in interstate commerce or by use of the mails,

9   participated in the process through which Maxim sold securities while filing documents with the

10  Commission that contained the misleading statements described above. Gifford should have

11  known that the documents contained these misleading statements. To establish a violation of

12  Section 17(a)(3), scienter is not required; Gifford's negligence as alleged herein is sufficient. *See*

13  *Aaron v. S.E.C.,* 446 U.S. 680, 701-702 (1980); *S.E.C. v. Dain Rauscher, Inc.,* 254 F.3d 852, 856

14  (9th Cir. 2001). [Note: this language is identical to other language the SEC has pled in other

15  recent cases.]

16         64.     By reason of the foregoing, Maxim and Gifford have violated and, unless

17  restrained and enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C.

18  § 77q(a)(3)].

19                          **FIFTH CLAIM FOR RELIEF**

20      *(False Periodic Reports—Violations of and Aiding and Abetting Violations of Exchange Act*
                    *Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13*

21                          *Thereunder by Defendants)*

22         65.     The Commission realleges and incorporates by reference Paragraphs 1 through 51.

23         66.     Based on the conduct alleged above, Maxim violated Section 13(a) of the Exchange

24  Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.

25  §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-131], which obligate issuers of securities

26  registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the

27  Commission accurate periodic reports, including annual, current, and quarterly reports. Unless

28  restrained and enjoined, Maxim will continue to violate Section 13(a) of the Exchange Act

1753358.1 08                              - 15 -          SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
                                                                          COMPLAINT

**Deleted:**

**Formatted: Font: Italic**

**Formatted: Font: Not Bold**

**Formatted: Bullets and Numbering**

**Formatted: Bullets and Numbering**

SEC  000042

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1  [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.

2  §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

3        67.    By engaging in the acts and conduct alleged above, Gifford knowingly provided

4  substantial assistance to Maxim's filing of materially false and misleading reports with

5  the Commission.

6        68.    By reason of the foregoing, Gifford aided and abetted Maxim's violations of

7  Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and

8  13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.  Unless

9  restrained and enjoined, Gifford will continue to aid and abet such violations.

10

11                          **SIXTH CLAIM FOR RELIEF**

        *(False Books and Records —Violations of and Aiding and Abetting Violations*
12            *of Exchange Act Section 13(b)(2)(A) by Defendants)*

13        69.    The Commission realleges and incorporates by reference Paragraphs 1 through 51.   [Formatted: Bullets and Numbering]

14        70.    Based on the conduct alleged above, Maxim violated Section 13(b)(2)(A) of the

15  Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered

16  pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records

17  and accounts which, in reasonable detail, accurately and fairly reflect the transactions and

18  dispositions of the assets of the issuer.  Unless restrained and enjoined, Maxim will continue to

19  violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

20        71.    By engaging in the acts and conduct alleged above, Gifford knowingly provided

21  substantial assistance to Maxim's failure to make and keep books, records, and accounts which, in

22  reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

23        72.    By reason of the foregoing, Gifford has aided and abetted violations by Maxim of

24  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  Unless restrained and

25  enjoined, Gifford will continue to aid and abet such violations.

26                        **SEVENTH CLAIM FOR RELIEF**

        *(Inadequate Internal Accounting Controls—Violations of and Aiding*
27            *and Abetting Violations of Section 13(b)(2)(B)*
28                *of the Exchange Act by Defendants)*

1353358.1 08                    - 16 -          SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
                                                                COMPLAINT

DRAFT\*CONFIDENTIAL\* FOR SETTLEMENT PURPOSES ONLY

73.     The Commission realleges and incorporates by this reference Paragraphs 1
through 51.

74.     Based on the conduct alleged above, Maxim violated Section 13(b)(2)(B) of the
Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered
pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient
system of internal accounting controls.  Unless restrained and enjoined, Maxim will continue to
violate Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

75.     By engaging in the acts and conduct alleged above, Gifford knowingly provided
substantial assistance to Maxim's failure to devise and maintain a sufficient system of internal
accounting controls.

76.     By reason of the foregoing, Gifford aided and abetted violations by Maxim of
Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].  Unless restrained and
enjoined, Gifford will continue to aid and abet such violations.

## EIGHTH CLAIM FOR RELIEF
*(False Proxy Statements—Violations of Section 14(a)*
*of the Exchange Act and Rule 14a-9*
*Thereunder by Defendants)*

77.     The Commission realleges and incorporates by this reference Paragraphs 1
through 51.

78.     Based on the conduct alleged above, Maxim and Gifford violated Section 14(a) of
the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which
prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting, or other
communication, written or oral, that contains a statement which, at the time and in the light of the
circumstances under which it was made, was false or misleading with respect to any material fact,
or which omits to state any material fact necessary in order to make the statements therein not
false or misleading or necessary to correct any statement in any earlier communication with
respect to the solicitation of a proxy for the same meeting or subject matter which had become
false or misleading.  To establish a violation of Section 14(a) and Rule 14a-9, Gifford's negligence
as alleged herein is sufficient.  *See In re McKesson*, 126 F. Supp. 2d 1248, 1264 (N.D. Cal. 2000).

1753358.1 08

SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
COMPLAINT

SEC 000044

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

79.     By reason of the foregoing, Maxim and Gifford violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder.  Unless restrained and enjoined, Maxim and Gifford will continue to violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin Maxim from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)], and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-91 thereunder; and

Permanently enjoin Gifford from directly or indirectly violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] and Section 14(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-131 thereunder.

II.

Order Gifford to disgorge any wrongfully obtained benefits received as a result of the overstatement of his annual bonus, including prejudgment interest.

III.

Order Gifford to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

SEC  000045

DRAFT*CONFIDENTIAL* FOR SETTLEMENT PURPOSES ONLY

1   decrees that may be entered, or to entertain any suitable application or motion for additional relief

2   within the jurisdiction of this Court.

3                                              V.

4        Grant such other and further relief as this Court may determine to be just and necessary.

5

6   DATED: September __, 2007              Respectfully Submitted,

7

8                                         _____

9                                         Erin E.  Schneider
                                          Attorney for Plaintiff
10                                        SECURITIES AND EXCHANGE COMMISSION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1753358.1  08                      - 19 -        SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
                                                                   COMPLAINT

SEC  000046

# Exhibit 32

1 | MARC J. FAGEL (Cal. Bar No. 154425)
MARK P. FICKES (Cal. Bar No. 178570)
2 |   fickesm@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
3 |   schneidere@sec.gov

4 | Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
5 | 44 Montgomery Street, Suite 2600
San Francisco, California 94104
6 | Telephone: (415) 705-2500
Facsimile: (415) 705-2501

7

8

9

10 |                UNITED STATES DISTRICT COURT

11 |              NORTHERN DISTRICT OF CALIFORNIA

12 |                     SAN JOSE DIVISION

13

14

15 | SECURITIES AND EXCHANGE COMMISSION,    Case No.  CV 07-6122 JW (HRL)

16 |              Plaintiff,               **SECURITIES AND EXCHANGE
                                          COMMISSION'S RESPONSE TO
17 |         v.                           DEFENDANT CARL W. JASPER'S
                                          SECOND SET OF INTERROGATORIES**
18 | CARL W. JASPER,

19 |              Defendant.

20

21 |     REQUESTING PARTY:        DEFENDANT W. CARL JASPER

22 |     RESPONDING PARTY:        PLAINTIFF SECURITIES AND EXCHANGE COMMISSION

23 |     NUMBER:                  TWO

24 |         Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff Securities and

25 | Exchange Commission ("Commission") hereby responds to defendant Carl W. Jasper's ("defendant")

26 | Second Set of Interrogatories ("Interrogatories").

27

28

## GENERAL OBJECTIONS TO INTERROGATORIES

1.      The Commission objects to defendant's Interrogatories generally, and incorporates this objection into each and every response, to the extent that defendant inappropriately requests specific types of information that are, by their very nature, subject to privileges and protected as work-product or trial preparation materials.  The Interrogatories seek information specifically created by attorneys in preparation for litigation or for trial preparation.  Such Interrogatories are not calculated to lead to the discovery of admissible evidence, and they seek to impose an undue burden upon the Commission and its staff.

2.      The Commission further objects to the defendant's Interrogatories generally, and incorporates this objection into each and every response, on the grounds that they are overly broad, vague, oppressive and unduly burdensome, to the extent that defendant seeks "all communications." The Commission has already complied with the requirements of Rule 26 of the Federal Rules of Civil Procedure and disclosed to defendant documents that support the allegations in the Commission's Complaint.  In addition, the Commission has produced documents responsive to defendant's First Set of Requests for Production.

3.      The Commission further objects to the defendant's Interrogatories generally, and incorporates this objection into each and every response, to the extent any of the Interrogatories explicitly or implicitly seek privileged or work-product protected information, including without limitation materials reflecting the Commission's staff's mental impressions, judgments, trial preparation materials, work product prepared in anticipation of litigation, and privileged intra-agency or inter-agency communications, including but not limited to memos, notes, lists, summaries, letters, emails, or intra-agency or inter-agency communications or similar documents or other information that reflect efforts by the Commission's counsel to contact persons in preparation for litigation, in trial preparation, or in conducting an investigation; such documents are subject to the law enforcement and deliberative process privileges and/or protected as work-product and trial preparation materials.

4.      The Commission objects to defendant's Interrogatories generally, and incorporates this objection into each and every response, on the grounds that the Interrogatories seek to improperly avoid the limitations on numbers of interrogatories by creating sub-parts not identified in the interrogatory as required by Rule 33 of the Federal Rules of Civil Procedure.  Plaintiff's First Set of Interrogatories contained 59 distinct requests for information.  Thus, although defendant labels the Interrogatories as "Interrogatory No. 9" and "Interrogatory No. 10," the Interrogatories are in reality "Interrogatory No. 60 and Interrogatory No. 61.

## OBJECTIONS TO DEFENDANT'S DEFINITIONS AND INSTRUCTIONS

1.      The Commission objects to defendant's instructions as vague and overly broad.

2.      The Commission objects to each and every one of defendant's instructions and definitions to the extent that they are inconsistent with, or seek to impose obligations on the Commission that are different from or greater than, those required by the Federal Rules of Civil Procedure, including Rules 26, 33 and 34.

3.      The Commission objects to defendant's Definition No. 1 on the grounds that it is overly broad, vague, and burdensome.

4.      The Commission objects to defendant's Definition No. 2 on the grounds that it is overly broad, vague, and burdensome.

5.      The Commission objects to defendant's Definition No. 3 on the ground that it is overly broad, vague, and burdensome.

6.      The Commission objects to defendant's Definition No. 4 on the grounds that it is overly broad, vague, and burdensome.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 9 (Actually INTERROGATORY NO. 60):

Describe in full all communications between the SEC and Jack Gifford, former CEO of MAXIM, or his representatives, from May 2006 to the present.  This interrogatory specifically includes all oral statements, written presentations, correspondence and documents made or exchanged

1  during the SEC investigation concerning Maxim's stock options and during settlement discussions

2  with Mr. Gifford.

3  **RESPONSE TO INTERROGATORY NO. 9/60:**

4      The general objections and objections to defendant's definitions and instructions are hereby

5  incorporated.  The Commission also objects to this Interrogatory to the extent it seeks information

6  protected by the attorney-client privilege and the attorney work-product doctrine.  Subject to, and

7  without waiving the foregoing objections, the Commission responds as follows:

8      Pursuant to Rule 33(d)(2) of the Federal Rules of Civil Procedure, the Commission specifies

9  that the documents produced in response to Request for Production No. 2 of Defendant's First Set of

10  Requests for Production are responsive to this interrogatory.

11  **INTERROGATORY NO. 10 (Actually INTERROGATORY NO. 61):**

12      Describe in full all communications between the SEC and Michael Byrd, former CFO of

13  MAXIM, or his representatives, from May 2006 to the present.  This interrogatory specifically

14  includes all oral statements, written presentations, correspondence and documents made or exchanged

15  during the SEC investigation concerning Maxim's stock options and during settlement discussions

16  with Mr. Gifford.

17  **RESPONSE TO INTERROGATORY NO. 10/61:**

18      The general objections and objections to defendant's definitions and instructions are hereby

19  incorporated.  The Commission also objects to this Interrogatory to the extent it seeks information

20  protected by the attorney-client privilege and the attorney work-product doctrine.  Subject to, and

21  without waiving the foregoing objections, the Commission responds as follows:

22      Pursuant to Rule 33(d)(2) of the Federal Rules of Civil Procedure, the Commission specifies

23  that the documents produced in response to Request for Production No. 4 of Defendant's First Set of

24  Requests for Production are responsive to this interrogatory.

25

26

27

28

1   DATED:  October 27, 2008

_Mark P. Fickes_

Mark P. Fickes
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Wendy W. Huang, am over 18 years of age and not a party to this action.  On October 27, 2008, I served a copy of: SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANT CARL W. JASPER'S SECOND SET OF INTERROGATORIES on counsel for defendant in this action by Federal Express, addressed to (with a copy by email):

        Steven M. Bauer
        Risha Jamison
        Latham & Watkins LLP
        505 Montgomery Street, Suite 2000
        San Francisco, CA  94111

I declare under penalty of perjury that the statements made above are true and correct.

Executed in San Francisco, California on October 27, 2008.


_____
Wendy W. Huang