1  MARC J. FAGEL (Cal. Bar No. 154425)
   MARK P. FICKES (Cal. Bar No. 178570)
2    fickesm@sec.gov
   ROBERT S. LEACH (Cal. Bar. No. 196191)
3    leachr@sec.gov
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
4    schneidere@sec.gov

5  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
6  44 Montgomery Street, Suite 2600
   San Francisco, California  94104
7  Telephone:  (415) 705-2500
   Facsimile:  (415) 705-2501

8

9

10                    **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12                        **SAN JOSE DIVISION**

13

14  SECURITIES AND EXCHANGE COMMISSION,          Case No. CV 07-6122 JW (HRL)

15                 Plaintiff,                    **SECURITIES AND EXCHANGE
                                                 COMMISSION'S OPPOSITION TO
16         v.                                    DEFENDANT CARL W. JASPER'S
                                                 MOTION TO COMPEL RESPONSES TO
17  CARL W. JASPER,                              FIRST SET OF REQUESTS FOR
                                                 PRODUCTION**
18                 Defendant.

19                                               Date:        November 10, 2009
                                                 Time:        10:00 a.m.
20                                               Location:    Courtroom 2, Fifth Floor
                                                              Hon. Howard R. Lloyd
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.  ISSUE PRESENTED .................................................................................................. 1

II.  SUMMARY OF ARGUMENT .................................................................................. 1

III.  PROCEDURAL BACKGROUND ............................................................................ 2

    A.  Gifford Provides Information to Maxim in Its Internal
        Investigation of Backdating Allegations ....................................................... 2

    B.  The SEC's Pre-Filing Interview of Gifford ................................................. 3

    C.  The SEC Sues Gifford and Jasper ................................................................ 4

    D.  Jasper's Repeated Failure to Seek Information from Gifford ....................... 6

        1.  Jasper Fails to Seek Discovery from Gifford in This
             Case ................................................................................................. 6

        2.  Jasper's Failure to Seek Discovery from Gifford in a
             Parallel Case ................................................................................... 7

    E.  The Court Grants the SEC's Motion for a Protective Order ....................... 8

    F.  Jasper's Half-Hearted Efforts to Obtain Gifford's Statements
        from Other Sources ....................................................................................... 9

IV.  ARGUMENT ........................................................................................................... 10

    A.  Jasper Has Not Met His Burden to Show Intrusion into the
        SEC's Work Product Is Warranted .............................................................. 10

    B.  The Notes Prepared by SEC Attorneys and Staff Constitute
        Opinion Work Product Subject to Almost Absolute Protection ...................... 11

    C.  Jasper Has No Substantial Need for the Notes .................................................. 13

        1.  Jasper's Failure to Seek Information from Gifford and
             15-Month Delay in Moving to Compel Belie Any
             Claim of Substantial Need ............................................................... 13

        2.  Jasper Has Sworn Discovery Responses from Gifford ......................... 14

        3.  Jasper Fails to Demonstrate How the Notes Are
             Essential to His Case ....................................................................... 14

D.   Jasper Has Not Shown That He Cannot Obtain Their
Substantial Equivalent by Other Means ........................................................ 16

V.   CONCLUSION................................................................................................................. 16

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Aaron v. SEC,*
   446 U.S. 680 (1980) ............................................................................................................ 4, 5

*Baker v. GM Corp.,*
   209 F.3d 1051 (8th Cir. 2000) ............................................................................................ 11

*Beck v. Dobrowski,*
   559 F.3d 680 (7th Cir. 2009) ............................................................................................... 5

*Copperweld Steel Co. v. Demag-Mannesmann-Bohler,*
   578 F.2d 953 (3d Cir. 1978) .............................................................................................. 15

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ............................................................................................................. 5

*Hickman v. Taylor,*
   329 U.S. 495 (1947) .................................................................................................... *passim*

*Holmgren v. State Farm Mut. Auto. Ins. Co.,*
   976 F.2d 573 (9th Cir. 1992) ...................................................................................... 11, 16

*In re Grand Jury Investigation,*
   599 F.2d 1224, 1232 (3d Cir. 1979) .................................................................................. 15

*In re Grand Jury,*
   106 F.R.D. 255 (D.N.H. 1985) .......................................................................................... 13

*McKenzie v. McCormick,*
   27 F.3d 1415 (9th Cir. 1994) ............................................................................................. 11

*Ryan v. Gifford,*
   2008 WL 43699 (Del. Ch. Jan. 2, 2008) ........................................................................ 8, 12

*SEC v. Berry,*
   580 F. Supp. 2d 911 (N.D. Cal. 2008) ................................................................................ 5

*SEC v. DiBella,*
   409 F. Supp. 2d 122 (D. Conn. 2006) ................................................................................. 5

*United States v. Batchelder,*
   442 U.S. 114 (1979) ............................................................................................................. 5

*United States v. Graham,*
   555. F. Supp. 2d 1046 (N.D. Cal. 2008) ..................................................................... 10, 15

*United States v. Morgan,*
   581 F.2d 933 (D.C. Cir. 1978) .......................................................................................... 14

*United States v. Ruehle,*
   __ F.3d __ (9th Cir. Sept. 30, 2009) ............................................................................ 6, 10

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ............................................................................................ *passim*

*Wright-Simmons v. City of Oklahoma City*,
   155 F.3d 1264 (10th Cir. 1998) ......................................................................... 15

<u>Rules</u>

Fed. R. Civ. Proc. 26(b)(1) ................................................................................... 14

Fed. R. Civ. Proc. 26(b)(3)(A) ............................................................................. 10

Fed R. Civ. Proc. 26(b)(3)(A)(ii) ......................................................................... 11

Fed. R. Civ. Proc. 26(b)(3)(B) ............................................................................. 11

<u>Regulations</u>

17 C.F.R. § 230.6 .................................................................................................. 12

<u>Other Authorities</u>

THOMAS LEE HAZEN, LAW OF SECURITIES REGULATION § 16.28[2] (6th ed. 2009) ........................ 4

I.    **ISSUE PRESENTED**

Whether the defendant is entitled to his adversary's work product – here, notes prepared by the SEC's attorneys of a witness interview – when the defendant's delays create his alleged need, the defendant has sworn discovery responses from the now-deceased witness, and the Court has already rejected a similar attempt to invade the SEC's work-product protection?

II.   **SUMMARY OF ARGUMENT**

Over 15 months after the SEC declined to waive work-product protection over its attorneys' notes of a pre-filing interview of former Maxim CEO Jack Gifford, defendant Carl Jasper moves this Court to compel production of the notes. This is the second time Jasper has urged the Court to permit him to intrude on the SEC's work product. In 2008, without even trying to depose Gifford, Jasper sought to discover Gifford's statements to the SEC through a Rule 30(b)(6) deposition of the SEC. The Court rejected Jasper's "quite unusual" request, holding that Jasper had delayed seeking information from Gifford, that he could obtain the substantial equivalent of the information through other means, and that the SEC's interest in its work product outweighed whatever interest Jasper had in the information. *See* Docket No. 52 (Order Granting Pl.'s Mot. for a Protective Order) at 5-6 ("Order"); Tough Decl. Ex. 8 at 5.

Jasper's second bite at the apple should likewise be rejected. Notes by SEC attorneys, and an SEC accountant working at their direction, from a pre-filing witness interview are classic work product. *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Indeed, they constitute opinion work product subject to almost absolute immunity from discovery under decades of United States Supreme Court precedent. *See Upjohn Co. v. United States*, 449 U.S. 383, 399-400 (1981) ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes . . . .").

Jasper's claim that he has a substantial need for the notes is belied by his failure to seek information from Gifford over many years in multiple forums. Jasper and Gifford were parties in a shareholder derivative action involving the same facts. Although Gifford publicly proclaimed his willingness to respond to discovery in that action without asserting his Fifth Amendment rights, Jasper elected not to seek it. In this case, as the Court recognized in its Order, Jasper also had ample

opportunity to obtain information from Gifford, but "at no time did Jasper attempt to seek discovery from Gifford directly" before he passed away. Order at 5-6. The fact that Jasper waited more than 15 months to bring this motion also speaks volumes about the lack of any real need. With discovery closed, Gifford's unsworn out-of-court statements can only have value if they are themselves admissible, and Jasper makes no showing that they are.

Further, Jasper cannot show a need for the information because he has received (through the efforts of others) numerous sworn discovery responses from Gifford in the derivative action, where Gifford answered interrogatories such as "[f]or each Stock Grant, state all reasons why the [s]pecific grant date was selected" and requests to admit that certain handwritten notes were authentic business records. Jasper has not faithfully heeded this Court's suggestion that he seek the information from Gifford's attorneys; instead, nearly one month before discovery was set to expire, he subpoenaed some, but not all, of Gifford's attorneys and made *no effort to get their documents*. And while he contests his adversary's assertion of a work-product objection here, he simply presumes a non-party to the litigation (Maxim's special committee) validly asserted an objection to describing what transpired at its interview of Gifford about Maxim's backdating.

Jasper's claim to the SEC's work product is no greater now than it was months ago simply because Jasper seeks documents prepared by his adversary's attorneys rather than the attorneys' testimony. The Court should deny the motion.

## III.   PROCEDURAL BACKGROUND

### A.   Gifford Provides Information to Maxim in Its Internal Investigation of Backdating Allegations

In May 2006, Merrill Lynch published a report entitled "Options Pricing – Hindsight is 20/20" questioning the timing of option grants by Maxim and other semiconductor companies. Leach Decl. Ex. 1. Maxim formed a special committee to investigate. *Id.* Ex. 2 at 7:10-16. The committee hired Orrick, Herrington & Sutcliffe to conduct the investigation; Orrick interviewed Gifford and others as part of its work. *Id.* at 7:10-10:9.

Gifford announced in December 2006 he was retiring from Maxim because of health reasons (he was 65). He stated that he would continue to serve as a strategic advisor. *Id.* Ex. 3. On January

31, 2007, Maxim announced that, as a result of the special committee's investigation, it was terminating the strategic advisor relationship. *Id.* Ex. 4.[1]

### B.       The SEC's Pre-Filing Interview of Gifford

The SEC commenced an investigation of Maxim's option practices in 2006. *Id.* ¶ 2.   On September 11, 2007, SEC staff attorneys, and an SEC staff accountant working at their direction, interviewed Gifford in the course of the SEC's investigation and prepared notes relating to the interview, in anticipation of litigation. *Id.* ¶¶ 3-6; Schneider Decl. ¶¶ 3-6; Fortunato Decl. ¶¶ 3-6.

The notes by the SEC's attorneys and the SEC accountant are not transcripts of the interview. Leach Decl. ¶ 6; Schneider Decl. ¶ 6; Fortunato Decl. ¶ 6.  They do not provide a verbatim account of what happened during the interview or what Mr. Gifford said.  Leach Decl. ¶ 6; Schneider Decl. ¶ 6; Fortunato Decl. ¶ 6.  Instead, the notes contain attorney thoughts, impressions, opinions, and conclusions.  In making the judgment what to record, the SEC professionals relied on their understanding of the facts gleaned in the SEC investigation and applicable legal theories to determine what was relevant and of importance to further their understanding of the option granting practices at Maxim.  Leach Decl. ¶¶ 5-6; Schneider Decl. ¶¶ 5-6; Fortunato Decl. ¶¶ 5-6.  The SEC did not ask Gifford to adopt the notes, nor has the SEC shared or otherwise disclosed the notes to anyone outside the SEC.  Leach Decl. ¶ 7; Schneider Decl. ¶ 7; Fortunato Decl. ¶ 7.  Jasper does not claim otherwise.

Jasper suggests that the SEC somehow deviated from practice by interviewing Gifford, rather than taking testimony. Mot. at. 1 & 7.  This is unfounded.  Nothing in the law requires the SEC to gather information through compelled or voluntary testimony as opposed to an interview.[2]  Indeed,

---

[1]     Maxim's counsel said of this decision: "The board of directors struggled with its decision concerning Mr. Gifford.  The case against Mr. Gifford was not clear-cut, and the board wrestled with somewhat ambiguous circumstantial evidence.  Ultimately, however . . . the relationship with Mr. Gifford has been severed."  Tough Decl. Ex. 28 at SEC264.  Jasper was forced to resign as a result of the special committee investigation, which found Jasper knew of, and participated in, the selection of grant dates for option grants either with hindsight or prior to completion of the grant-approval process.  Leach Decl. Ex. 5 at 44.

[2]     Jasper quotes an SEC Enforcement Manual first adopted after the SEC investigation in October 2008, erroneously suggesting it reflects some belief that SEC attorney notes are not work product. Mot. at. 1, 10-11.  In fact, it reflects the reality that in some situations it may be necessary for the SEC to waive work-product protection if it wants to aid the criminal authorities in proving a

**Footnote continued on next page**

the SEC routinely gathers information in investigations through interviews.  *See* THOMAS LEE HAZEN,

LAW OF SECURITIES REGULATION § 16.28[2] (6th ed. 2009) ("The SEC is armed with subpoena

power to facilitate its investigations.  However, the subpoena power is not the only method the

Commission can use to gather information.  The SEC often conducts much of its investigation

through interviews and the like."); Leach Decl. ¶ 3.  Gifford was not even a stand-out in the SEC's

investigation here.  As its privilege log reflects, the SEC obtained statements from witnesses other

than Gifford through informal interviews.  *See* Tough Decl. Ex. 5 at 1 & 4 (describing notes of

interviews with Sheila Raymond, Chuck Rigg, and Tony Gilbert).[3]

　　　　At least five lawyers from four separate law firms represented Gifford during the interview:

Brad Brian of Munger, Tolles & Olson, Jerome Selvers of Sonnenblick, Parker & Selvers, Stephen

Mansfield of Akin Gump Strauss Hauer & Field, and John Hueston and David Siegel of Irell &

Manella.  Leach Decl. ¶ 8.

　　　　**C.　　The SEC Sues Gifford and Jasper**

　　　　Months after the interview, on December 4, 2007, the SEC filed a complaint against Gifford

and Maxim, alleging Gifford aided and abetted Maxim's violations of securities laws prohibiting it

from filing false reports with the SEC, falsifying books and records, and failing to maintain adequate

internal controls; directly violated the prohibition on filing false proxy statements; and directly

violated Section 17(a)(3) of the Securities Act, which makes it unlawful to "engage in any

transaction, practice, or course of business which operates or would operate as a fraud or deceit." 15

U.S.C. § 77q(a)(3); Tough Decl. Ex. 4.  The claims Gifford was alleged to have directly violated do

not require proof of scienter.  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Beck v. Dobrowski*,

---

particular witness obstructed justice or lied to federal officials, or if it wants to impeach a witness
with a prior inconsistent statement.  The manual Jasper cites further makes clear that whether the
SEC staff interviews a witness, takes the witness' testimony voluntarily, or compels the testimony by
subpoena is within the staff's discretion.  Leach Decl. Ex. 24 at 75-80 (noting the staff may interview
a witness, "may request" voluntary testimony, or "may require" testimony by subpoena).

[3]　　　Before the interview, Gifford's physician at Stanford University opined in writing that
Gifford's medical condition precluded him from sitting for a deposition.  *See* Leach Decl. Ex. 6.

---

1   559 F.3d 680, 682 (7th Cir. 2009).  Along with the complaint, the SEC lodged a proposed final

2   judgment, to which Gifford consented without admitting or denying the allegations.[4]

3           That same day, the SEC charged Jasper with the same violations, as well as claims that he

4   directly falsified books and records, made false statements to auditors, falsely certified Maxim's

5   financial statements, and violated Section 17(a)(1) of the Securities Act and Section 10(b) and Rule

6   10b-5 of the Exchange Act.  *See* Docket No. 1.  These last claims include a scienter element.  *See*

7   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Aaron*, 446 U.S. at 701-02.

8           Jasper insists that, from day one, the SEC has been impermissibly inconsistent.  His basis is

9   the *absence* of an allegation about Gifford's mental state.[5]  He assumes the sole basis for the SEC's

10  litigation judgment to not assert a Section 10(b) claim against Gifford and to settle with him are

11  handwritten notes Gifford made directing Jasper to expense backdated options.  He ignores the fact

12  that he and Gifford were positioned differently within the company, with Jasper, as CFO and a

13  Certified Public Accountant, having responsibility for ensuring the company's financial statements

14  and related disclosures were accurate and in conformity with Generally Accepted Accounting

---

16  [4]     Jasper argues the Gifford interview was unusual because three days later the SEC agreed on
17  all material terms of a settlement.  His only cite for this is a comparison of a draft complaint provided
    to Gifford's attorneys with the final, filed complaint.  It is the Commission, however, not the staff,
18  that has authority to settle an SEC enforcement action.  Leach Decl. ¶ 9.  Jasper has no basis to
    conclude when the staff and Gifford began discussing a possible settlement, whether any discussions
19  had been ongoing before the September 11, 2007 interview, when or if the staff decided to
    recommend a settlement to the Commission itself, or when the Commission voted on any
20  recommendation by the staff.  Moreover, as at least a dozen cases in just the last two months
    demonstrate, it is common for the SEC to file and settle charges on the same day.  *Id.* ¶ 10 (citing
21  examples).

22  [5]     In a recent filing, Jasper insists the SEC claimed Gifford "at most" acted negligently.  Docket
    No. 75 at 6.  This is not what the Gifford complaint says.  In any event, the SEC has discretion in
23  determining when and how to settle and litigate its cases.  *See SEC v. Berry*, 580 F. Supp. 2d 911,
    924 (N.D. Cal. 2008) (stating "[t]he SEC enjoys discretion in choosing its quarry and how vigorously
24  it pursues them" and upholding complaint against officer for aiding and abetting company's fraud
    even though company was not charged with fraud); *see also United States v. Batchelder*, 442 U.S.
25  114, 124 (1979).  The mere fact that the SEC declined to allege that Gifford committed scienter-
    based fraud does not preclude such allegations against Jasper.  *See Berry*, 580 F. Supp. 2d at 924; *see*
26  *also SEC v. DiBella*, 409 F. Supp. 2d 122, 135-36 (D. Conn. 2006) (holding the fact that the SEC
    charged certain parties with a non-scienter violation does not mean it "found" that the parties did not
27  act intentionally or with scienter).

28

---

Principles.  *See United States v. Ruehle*, __ F.3d __ (9th Cir. Sept. 30, 2009) ("The duties undertaken by [the CFO] broadly encompassed not only accurately and completely reporting the company's historical and current stock option granting practices, but also [the company's] strict compliance with reporting and record keeping requirements imposed through the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002, among many other federal and state rules and regulations.").  And he characterizes as "key" a 3-line paragraph in the SEC's 21-page complaint against him to the effect that on four occasions Maxim's CEO instructed Jasper in handwritten notes to record an expense. Mot. at 1.  However, as the SEC's recently filed motion for summary judgment demonstrates, without consideration of the notes, the overwhelming and unrebutted evidence shows that Jasper knew of the backdating, knew it was wrong, and still approved numerous materially false financial statements. *See* Docket No. 63.[6]

>    **D.      Jasper's Repeated Failure to Seek Information from Gifford**
>
>          **1.      Jasper Fails to Seek Discovery from Gifford in This Case**

The SEC made Rule 26 disclosures on March 21, 2008, identifying Gifford and others as knowledgeable witnesses.  Tough Decl. Ex. 17; Docket No. 41 (Fickes Decl.) ¶ 3.[7]   Instead of seeking information from these individuals, Jasper focused on attempting to obtain the SEC's work product.  *See* Order at 2 & 3 (noting that Jasper did not even attempt to first seek discovery from

---

[6]      Jasper intends to show the Gifford notes are fabricated through the "expert" testimony of Daniel Gill, a retired FBI agent who worked asset forfeiture cases.  Leach Decl. Ex. 19.  Gill formed his "opinion" in less than two days after reviewing the complaints, a handful of documents, and five testimony transcripts. *Cf. id.* Exs. 19 & 20.  He has been qualified as a paid expert only once – in a trademark case where he was asked to calculate lost profits. *Id.* Exs. 19 & 21 at 53:18-55:20.  In reaching his "opinions," Gill was not given, and he did not consider, Gifford's sworn responses to discovery (described below) with respect to his handwritten notes. *Id.* Ex. 21 at 148:21-151:12.  He did not receive or consider the sworn affidavit of a lawyer at Maxim authenticating one of the notes Gill's report identifies as being suspect. *Id.* Ex. 21 at 148:21-151:12; ¶ 33; Ex. 22.  Nor did Gill speak with Jasper.  Notably, in attacking the veracity of the notes Gifford wrote, Jasper fails to note that, when asked point-blank about these notes by the staff, Jasper chose to invoke his Fifth Amendment privilege against self-incrimination. *See, e.g.*, Docket No. 64-19.

[7]      Docket No. 41, the Declaration of Mark P. Fickes in Support of Plaintiff Securities and Exchange Commission's Motion for Protective Order Precluding the Deposition of Plaintiff's Attorneys, is also attached as Exhibit 23 to the Declaration of Robert S. Leach in support of this opposition.

1   Gifford or other witnesses); Docket No. 41 ¶¶ 3-4 & 10.  The SEC – not Jasper – noticed Gifford's

2   deposition for January 29, 2009.  Tough Decl. Ex. 35; Docket No. 41 ¶ 4.  Jasper's only effort in this

3   regard was a cross-notice for Gifford's deposition in late December 2008.  Order at 5-6; Docket No.

4   41 ¶ 4.

5          On May 30, 2008, Jasper served his First Set of Requests for Production (the "Request") – the

6   request at issue here – generally seeking all documents relating to communications involving the

7   SEC, Gifford, former Maxim CFO Michael Byrd, and their attorneys.  Tough Decl. Ex. 1 (Request

8   Nos. 2 & 4 at 5-6); Docket No. 41 ¶ 5 & Ex. A.  On July 3, 2008, the SEC responded to the Request

9   by identifying non-privileged documents produced in its Rule 26 disclosures that evidenced

10  communications with Gifford's counsel and by producing additional non-privileged documents

11  evidencing communications between the SEC and Gifford.  Tough Decl. Ex. 2 (Response Nos. 2 & 4

12  at 3-5); Docket No. 41 ¶ 6 & Ex. B.  On July 3, 2008, the SEC also produced a privilege log

13  identifying documents arguably responsive to the Request, but which are protected by the work-

14  product doctrine.  Tough Decl. Exs. 5 & 6; Docket No. 41 ¶ 7.

15         On September 22, 2008, Jasper served his Second Set of Interrogatories, asking the SEC to,

16  among other things, describe all communications between the SEC's attorneys and Gifford, Byrd,

17  and their attorneys.  Docket No. 41 ¶ 8 & Ex. C.  On October 27, 2008, the SEC responded to the

18  Second Interrogatories by setting forth the SEC's privilege objections.  *Id.* ¶ 9 & Ex. D.

19         Rather than move to compel responses to either the Request or the Second Interrogatories or

20  pursue the discovery from Gifford himself, on December 9, 2008, Jasper noticed a Rule 30(b)(6)

21  deposition of the SEC, seeking testimony from the SEC on "[a]ny and all statements made by John

22  Gifford [and Byrd] to the SEC regarding stock option practices and/or the alleged backdating of

23  options at Maxim."  Docket No. 41 ¶ 11 & Ex. E.

24              **2.      Jasper's Failure to Seek Discovery from Gifford in a Parallel Case**

25         When the SEC filed this case, Maxim shareholders were actively litigating a derivative action,

26  filed in June 2006 in Delaware state court, against Gifford, Jasper, and others.  Leach Decl. Ex. 7.

27  After initially declining to respond to discovery based on the Fifth Amendment, Gifford advised the

28  Delaware court and the parties in writing that he would not assert his Fifth Amendment rights in the

case. *Id.* Ex. 8; *Ryan v. Gifford*, 2008 WL 43699, at *2 n.4 (Del. Ch. Jan. 2, 2008). Subsequently, Gifford supplemented his discovery responses, providing sworn substantive answers to at least three separate sets of interrogatories. *See* Leach Decl. Exs. 9-11. For example, Gifford stated:

> *Interrogatory*: For each Stock Grant, state all reasons why the Specific grant date was selected. *Response*: In many instances, Mr. Gifford did not select the dates for option grants. Mr. Gifford believed that the selection of dates for grants was generally made through practices and procedures developed by professionals inside and outside of the Company. Mr. Gifford relied on others to properly administer the option grant process. . . . He believed that the processes and procedures in place complied with applicable rules.

Ex. 9 at 7-8.

Gifford also answered three separate sets of requests for admission, including requests directed to whether his handwritten notes were authentic business records made at the relevant time. *Id.* Exs. 12-14. For example, when asked to admit certain notes were "made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters," Gifford responded:

> [I]t was his regular business practice in the performance of his duties at Maxim to make handwritten notes of instruction or handwritten notes to otherwise follow up or make a further inquiry as to subject, that [certain handwritten notes] appear to comprise or contain a copy of such a notes, and that those handwritten notes appear to have been at or near the time of the occurrence of the matters set forth therein.

*Id.* Ex. 14 at 4-5.

Thus, it is simply false to say, as Jasper repeatedly does, that the "the only time Gifford spoke on [the backdating charges] in a non-privileged setting . . . was during his interview with the SEC." Mot. at 7; Docket No. 43 (Jasper Protective Order Opp'n) at 1-2. Even if a privilege applies to the special committee's interview of Gifford – and Jasper presents no evidence one does – Gifford provided multiple responses under oath to discovery in the derivative case and proclaimed his willingness to continue to do so.

### E.     The Court Grants the SEC's Motion for a Protective Order

The SEC moved for a protective order to preclude Jasper from proceeding with the Rule 30(b)(6) deposition. At the hearing, the Court noted that Jasper's request was "quite unusual" and his counsel conceded the Rule 30(b)(6) deposition was an "end run" in place of the motion to compel production of documents Jasper could have brought. Tough Decl. Ex. 8 at 5, 18-19. As the Court

stated during the hearing to Jasper's counsel:  "[W]hat you really want is the SEC version of what Gifford said.  You don't even want Gifford's version."  Tough Decl. Ex. 8 at 12; *see* Order at 5.

Jasper argued then, as he does now, that he had a substantial need for the SEC to provide the statements Gifford made in the September 2007 interview.[8]  The Court rejected this:  "Suffice to say that for discovery purposes and on the record presented, this court is unpersuaded that the stated need for the SEC's deposition outweighs the SEC's interest in protecting its attorneys' work product."  Order at 5; Docket No. 43 at 2, 10-11.

The Court also rejected Jasper's argument that he had no choice but to proceed with an SEC deposition:  "[T]he record indicates that at no time did Jasper attempt to seek discovery from Gifford directly, save for an eleventh-hour 'cross-notice' for his deposition, which reportedly was served in late December 2008 only after the Commission advised that it would be filing the . . . motion [for a protective order]."  Order at 5-6.

### F.    Jasper's Half-Hearted Efforts to Obtain Gifford's Statements from Other Sources

In the Order, the Court gave Jasper a road map for obtaining the information he sought, noting that "Gifford's attorneys are an alternate source of the information Jasper seeks."  Order at 6.  Jasper, however, first responded by again seeking the information from the SEC.  On July 9, 2009, Jasper's counsel wrote the SEC demanding that it produce the notes and respond further to the Second Interrogatories.  Tough Decl. Ex. 40.  The SEC declined.  *Id.* Ex. 9.  Jasper waited until August 31, 2009, just over one month before the discovery cut-off, before taking any action.  That day he served a notice for the depositions of 17 witnesses, including three of Gifford's counsel: David Siegel, Steve Mansfield, and Brad Brian.  Leach Decl. Ex. 15; Docket Nos. 60 & 74 (establishing October 15, 2009 cut-off for all discovery).  He has not served any subpoena for documents from the attorneys or their firms; nor did he subpoena Brian or two other attorneys who represented Gifford during the SEC interview:  Jerome Selvers and John Hueston.  Schneider Decl. ¶ 9.  While counsel for Siegel and

---

[8]    Jasper also claimed that he had a substantial need for interview statements by Byrd.  Docket No. 43 at 9-10.  The Court granted the motion for a protective order with respect to Byrd, noting that Jasper could depose him.  Order at 5.  Despite Jasper's claim of substantial need for the information, Jasper has not bothered to depose Byrd.  Schneider Decl. ¶ 10.

Mansfield claim that they have no notes and are unable to separate Gifford's statements in the SEC interview from privileged communications with Gifford, Jasper has done nothing to test this and presents no basis to presume the same is true for Brian, Selvers, or Hueston.

Jasper also has made no effort to discover Gifford's statements to the special committee that investigated the backdating.  In a deposition of the special committee's lead lawyer, Jasper's counsel asked all of nine questions about the Gifford interview and simply assumed a privilege applied to the statements made at the interview.  Ex. 2 at 8:8-10:9.  He did not ask whether Gifford was told the substance of the interview would be shared with Maxim's auditors, in which case the attorney-client privilege never attached because the communication was not made in confidence.  *See United States v. Ruehle*, __ F.3d __ (9th Cir. Sept. 30, 2009).  He did not ask what Maxim disclosed about the interview to its auditors or others, in which case any privilege may have been waived.[9]

## IV.   ARGUMENT

### A.   Jasper Has Not Met His Burden to Show Intrusion into the SEC's Work Product Is Warranted

A party ordinarily is prohibited from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. Proc. 26(b)(3)(A).  "[I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties . . . .  Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."  *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947); *see Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981) (describing the "strong public policy" underlying the work-product doctrine).

"[T]he general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden

---

[9]   In his motion, Jasper also provides no evidence Maxim could claim work-product protection over the interview in this litigation.  To the contrary, he cites to this Court authority expressly *declining* to extend work-product protection to non-parties.  *See* Mot. at 12 (citing *United States v. Graham*, 555. F. Supp. 2d 1046, 1050 (N.D. Cal. 2008)).

rests on the one who would invade that privacy to establish adequate reasons to justify production . . .
." *Hickman*, 329 U.S. at 512.  Work product may not be discovered unless the requesting party
shows that it (1) has a substantial need for the materials to prepare its case and (2) cannot, without
undue hardship, obtain their substantial equivalent by other means.  *Id.* Rule 26(b)(3)(A)(ii).

Moreover, the Court must "protect against disclosure of the mental impressions, conclusions,
opinions, or legal theories of the party's attorney or other representative."  *Id.* Rule 26(b)(3)(B).
Although the Supreme Court has not decided whether opinion work product is absolutely protected
from discovery, it has emphasized that a party seeking opinion work product, such as notes based on
oral statements of a witness, must make a "far stronger showing of necessity and unavailability."
*Upjohn*, 449 U.S. at 401-02.  The lone setting where the Ninth Circuit has permitted discovery of
opinion work product is where "mental impressions are *at issue* in a case and the need for the
material is compelling."  *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir.
1992) (allowing discovery in a bad faith insurance claim settlement case of memos drafted by a
claims adjustor showing a range of values for plaintiff's claim).

Here, Jasper cannot seriously question that the SEC notes are work product.  And he fails to
make the requisite showing necessary to obtain ordinary work product – substantial need for the
materials and inability obtain their substantial equivalent through other means – let alone the "far
stronger showing" necessary for opinion work product.

### B.  The Notes Prepared by SEC Attorneys and Staff Constitute Opinion Work Product Subject to Almost Absolute Protection

Work product of a lawyer is reflected in "interviews, statements, memoranda,
correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and
intangible ways."  *Hickman*, 329 U.S. at 511.  "[I]nterview notes [a]re protected work product."
*McKenzie v. McCormick*, 27 F.3d 1415, 1420 (9th Cir. 1994); *Baker v. GM Corp.*, 209 F.3d 1051,
1054 (8th Cir. 2000) ("Notes and memoranda of an attorney, or an attorney's agent, from a witness
interview are opinion work product entitled to almost absolute immunity.").  Indeed, in *Hickman*
itself, a lawyer "privately interviewed [witnesses] and took statements from them with an eye toward
the anticipated litigation."  *Hickman*, 329 U.S. at 498; *id.* at 497 (presenting the question as whether

1   "a party may inquire into oral and written statements of witnesses or other information secured by an

2   adverse party's counsel").

3        The notes at issue here are work product.  They were prepared in anticipation of litigation by

4   SEC staff attorneys and an SEC staff accountant working at their direction.  They are not transcripts

5   or recordings of the interview.  Rather, they are imbued with each individual's understanding of the

6   legal, factual, and strategic issues raised.  The SEC attorneys and their accountant relied on their

7   understanding of the important facts that had been learned in the investigation and applicable legal

8   theories to determine, in their judgment, the information they chose to record.  The attorneys' and

9   accountant's knowledge of the case facts and theories provided a filter through which they each sifted

10  the relevant information conveyed and statements made during the interview.

11       Jasper suggests that the SEC notes are not even fact work product.  Mot. at 11.  He cannot,

12  however, dispute the notes were prepared by SEC attorneys, and an SEC accountant working at their

13  direction, in anticipation of litigation.  Jasper simply ignores the well-settled law cited above; indeed,

14  his brief does not even cite *Hickman* or *Upjohn*.

15       Instead, Jasper argues that because the SEC took sworn testimony from other witnesses in its

16  investigation and decided to produce the transcripts of the testimony, the SEC's notes must not be

17  work product.  Mot. at 11.  This is wrong.  In civil litigation, a distinct line exists between a witness's

18  recorded statement and an attorney's interview notes.  That distinction is clear in this civil litigation.

19  Indeed, federal regulation provides that a witness who provides testimony to the SEC is entitled to

20  procure a copy of the transcript.  17 C.F.R. § 230.6.  Witnesses did so here, and the court in the

21  Delaware derivative action ordered Maxim to request from the SEC and produce to the shareholder

22  plaintiffs transcripts of the investigative testimony.  *See Ryan v. Gifford*, 2007 WL 4259557, at *1 &

23  2 (Del. Ch. Nov. 30, 2007); Leach Decl. Exs. 16-18.  Unlike a verbatim testimony transcript,

24  however, there is no provision for sharing notes of a witness interview.  This is because

25  contemporaneous notes reflect the attorney's thought processes if for no other reason than they show

26  what the attorney found important enough to reduce to writing.  *See Upjohn Co.*, 449 U.S. at 399

27  ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly

28  disfavored because it tends to reveal the attorney's mental processes . . . .");  *In re Grand Jury*

1  *Subpoena Dated Dec. 19, 1978*, 599 F.2d 504, 512 (2d Cir. 1979); *In re Grand Jury*, 106 F.R.D. 255,

2  257 (D.N.H. 1985).[10]

3  **C.    Jasper Has No Substantial Need for the Notes**

4  **1.    Jasper's Failure to Seek Information from Gifford and 15-Month Delay in**
5  **Moving to Compel Belie Any Claim of Substantial Need**

6      Jasper has failed to show his substantial need for the SEC's notes.  Rather he has, in multiple

7  forums, consistently declined to seek the information from Gifford.  Jasper could have, but failed to,

8  depose Gifford in this case.  Instead, as the Court has recognized, Jasper demanded the SEC's work

9  product, serving three separate requests for the SEC's notes or testimony before taking a single fact

10  deposition.  Similarly, for nearly two years, Jasper was a party to litigation with Gifford involving the

11  same issues presented here.  All Jasper needed to do was propound an interrogatory requesting

12  Gifford to describe what he said to the SEC, if he really needed to know.  Although Jasper

13  supposedly considered Gifford "central[] to the allegations" and Gifford's statements to the SEC to

14  be "important," Jasper did not seek that discovery here (or in the Delaware case) when he had

15  abundant opportunity.  Mot. at 1 & 8.

16      Indeed, the fact that Jasper waited 15 months from the SEC's assertion of a work-product

17  objection also demonstrates the lack of need.  If Jasper believed discovery of the SEC's work product

18  would lead to discovery of *evidence* that Jasper did or did not commit securities fraud, then waiting

19  until after the discovery cut-off to compel the notes' production is of no use since he will not be able

20  to obtain such evidence now that discovery is closed.  In truth, Jasper wants the SEC's work product

21  so he can second-guess the SEC's litigation judgments.  This is not a substantial need.

22  _____

23  [10]    "[A]s to oral statements made by witnesses to [the attorney] . . ., whether presently in the form
of his mental impressions or memoranda, we do not believe that any showing of necessity can be

24  made under the circumstances of this case so as to justify production. Under ordinary conditions,
forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to

25  his adversary gives rise to grave dangers of inaccuracy and untrustworthiness.  *No legitimate purpose
is served by such production.  The practice forces the attorney to testify as to* what he remembers or

26  *what he saw fit to write down regarding witnesses' remarks.  Such testimony could not qualify as
evidence*; and to use it for impeachment or corroborative purposes would make the attorney much

27  less an officer of the court and much more an ordinary witness.  The standards of the profession
would thereby suffer."  *Hickman*, 329 U.S. at 512-13 (emphasis added).

28

1

### 2.   Jasper Has Sworn Discovery Responses from Gifford

2    Jasper also has no need for the information because, while he declined to seek information

3  from Gifford when he had the opportunity, others did.  In the Delaware case, Gifford provided

4  multiple, sworn discovery responses providing insight into his view of the backdating at Maxim.  He

5  also confirmed his practice of making handwritten notes of instruction and authenticated certain notes

6  relating to options.  Jasper has not even mentioned this discovery though he (and not the SEC)

7  received it years ago as a party to that action.

8

### 3.   Jasper Fails to Demonstrate How the Notes Are Essential to His Case

9    Rule 26 provides that even evidence inadmissible at trial is subject to discovery, so long as it

10  is reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. Proc. 26(b)(1).

11  Jasper defends his "substantial need" by stating that the interview statements may lead to the

12  discovery of admissible evidence.  Mot. at 2 ("That Gifford suddenly passed away . . . does not make

13  his . . . statements any less likely to lead to the discovery of admissible evidence.") & 7 ("[W]hatever

14  Gifford told the SEC . . . will surely lead to the discovery of other critical and admissible evidence.").

15  However, as Jasper acknowledges, the discovery cut-off has passed.  Mot. at 14 ("Fact discovery is at

16  an end."); Docket Nos. 60 & 74 (ordering discovery cut-off of October 15, 2009).  The SEC notes

17  thus cannot lead to the discovery of admissible evidence.

18    Jasper also fails to demonstrate how the notes themselves are admissible, further undercutting

19  any need for the information.  In his motion, Jasper describes the notes as "material," "use[ful]," and

20  "critical," but he makes no effort to explain how they are admissible.  Mot. at 7, 8, & 9.  Gifford's

21  death only further diminishes their value, as the notes could not be used to impeach Gifford.

22    Previously, Jasper claimed Gifford's unsworn interview statements are not hearsay because

23  they are adoptive admissions of the SEC.  *See* Docket No. 43 at 4-5.  The only authority he cited is

24  distinguishable.  In *United States v. Morgan*, 581 F.2d 933, 938 (D.C. Cir. 1978), the court concluded

25  an affidavit by a detective to a judicial officer, in which the detective swore that he believed

26  particular statements by an informant were trustworthy, became the adoptive admission of the

27  government.  The SEC complaints, however, are not like the affidavit in *Morgan*.  The complaints do

28  not quote a witness' interview statements.  They do not say a particular witness spoke truthfully on a

1  particular date and his or her statement is reliable.  They represent an amalgam of information

2  gathered by the SEC over a lengthy investigation, not the SEC's vouching for an individual it

3  interviewed and alleged violated the federal securities laws.  The only other case cited by Jasper,

4  *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268-69 (10th Cir. 1998), also is of no

5  help.  There, an agent of the city against whom the statements were admitted testified he acted on the

6  particular report that was admitted.  Jasper cites no case, and the SEC is aware none, where an agency

7  was deemed to "adopt" the statement of a witness by making allegations in a complaint.  The Court

8  should not sanction an intrusion into the SEC's work product absent a substantially greater showing

9  by Jasper that the information he seeks has some evidentiary value at trial.

10  Jasper also relies on *United States v. Graham*, 555 F. Supp. 2d 1046 (N.D. Cal. 2008), to

11  suggest his need.  The criminal case, however, is inapposite.  First, the case involved discovery from

12  non-parties, and the Court explicitly declined to extend the work-product doctrine to the non-parties

13  who were seeking it.  *Id.* at 1050.  Second, the Court emphasized that the defendant had a "far more

14  crucial" need for the information because it was a criminal case and the defendant needed to know

15  how uncooperative witnesses were likely to testify at trial.  In this civil case, unlike *Graham*, Jasper

16  seeks the notes of his adversary for a witness who will not testify at trial.  In addition, Jasper cites *In

17  re Grand Jury Investigation*, 599 F.2d 1224, 1232 (3d Cir. 1979), which upheld production of a

18  corporate attorney's memoranda of an interview with a deceased employee in an investigation where

19  there was a "stark inability of the government to secure the information from any more reliable

20  source."  Here, in contrast, Jasper has sworn discovery responses from Gifford and Powerpoints by

21  his attorneys, and there is no prospect that discovery will lead to a more reliable source for

22  information admissible at trial.  Similarly, in *Copperweld Steel Co. v. Demag-Mannesmann-Bohler*,

23  the Third Circuit upheld the admissibility of an attorney interview memorandum at trial where the

24  proponent of the evidence "did not . . . have an opportunity to depose" the subject of the interview

25  before his death.  578 F.2d 953, 963 n.14 (3d Cir. 1978).[11]  Jasper had ample opportunity here.

27  [11]     The Third Circuit cases also were decided before *Upjohn* made clear a party seeking attorney
notes must make a "far greater" showing of substantial need than when the party seeks ordinary work
28  product.  Since then, the Ninth Circuit has allowed discovery of opinion work product only where a
**Footnote continued on next page**

### D.     Jasper Has Not Shown That He Cannot Obtain Their Substantial Equivalent by Other Means

Despite this Court's conclusion that Jasper could obtain the information he seeks from others – namely Gifford's attorneys – Jasper has not diligently pursued this option.  Jasper's first response to the Order was to demand the SEC produce its attorneys' notes and respond under oath to interrogatories about the SEC pre-trial interview.  Tough Decl. Ex. 40.  After the SEC declined, Jasper waited until August 31, 2009 – just over thirty days before the discovery cut-off – to seek depositions from some of Gifford's representatives.  Even then, Jasper did not serve any subpoenas for documents from these individuals or their firms.  *Id.* Exs. 37 & 38.  He provides no evidence that one of the attorneys whose deposition was noticed, Brad Brian, lacks notes of the interview and is unable to separate his recollection of the interview from privileged communications with Gifford.  Jasper also failed to subpoena testimony or documents from two of the attorneys representing Gifford during the interview:  Jerome Selvers and John Hueston.

Jasper also has ignored another source for the information:  counsel for Maxim's special committee, who also interviewed Gifford about Maxim's stock option practices.  Jasper appears to have assumed this conversation was privileged.  Jasper's unquestioning willingness to presume that other, non-party sources of the information are "privileged," while seeking his adversary's work product, reveals his motion as a litigation ploy.

## V.     CONCLUSION

The Court should deny Jasper's motion to compel.

Dated:  October 20, 2009                              Respectfully submitted,

/s/ Robert S. Leach
Mark P. Fickes
Robert S. Leach
Erin E. Schneider

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

---

party's "mental impressions" are at issue, which is not the case here, and where there is a compelling need, which has not been shown.  *Holmgren*, 976 F.2d at 577.