United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

Securities and Exchange Commission,

                Plaintiff,

   v.

Carl W. Jasper,

                Defendant.

_____/

NO. C 07-06122 JW

**ORDER DENYING DEFENDANT'S
RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW, OR IN THE
ALTERNATIVE FOR A NEW TRIAL;
GRANTING IN PART PLAINTIFF'S
MOTION FOR PERMANENT
INJUNCTION AND OTHER RELIEF**

## I.  INTRODUCTION

The Securities and Exchange Commission ("SEC") brought this civil enforcement action against Carl W. Jasper ("Defendant") alleging, *inter alia*, violations of § 10(b) of the Securities and Exchange Act of 1934 and various SEC rules.  The SEC alleges that Defendant unlawfully backdated options grants and submitted false financial statements for Maxim Integrated Products, Inc. ("Maxim" or the "Company").

## II.  BACKGROUND

**A.**  **Evidence Presented at Trial**

    **1.**  **Defendant's Participation in Maxim's Backdating Scheme**

Evidence at trial showed that from at least 2000 through 2005, Maxim engaged in a regular practice of making in-the-money stock-option grants to employees and directors without reflecting them as expenses in SEC filings.  As the Company's Chief Financial Officer ("CFO"), Principal

Accounting Officer, and a Certified Public Accountant, Defendant played a central role in carrying out Maxim's backdating scheme.

The SEC's evidence demonstrated that on numerous occasions, Defendant actively suggested to the Company's CEO, Jack Gifford, historical low-points in Maxim's stock price to be used after the fact as stock-option grant dates. Examples of communications between Defendant and Gifford in which Defendant suggested taking advantage of low stock prices, even though the stock-options were not actually granted on those dates, are as follows:

(1) Defendant's response to a memo from Gifford asking about the lowest price Maxim could use for an option grant in the first quarter of fiscal year 2004, which stated, "The best price is the first day of the quarter–June 30, 2003. The price was $34.10 on that date. . . . I have attached a listing of Maxim's closing stock prices for your reference." (Trial Exs. 56, 115.)

(2) A December 28, 2001 memo from Defendant to Gifford suggesting dates for option grants to several classes of employees, which stated, "Given the run up in our stock price this quarter, I would like to propose the following to set the option price for Q202 activity. . . ." (Trial Ex. 61.)

(3) A memo from Defendant to Gifford regarding an option grant for Maxim employee Dave Carron, which states, "But I would like to grant him an option now at the Oct price so that he gets a favorable price. I believe this will go a long way in ensuring he stays with Maxim. Please consider and approve the attached grant proposal." (Trial Ex. 81.)

(4) An August 2, 2000 memo from Defendant to Gifford regarding using a low-stock price for a hire-on grant, which stated, "Typically we default to using everyone's hire on date as the date to grant and set the price for the hire on option grant. . . . If you want Brian to get the lower price, please sign the attached memo and I will see that it is done. We should not be doing this as a practice as the accounting rules would require a comp charge but for one person we will just get it done." (Trial Ex. 67.)

(5) A November 21, 2002 memo from Defendant to Gifford suggesting that he make the Board's 2002 option grant on October 10. (Trial Ex. 78.)

(6) A January 4, 2000 memo from Defendant to Gifford listing a range of low stock prices from October 1999 and suggesting that Gifford make the Director grant on October 21 "to achieve [his] objective." (Trial Ex. 34.)

Additionally, the SEC presented witness testimony to prove that Defendant was aware of Maxim's backdating practices. Maxim stock administration employee Sandy Wong testified that Maxim used historical stock price information to pick low stock prices as recommended exercise prices for option grants to employees. Maxim's stock administration manager, Sheila Raymond,

2

testified, "The process at the company, the way the company worked was to grant options at the lowest possible price without taking as–without taking expense for it. That's just the way the company was." (Trial Tr. 607:1-608:24.) Ms. Raymond further testified that she did not draft the grant approval memoranda on the dates listed in the memoranda. Instead, she obtained the grant date and price information either verbally from Defendant, or by selecting the low price for the quarter from a stock price report. (See id. at 612:14-613:21.) At the end of each quarter, Ms. Raymond delivered the backdated memoranda to Defendant personally. (See id. at 613:23-615:8.)

### 2. Defendant's Misrepresentations

As CFO and Principal Accounting Officer, Defendant was ultimately responsible for the accuracy of Maxim's financial statements and its internal controls. (Trial Tr. 447:7-448:7, 488:2-489:11, 961:8-964:19.) Defendant assured the Board that Maxim's option granting process was "well-documented by . . . his group" and that he "closely monitor[ed] the closing price of Maxim stock each day." (See id. at 1166:8-1172:22.) Despite his knowledge of the proper accounting practices for backdated stock options, during Defendant's tenure as CFO, Maxim never recorded the applicable compensation expense in its financial statements.

Due to Maxim's failure to properly account for backdated stock options in its financial statements, all of the annual and quarterly reports that the Company submitted to the SEC that Defendant had signed and certified were false and had to be restated.[1] Defendant also signed ten management representation letters, which assured auditors that Maxim's financial statements complied with generally accepted accounting principles. (Trial Exs. 151-52, 495-501, 504.)

### 3. Defendant's Mental State

Evidence at trial showed that Defendant was cognizant that according to generally accepted accounting principles, in-the-money stock-option grants should be recorded as compensation

---

[1] (Trial Tr. 528:6-530:9, 532:20-533:3, 533:24-534:4, 536:12-539:20, 544:9-546:8 (testimony of Alan Hale, Maxim Interim CFO); Trial Tr. 808:5-810:22, 817:1-818:19, 852:16-25 (testimony of Lisa Portnoy, former Maxim auditor); Trial Tr. 951:20-953:16, 954:18-955:9, 956:2-957:10, 959:17-960:12 (testimony of Scott Angel, current Maxim auditor); see also Trial Exs. 89-92 (Maxim's Form 10-K annual reports), 457 (Restatement).)

United States District Court
For the Northern District of California

expenses.[2]  Despite Defendant's knowledge, however, the SEC presented evidence demonstrating that Defendant intentionally concealed Maxim's backdating practices from Board members.  Two of those Board members testified that when they asked Defendant about the Company's option granting practices, he told them that Maxim never backdated options.  (See Trial Tr. 479:10-836:16, 484:24-486:14 (testimony of Kip Hagopian); Trial Tr. 1166:5-17, 1170:20-1171:11 (testimony of James Bergman).)

**B.** **Procedural History and Trial**

The SEC's claims against Defendant were tried to a jury.  After close of the evidence, Defendant made a timely Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a).[3]  The Court took Defendant's Rule 50(a) Motion under submission and submitted the case to the jury with a Verdict form that asked their findings as to each claim.  The Verdict form returned by the jury was as follows:

| CLAIM | VERDICT/AWARD |
|---|---|
| Fraud in Connection with the Purchase or Sale of Securities | Verdict in favor of the SEC |
| Use of Instrumentalities in Interstate Commerce to Commit Securities Fraud | Verdict in favor of the SEC |
| Obtaining Money or Property by Means of Securities Fraud | Verdict in favor of Defendant |
| False Periodic Reports–Aiding and Abetting | Verdict in favor of the SEC |
| False Books and Records–Aiding and Abetting | Verdict in favor of the SEC |
| Inadequate Internal Accounting Controls–Aiding and Abetting | Verdict in favor of the SEC |

---

[2]  (See, e.g., Trial Ex. 3 (letter from Defendant describing "the accounting principle guiding the expensing of options by the International Accounting Standards Board"); Ex. 41 (describing Defendant as a "major contributor[]" to "a letter of comment on [the Financial Accounting Standards Board's] proposals on stock-based compensation"); Ex. 49 (letter from Defendant to Gifford, stating with regard to a Company stock-bonus program, "As long as the options are granted at fair market value on the date the number of shares, vesting terms, and other pertinent option information is known, then we do not need to record any compensation expense related to the option.").

[3]  (Defendant Carl W. Jasper's Notice of Motion for Judgment as a Matter of Law, hereafter, "Rule 50(a) Motion," Docket Item No. 233.)

United States District Court

For the Northern District of California

4

United States District Court

For the Northern District of California

| Circumventing Internal Accounting Controls | Verdict in favor of Defendant |
|---|---|
| Falsifying Books and Records | Verdict in favor of the SEC–Defendant acted deliberately |
| False Statements of Omissions to Accountants and Auditors | Verdict in favor of the SEC |
| False Certifications | Verdict in favor of the SEC |
| False Proxy Statements | Verdict in favor of Defendant |

Defendant timely filed the following motions: (1) Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial,[4] (2) Motion for Judgment or New Trial based on government misconduct,[5] and (3) Request for Judgment Based on Estoppel Defenses.[6]  The SEC timely filed a Motion for Permanent Injunction, Other Relief and Final Judgment.  (hereafter, "SEC's Motion," Docket Item No. 265.)

The Court conducted a hearing on July 12, 2010.  This Order disposes of all pending post-trial Motions.

### III.  STANDARDS

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law ("JMOL").  Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense . . . ."  Fed. R. Civ. P. 50(a)(1); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).  The motion must be made before the case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).

If, as was the case here, the court does not grant a motion for judgment made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later

---

[4] (hereafter, "Defendant's Renewed Motion for JMOL," Docket Item No. 260.)

[5] (hereafter, "Defendant's Motion Re Misconduct," Docket Item No. 263.)

[6] (hereafter, "Defendant's Motion Re Estoppel," Docket Item No. 259.)

United States District Court

For the Northern District of California

1   deciding the legal questions raised by the motion.  Fed. R. Civ. P. 50(b).  The standard for granting a

2   renewed post-verdict JMOL is the same as the standard for granting a pre-submission JMOL under

3   Rule 50(a).  Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001).

4   A party is entitled to judgment as a matter of law if, under the governing law, there can be but one

5   reasonable conclusion as to the verdict, and that is, a finding in favor of the moving party.  (Id.)  The

6   court must draw all reasonable inferences in favor of the nonmoving party and should review all

7   evidence in the record.  Reeves, 530 U.S. at 150.

8                                              **IV.  DISCUSSION**

9   **A.       Defendant's Motions for Judgment or a New Trial**

10           Defendant moves for judgment, or in the alternative, a new trial, on multiple grounds.

11  Defendant's contentions can be divided into the following general categories: (1) the SEC did not

12  prove that each of the nineteen specific grants at issue were improperly backdated, (2) the SEC's

13  presentation as to evidence of materiality caused juror confusion, (3) the SEC's reliance on Maxim's

14  September 2008 Restatement was improper, (4) the jury was improperly allowed to make adverse

15  inferences based on Defendant's invocation of the Fifth Amendment, (5) the expert testimony of

16  several SEC witnesses was insufficient to prove liability, (6) there was insufficient evidence to

17  support any of the SEC's negligence claims, (7) the SEC on several occasions at trial misled the jury

18  or made improper statements to the jury, and (8) the SEC should be judicially estopped from telling

19  the jury that it sued Gifford for fraud when its Complaint only alleged negligence, or "non-scienter

20  fraud," against Gifford.  The Court addresses each of these general categories of contentions in turn.

21           **1.       Proof of Backdating as to Nineteen Specific Grants**

22           Defendant contends that in pre-trial discovery, the parties agreed to limit the case to nineteen

23  specific option grants, and that the SEC failed at trial to prove that Maxim backdated any of those

24  nineteen specific grants.  (Defendant's Renewed Motion for JMOL at 3-5.)  Defendant further

25  contends that the evidence on which the SEC relied to prove backdating was insufficient as to the

26  nineteen grants at issue because Maxim's Restatement covered a much wider temporal scope than

27  Defendant's tenure as CFO, and the Equity Edge data at most showed the grant date and stock price

28                                                       6

1    on particular dates.  (Id.)  The SEC responds that it was not required to prove backdating as to each

2    individual grant, and there is no authority to support Defendant's contention that the Court erred by

3    instructing the jury that it could consider the nineteen grants in the aggregate.[7]

4            In light of the evidence of Maxim's widespread backdating practices, the Court finds that the

5    jury could reasonably conclude that Maxim backdated the nineteen option grants at issue.

6    Accordingly, the Court DENIES Defendant's Motion for JMOL or a new trial on that basis.

7            **2.    Evidence of Materiality**

8            Defendant contends that the SEC's closing argument confused the jury with respect to the

9    appropriate standard for materiality because it focused on a general accounting perspective rather

10   than whether the alleged intrinsic value of the nineteen grants at issue would have been important to

11   investors.  (Defendant's Renewed Motion for JMOL at 10.)  Defendant further contends that the

12   SEC improperly relied on Maxim's failure to follow generally accepted accounting principles

13   ("GAAP") to prove materiality.  (Id.)  The SEC responds that it introduced at trial evidence, beyond

14   failure to follow GAAP, sufficient to show that Defendant's misrepresentations regarding Maxim's

15   stock option grants were material.  (SEC's Opposition Re JMOL at 17-19.)

16           The Court finds that the jury was properly instructed as to the proper standard for materiality

17   under the securities laws.  Furthermore, in light of the evidence of materiality presented at trial, the

18   Court finds that the jury could reasonably conclude that a reasonable investor would consider

19   Defendant's misstatements important in deciding whether or not to buy or sell Maxim stock.

20   Accordingly, the Court DENIES Defendant's Motion for JMOL or a new trial on that basis.

21           **3.    Reliance on September 2008 Restatement**

22           Defendant contends that the SEC improperly relied on Maxim's 2008 Restatement because

23   the document is inadmissible hearsay and encompasses many grants that are not relevant to the

24   present litigation.  (Defendant's Renewed Motion for JMOL at 12.)  The SEC responds that the

25   Restatement is a business record within the meaning of Fed. R. Evid. 803(d), and the broad scope of

26   _____

27   [7]  (SEC's Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law or a
     New Trial at 11-12, hereafter, "SEC's Opposition Re JMOL," Docket Item No. 273.)

28                                                                 7

*United States District Court*
For the Northern District of California

1    the Restatement goes to its weight rather than its admissibility.  (SEC's Opposition re JMOL at 26-

2    27.)

3           Defendant relies on <u>Paddack v. Dave Christensen, Inc.</u> for the proposition that the results of a

4    "special audit" do not constitute a business record.  745 F.2d 1254, 1258 (9th Cir. 1984).  In

5    <u>Paddack</u>, however, the court expressly distinguished between the compliance audit at issue in that

6    case and a "financial statement audit," which the court noted was "generally admissible as a

7    business record of the audited entity under Fed. R. Evid. 803(6)."  <u>Id.</u> at 1257 n.3.  The Court finds

8    that the Restatement here resulted from a financial statement audit conducted in accordance with

9    regular audit procedures, and it is thus an admissible business record.  Furthermore, the Court finds

10   that despite its broad scope, the jury was entitled to conclude from the Restatement that Maxim

11   backdated the nineteen grants at issue.  Accordingly, the Court DENIES Defendant's Motion for

12   JMOL or a new trial on that basis.

13          **4.    Fifth Amendment**

14          Defendant contends that the SEC failed to demonstrate that the requirements of <u>Doe ex rel.

15   Rudy-Glanzer v. Glanzer</u>[8] had been met as to each individual instance where the SEC sought an

16   adverse inference based on Defendant's invocation of the Fifth Amendment, and that the Court erred

17   in instructing the jury that it could make an adverse inference based on Defendant's invocation of

18   the Fifth Amendment without also instructing on the requirements of <u>Glanzer</u>.  (Defendant's

19   Renewed Motion for JMOL at 13.)  Defendant further contends that the Court erred in excluding

20   documents establishing that the SEC drafted a declaration for Maxim CEO Jack Gifford in which

21   Gifford invoked the Fifth Amendment in response to SEC questioning.  (<u>Id.</u> at 15-16.)  The SEC

22   responds that it presented at trial independent evidence of Defendant's mental state and the dates on

23   which he drafted backdating approval memoranda, so it was proper for the jury to make an inference

24   adverse to Defendant as to those issues.  (SEC's Opposition re JMOL at 28.)  The SEC also

25   contends that the Court on multiple occasions ruled that the documents Defendant sought to

26   _____

27          [8]  232 F.3d 1258 (9th Cir. 2000).

28                                              8

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1 introduce with respect to Gifford invoking the Fifth Amendment were privileged attorney work

2 product, and thus they were properly excluded. (Id. at 29.)

3      The Court finds that the SEC made a sufficient showing that the Glanzer requirements had

4 been met to allow the jury to make adverse inferences with regard to Defendant's invocation of the

5 Fifth Amendment.  The Court further finds that the Gifford documents at issue were properly

6 excluded pursuant to the Court's prior orders.  (See Docket Item Nos. 52, 128.)  Accordingly, the

7 Court DENIES Defendant's Motion for JMOL or a new trial on that basis.

8      **5.      Sufficiency of the SEC Witnesses**

9      Defendant contends that the testimony of accounting expert Albert Vondra, economics expert

10 Howard Mulcahey, and percipient witness James Long was insufficient to support the jury's finding

11 of liability.  (Defendant's Renewed Motion for JMOL at 17-18.)  As to Vondra, Defendant contends

12 that his testimony cannot establish materiality as to any specific grant. (Id. at 17.)  Likewise,

13 Defendant contends that Mulcahey's testimony as to the Restatement's general effect on the stock

14 market cannot establish the impact of any particular grant. (Id.)  Finally, Defendant contends that

15 Long was an undisclosed expert witness in electronic discovery under the guise of a fact witness.

16 (Id. at 18.)  The SEC responds that (1) a reasonable jury, faced with evidence of a routine and

17 systematic backdating scheme could reasonably have found that every grant analyzed by Vondra

18 was backdated, (2) Mulcahey's testimony is relevant to the effect on investors of news of Maxim's

19 backdating practices, and the individual impact of any specific grant is irrelevant, and (3) Long was

20 a percipient witness regarding the metadata in the Equity Edge database.[9]  (SEC's Opposition at 31-

21 34.)

22      The Court finds that the testimony of Vondra, Mulcahey, and Long are all admissible and

23 relevant to a material issue in the litigation, and it was proper for the jury to consider those

24 _____

25      [9]  The Court finds that the SEC's reliance on US v. Lecroy, 441 F.3d 914, 927 (11th Cir.
2006), is on point with regard to Long's witness status.  In that case, the court held that "[j]ust
26 because [a particular witness'] position and experience could have qualified him for expert witness
status does not mean that any testimony he gives at trial is considered 'expert testimony.'"  Id.
27 Likewise here, the fact that Long was qualified to testify as an expert in electronic discovery does
not mean that he testified as an expert witness in this instance.

28

United States District Court

For the Northern District of California

testimony when making their liability findings.  Accordingly, the Court DENIES Defendant's
Motion for JMOL or a new trial on that basis.

### 6.   Sufficiency of Proof as to Negligence Counts

Defendant contends that the Court erred by allowing the SEC's negligence claims to go
before the jury without putting on any evidence of the duty of care owed by a CFO of a public
company.  (Defendant's Renewed Motion for JMOL at 20.)  Defendant further contends that the
jury's request for a fuller explanation of the term "unreasonable" in the jury instructions showed that
the lack of clarity with regard to the appropriate standard for the negligence claims made a
difference.  (Id.)  The SEC responds that in finding Defendant liable for lying to auditors, the only
claim on which the SEC prevailed in which the jury may have found that Defendant acted
"negligently," the jury determined that Defendant "knew or should have known" that his actions
could result in rendering Maxim's financial reports materially misleading.  (SEC's Opposition re
JMOL at 35-36.)  Thus, Defendant could not have been prejudiced by any lack of evidence of an
appropriate negligence standard, or any jury confusion as to that standard.  (Id.)

The Court finds that there was sufficient evidence presented at trial to support the jury's
findings of liability based on Defendant acting intentionally.  Thus, any lack of evidence of an
appropriate negligence standard for CFOs is moot.  Accordingly, the Court DENIES Defendant's
Motion for JMOL or a new trial on that basis.

### 7.   SEC Misconduct at Trial

Defendant moves for judgment or a new trial on the ground that the SEC's misconduct was
so pervasive in presenting its case, that the jury could not have come to a fair decision.  (Defendant's
Motion Re Misconduct.)  Defendant contends, *inter alia*, that (1) the SEC falsely represented to the
jury that Gifford was charged with fraud and accepted responsibility for his misconduct, (2) the SEC
improperly suggested to the jury that Defendant was the only alleged participant in the backdating
scheme who invoked his Fifth Amendment rights, and (3) the SEC withheld information from its
interview with Gifford and then falsely told the jury that it had not withheld any exculpatory
evidence.  (Id.)  The SEC responds that (1) it charged Gifford with non-scienter fraud, which is a

United States District Court
For the Northern District of California

type of securities fraud, and Gifford accepted responsibility by voluntarily paying more than $800,000 in civil penalties and disgorgement of ill-gotten gains, (2) the SEC's comments with regard to Defendant's invocation of the Fifth Amendment were in line with the Court's prior orders and jury instruction, and there is no inconsistency in accepting a Fifth Amendment declaration from one witness in an investigation while arguing that the jury should draw an adverse inference against another at trial, and (3) the Court on multiple occasions ruled that the SEC's investigatory interviews with Gifford were properly excluded as attorney work product.[10]

"To warrant reversal on grounds of attorney misconduct, the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir. 1984) (internal citation and quotation marks omitted). "Using some degree of emotionally charged language during closing argument in a civil case is a well-accepted tactic in American courtrooms." Settlegoode v. Portland Pub. Sch., 371 F.3d 503, 518 (9th Cir. 2004). "The federal courts erect a 'high threshold' to claims of improper closing arguments in civil cases raised for the first time after trial." Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1193 (9th Cir. 2002).

The Court finds that the SEC's conduct of which Defendant complains essentially amounts to a small number of isolated statements in lengthy closing and rebuttal arguments. The fact that the verdict was not in favor of the SEC on all of its claims demonstrates that the jury carefully weighed the evidence before it and did not merely presume Defendant's liability. Thus, even assuming the SEC committed misconduct during the trial, it was not of the kind or quality that would permeate the entire proceedings and taint the jury's verdict. Accordingly, the Court DENIES Defendant's Motion for Judgment or a New Trial based on trial misconduct.

---

[10] (SEC's Opposition to Defendant's Motion for Judgment or New Trial, Docket Item No. 271.)

United States District Court

For the Northern District of California

**8.      Estoppel Defenses**

Defendant contends that the SEC took a position at trial with respect to Gifford's role in the backdating scheme inconsistent with the position it took prior to trial.  (Defendant's Motion Re Estoppel at 13-15.)  More specifically, Defendant contends that in its Complaint, the SEC alleged that Gifford was merely negligent, and used its claim of a lower level of scienter to resist discovery into its investigation of, and discussions with, Gifford.  (Id.)  Then at trial, after being confronted with evidence of Gifford's integral role in Maxim's backdating practices, the SEC changed position and represented to the jury in its rebuttal argument that it had sued Gifford for fraud, which gave the SEC an unfair advantage since Defendant did not have an opportunity to address the SEC's inconsistent position with the jury.  (Id.)  The SEC responds that it did not take inconsistent positions because it did, in fact, sue Defendant for securities fraud, and the SEC never took the position that Gifford did not act intentionally.[11]

Judicial estoppel is an equitable doctrine that precludes parties from disavowing their prior representations to the courts.  Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996).  In determining whether judicial estoppel applies, courts typically consider factors such as (1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether the first tribunal accepted or relied upon the prior position, and (3) whether the party now asserting the inconsistent position stands to gain an unfair advantage.  New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).

The Court finds that the SEC was not precluded from representing to the jury that Gifford played a central role in the backdating scheme, or that the SEC sued him for fraud, merely because it did not allege claims for scienter-based fraud against Gifford in its Complaint.  The SEC has wide discretion to determine when and how to settle and litigate its cases, and the fact that the SEC did not allege certain claims against Gifford has no bearing on whether it may allege those claims against Defendant.  See SEC v. Berry, 580 F. Supp. 2d 911, 924 (N.D. Cal. 2008) (upholding the

---

[11]  (SEC's Opposition to Defendant's Request for Judgment Based on Estoppel Defenses at 9-12.)

SEC's complaint against general counsel for aiding and abetting a company's fraud even though the company itself was not charged with fraud). Accordingly, the Court DENIES Defendant's Motion for Judgment Based on Estoppel Defenses.[12]

## B.   SEC's Motion for Permanent Injunction and Other Relief

Pursuant to the jury's verdict against Defendant, the SEC seeks the following remedies: (1) an order enjoining Defendant from future violations of the federal securities laws, (2) a permanent bar on Defendant serving as a director or officer of a public company, (3) a "significant" civil money penalty, (4) forfeiture of Defendant's bonuses and stock-sale profits pursuant to Section 304(a) of the Sarbanes-Oxley Act, and (5) disgorgement of Defendant's ill-gotten gains.  (SEC's Motion.) The Court will address each of these remedies in turn.

### 1.   Injunction

The SEC seeks to enjoin Defendant from all future violations of the federal securities law. (SEC's Motion at 9.)

Injunctive relief is the primary statutory remedy for violations of the federal securities laws. 15 U.S.C. §§ 77t(b), 78u(d); SEC v. Randolph, 736 F.2d 525e, 529.  A district court may grant the SEC's request for a permanent injunction upon the SEC showing a reasonable likelihood that the defendant will commit future violations.  SEC v. Fehn, 97 F.3d 1276, 1295 (9th Cir. 1996).  In determining the likelihood of future violations, the court should consider the totality of the circumstances, including: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the violation; (3) the defendant's recognition of the wrongfulness of the conduct; (4) the likelihood, given the defendant's occupation, of future violations; and (5) the sincerity of his assurances against future violations.  Id.  Past violations may permit an inference that future violations will occur, and

---

[12]  The Court finds Defendant's equitable estoppel contentions equally unavailing.  Equitable estoppel is only applicable where the defendant has reasonably relied on some conduct of the SEC to his detriment.  Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 59-61 (1984). Furthermore, a federal agency may not be estopped on the same terms as other parties to the litigation.  Id. at 60-61 ("When the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.").  The Court finds that Defendant here has not made a sufficient showing of reasonable reliance on the SEC's conduct to support an equitable estoppel defense.

United States District Court
For the Northern District of California

1    the fact that the defendant is presently not engaged in any violations does not preclude a court from

2    issuing a permanent injunction.  SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980).

3        Here, the Court finds that all of the Fehn factors weigh in favor of enjoining Defendant from

4    future violations of the federal securities laws.  First, the jury found that Defendant acted knowingly

5    or with reckless disregard for the truth when he made misstatements in connection with the purchase

6    or sale of securities,[13] and that Defendant acted "deliberately" when he "falsified a book, record, or

7    account of Maxim,"[14] demonstrating a high degree of scienter.  Second, evidence presented at trial

8    demonstrates that Defendant's backdating practices occurred over the course of a five-year period

9    from 2000 to 2005, and that multiple reports filed with the SEC throughout that time contained

10   materially false or misleading certifications.  Thus, Defendant's violative acts were part of an

11   ongoing pattern of conduct rather than isolated incidents.  Third, Defendant has never publicly

12   acknowledged the wrongfulness of his conduct, and at trial continued to pin the blame for Maxim's

13   backdating troubles on Gifford rather than taking any responsibility for his actions.  Fourth,

14   Defendant has indicated that he seeks to continue working in the public accounting field,[15] and thus

15   Defendant's future employment is likely to place him in a position of responsibility over a

16   company's compliance with securities laws.  And finally, the Court is not aware of any assurances

17   that Defendant has ever provided against future violations.

18

19

20

21   _____

         [13]  (Verdict at 1-2, Docket Item No. 247.)

22
         [14]  (Id. at 9.)

23

24       [15]  In the parties' Joint Pretrial Conference Statement, Defendant stated that if the SEC failed
     to convince the jury of his complicity in Maxim's backdating practices, Defendant could "go back to
     trying to earn a living to support his family."  (Docket Item No. 134 at 4.)  Defendant contends that
25   he never specifically stated that he planned to work in public accounting, and he is not currently
     employed at a public company.  (Defendant's Opposition to the SEC's Motion for Final Judgment,
26   "Defendant's Opposition," Docket Item No. 277.)  The Court finds that, although not explicitly,
     Defendant's statement strongly implies that he would like to return to a position similar to the one he
27   had prior to the SEC's action against him.

28                                                          14

United States District Court

For the Northern District of California

Defendant responds that an injunction is unnecessary because the SEC cannot rely solely on Defendant's past violations to show a reasonable likelihood of future ones,[16] and that Defendant does not have any prior history of securities law violations. (Defendant's Opposition at 14-15.) As to the first point, the Court finds that the SEC has presented evidence to support its request for an injunction beyond the mere fact of past violations. As discussed above in connection with the analysis under <u>Fehn</u>, the SEC has demonstrated, among other things, that Defendant acted with a high degree of scienter, that his violative conduct was recurrent, and that he has not recognized the wrongful nature of his conduct. In support of his contention that an injunction is inappropriate for a "first offender" such as himself, Defendant relies on <u>SEC v. Johnson</u>.[17] In <u>Johnson</u>, however, the court found that a permanent injunction was inappropriate in part because the defendant's violation was an isolated incident that took place over the course of two months "in a career that spanned more than ten years." Here, on the other hand, Defendant's violative conduct took place with significant regularity over the course of five years. Thus, the Court finds that the SEC has met its burden of establishing that a permanent injunction is appropriate.

Accordingly, the Court GRANTS the SEC's request for an order enjoining Defendant from any future violations of the securities laws.

### 2. Director and Officer Bar

The SEC seeks a bar prohibiting Defendant from serving as a director or officer of a public company. (SEC's Motion at 11.)

A district court "may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine," any person engaged in securities fraud "from acting as an officer or director [of a public company] if the person's conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). In determining whether to order a director and officer bar, a court may consider:

---

[16] <u>See</u> <u>SEC v. Blatt</u>, 583 F.2d 1325, 1334 (5th Cir. 1978).

[17] 595 F. Supp. 2d 40, 44-45 (D.D.C. 2009).

United States District Court

For the Northern District of California

(1) the "egregiousness" of the underlying securities law violation; (2) the defendant's "repeat offender" status; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.[18]

Here, the Court has previously discussed the recurrent nature of Defendant's violative actions, his high degree of scienter, and the significant likelihood that misconduct will occur, all of which weigh in favor of imposing a director and officer bar. As far as the remaining First Pacific Bancorp factors, the evidence at trial showed that Defendant on multiple occasions misstated the Company's financials, certified false reports to the SEC, and concealed the Company's backdating practices from auditors and the board of directors. While it is clear that the costly financial restatements that Defendant's actions necessitated harmed the Company and caused losses to investors, Defendant reaped only indirect benefits from the backdating scheme, and thus it does not appear that Defendant acted purely out of selfish motives. Thus, the Court finds that the egregiousness factor weighs in favor of a director and officer bar, but the lack of a direct economic stake in the backdating scheme weighs against imposing the harshest possible penalty.

Defendant's role at the time of the fraud also weighs in favor of a bar: Defendant was the Company CFO, and thus the person ultimately responsible for ensuring the accuracy of the Company's financial reports and complying with accounting rules. Although as CEO, Gifford also bears substantial responsibility for the fraud that occurred on his watch, the fact that Defendant was not alone in carrying out the backdating scheme does not lessen his culpability.

---

[18] SEC v. First Pac. Bankcorp., 142 F.3d 1186, 1193 (9th Cir. 1998) (quoting 15 U.S.C. § 78u(d)(2)); see also SEC v. Hilsenrath, 2009 U.S. Dist. LEXIS 58930. In the Sarbanes-Oxley Act of 2002, Congress lowered the SEC's burden in seeking a director and officer bar from showing "substantial unfitness" to serve to only showing "unfitness" to serve. SEC v. Levine, 517 F. Supp. 2d 121, 144-45 (D.D.C. 2007). Based on this reduced burden post-Sarbanes-Oxley, SEC contends that the Court should adopt the unfitness test adopted by the D.C. district court in Levine. In that test, the Court also considers the defendant's acknowledgment of wrongdoing and credibility of the defendant's contrition as unfitness factors. See Levine, 517 F. Supp. 2d at 145-46. Since the Ninth Circuit has not adopted the Levine test, and at least one court in the district has continued applying First Pacific Bancorp after Sarbanes-Oxley's removal of "substantial" from the statutory language, the Court will only consider the First Pacific Bancorp factors here. However, the Court finds that in this case, both tests would yield the same outcome.

United States District Court

For the Northern District of California

On balance, the Court finds that a director and officer bar is appropriate, but a permanent bar is unduly harsh under the circumstances.  As the Court noted in <u>Johnson</u>, "a permanent bar against serving as an officer or director of a publicly held company is far too draconian a remedy" where Defendant did not actually gain any money from his violation of the Exchange Act.  595 F. Supp. 2d at 45 (finding that "[g]iven the specific intent with which [the defendant] acted and his understanding at the time that his actions were very questionable, . . . a five year bar is appropriate").  Moreover, the absence of any other violations of securities laws in Defendant's past weighs against a lifetime bar.  <u>See</u> <u>Levine</u>, 517 F. Supp. 2d at 146; <u>SEC v. Stanard</u>, 2009 WL 196023, at *33.

In sum, the Court does not find that there is sufficient evidence that Defendant will violate the securities laws again in the future to permanently deprive him of his career and livelihood.  Furthermore, it appears that Defendant has had difficulty obtaining regular employment since his resignation from Maxim in January 2007, thus he has already been effectively barred from his profession for three and a half years.  However, considering Defendant's active participation in a fraudulent scheme over the course of several years, the Court finds that a director and officer bar of two years from the date of Judgment is appropriate.[19]

### 3.    Civil Money Penalties

The SEC moves the Court to impose "significant" money penalties against Defendant. (SEC's Motion at 12-14.)  The SEC contends that "Third Tier" penalties are appropriate here due to Defendant's repeated violations of the securities laws.  (<u>Id.</u>)

The court may impose civil monetary penalties against any person who violates the Exchange Act.  15 U.S.C. §§ 77t(d), 78u(d)(3).  Third-tier penalties may be imposed when the

---

[19]  The Court rejects Defendant's contention that any bar is inappropriate because the SEC did not seek director and officer bars in its settlements with Gifford and Byrd.  (<u>See</u> Defendant's Opposition at 18.)  "The SEC enjoys discretion in choosing its quarry and how vigorously it pursues them."  <u>SEC v. Berry</u>, 580 F. Supp. 2d 911, 924 (citing <u>United States v. Batchelder</u>, 442 U.S. 114, 124 (1979)).  The SEC is not constrained in seeking a particular remedy with respect to one defendant simply because it did not seek the same remedy with respect to others.  There are legitimate reasons why the SEC may have declined to seek a director and officer bar against Gifford and Byrd; all of which are not for the Court to evaluate.

United States District Court

For the Northern District of California

violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." 15 U.S.C. § 78(d)(3)(B)(iii). The penalty is not to exceed the greater of $120,000 for each violation, or the "gross amount of pecuniary gain" to the defendant. Id.; see 17 C.F.R. § 201.1002 (increasing Third Tier penalty to $120,000 for conduct occurring after 2001).

Here, the jury found Defendant liable for violations involving fraud and deliberate or reckless disregard of regulatory requirements. (See Verdict.) Moreover, Defendant's multiple misstatements and false SEC filings over an extended period of time, resulting in Maxim's delisting from NASDAQ, created a significant risk of substantial loss to investors. Thus, the Court finds that a Third-Tier penalty is appropriate here.

Defendant contends that Defendant's inability to pay militates for a smaller monetary penalty. (Defendant's Opposition at 19-20.) Several district courts have recognized that ability to pay is a relevant consideration when determining the amount of civil penalties to impose. See, e.g., SEC v. Druffner, 517 F. Supp. 2d 502, 513 (D. Mass. 2007) (finding civil penalties not warranted where defendant's total assets worth less than $30,000 and defendant had an annual salary of about $30,000); SEC v. Henke, 275 F. Supp. 2d 1075, 1086 (N.D. Cal. 2003) (finding a Third Tier civil penalty of $100,000 for each of five violations appropriate where defendant showed assets of $4.2 million). Here, Defendant declares assets far in excess of the $30,000 that the court found justified a waiver of civil penalties in Druffner.[20] Furthermore, since the Court is only imposing a limited director and officer bar, Defendant will have the opportunity to continue earning a living in his chosen profession for years to come. Thus, Defendant's financial situation does not weigh heavily against a significant monetary penalty. However, since Defendant benefitted only indirectly from the backdating scheme, the Court finds that imposing the maximum civil penalty would be excessive.

---

[20] (See Declaration of Christopher B. Campell in Support of Defendant Carl W. Jasper's Opposition to the SEC's Motion for Final Judgment, Ex. B (filed under seal).)

United States District Court

For the Northern District of California

Accordingly, the Court finds that under the circumstances here, a monetary penalty of $60,000 for each of the six claims involving a culpable mental state where the jury found liability–counts 1, 2, 4, 5, 6, and 8, for a total of $360,000–adequately achieves the congressional purpose of deterring future violations of the securities laws.

### 4. Forfeiture of Bonuses and Stock-Sale Profits

The SEC moves for an order requiring Defendant to forfeit to Maxim all of the bonuses and stock-sale profits he received during the relevant time period. (SEC's Motion at 14-15.)

"Section 304(a) of the Sarbanes-Oxley Act provides for the forfeiture of certain bonuses and profits when corporate officers fail to comply with securities law reporting requirements." In re Digimarc Corp. Derivative Litigation, 549 F.3d 1223, 1229 (9th Cir. 2008). The relevant provisions provide:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for–
> (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
> (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243.

Here, Maxim restated its financial statements because of its failure to record expenses for in-the-money stock option grants for the fiscal years ended June 29, 2002, June 28, 2003, June 26, 2004, and June 25, 2005. (See Trial Ex. 457 (Maxim's Form 10-K Report for Fiscal Year ended June 24, 2006 disclosing restated financials).) Maxim filed the form 10-K Reports that contained the financial statements that had to be restated on September 25, 2002, September 22, 2003, September 9, 2004, and September 8, 2005.[21] Under the plain language of the statute, as Company CFO, Defendant is required to reimburse Maxim for any bonus or profit from sale of Maxim stocks during the 12-month period following the filing of each of the 10-K Reports that had to be restated.

---

[21] (See Joint Statement of Undisputed Facts ¶¶ 6-9, Docket Item No. 127.)

The trial evidence shows that Defendant received the following bonuses during that time period: (1) $207,466 on December 4, 2003; (2) $646,447 on November 18, 2004; and (3) $465,212 on December 15, 2005.  (See Trial Ex. 473 (Record of Defendant's Bonus/Commission Information).)  Also during this period, on November 10, 2003, Defendant sold 15,000 shares of Maxim stock at a profit of $550,514.  (See Trial Ex. 482 (SEC Statement of Changes in Beneficial Ownership).)  Thus, the Court finds that Defendant must forfeit to Maxim $1,869,639, the total amount he gained from bonuses or Maxim stock sales within a year of the filing of each of the three 10-K Reports that had to be restated.

Defendant contends that he is not required to forfeit any bonuses or stock-sale profits under Sarbanes-Oxley because of the limiting effect of the word "first" in Section 304(a).  (Defendant's Opposition at 22-23.)  Under Defendant's reading of the statute, the first filing that had to be restated during his tenure as CFO was the 10-K Report submitted to the SEC on September 25, 2002.  Since Defendant did not profit from any stock sale or receive any bonus subsequent to that filing until November 10, 2003 and December 4, 2003 respectively, he did not make any reimburseable gain for more than twelve-months after the first filing embodying the noncompliance with a financial reporting requirement.  In support of his contention, Defendant relies on SEC v. Mercury Interactive, LLC, a case from this district in which the court dismissed the SEC's claim under Section 304(a) because it did not "identif[y] adequately a 'first public issuance or filing' sufficient to identify a twelve-month period for which [defendants] are obligated to repay bonuses and stock profits."  2009 WL 2984769, at *7 (N.D. Cal. 2009).

The Court finds, however, that Mercury Interactive is distinguishable because in that case, the defendant's last alleged options grant should have been reported in an August 13, 2002 Form 10-Q, while the SEC based its Section 304 claim on subsequent filings that also failed to disclose the compensation expense.  See id., at *6.  The court rejected the SEC's contention that the defendant was "responsible for repayment of all bonuses and stock sales in the year following each annual and quarterly financial statement because 'the financial impact of the misconduct is not limited to the very first financial statement following the fraud.'"  Id., at *7.  In contrast here, backdating of stock

20

United States District Court

For the Northern District of California

1    option grants continued throughout the relevant period, and thus each of the 10-K Reports that had

2    to be restated reflected the first financial statement submitted after new stock options grants were

3    issued that should have been expensed.  Thus, unlike in <u>Mercury Interactive</u>, the SEC here does not

4    base its Section 304 claim on the continuing impact of stock option grants that should have been

5    reflected as expenses in Maxim's September 25, 2002 10-K Report, but instead bases it on new

6    stock option grants that should have been reflected as expenses in Maxim's September 22, 2003,

7    September 9, 2004, and September 8, 2005 10-K Reports.

8           Defendant further contends that he is not required to forfeit his bonuses and stock-sale profits

9    because Section 304 only applies when the issuer is "required" to issue an accounting restatement,

10   and the SEC has not shown that Maxim was ever ordered or compelled to do so.  (Defendant's

11   Opposition at 23 n.68.)  In support of his contention, Defendant relies on <u>SEC v. Shanahan</u>, a case in

12   which the court granted summary judgment to the defendant on the SEC's Section 304 claim

13   because the SEC did not prove that defendant's company was "required to prepare an accounting

14   statement."  624 F. Supp. 2d 1072, 1077-78 (E.D. Mo. 2008).  Unlike here, however, in <u>Shanahan</u>,

15   the company never actually restated its financial statements.  <u>Id.</u> at 1078.  The court held that

16   Section 304 does not apply where there should have been an accounting restatement because of

17   material non-compliance, but none actually occurred.  <u>Id.</u>  Thus, the Court finds that <u>Shanahan</u> is

18   inapposite in the present circumstances.  Moreover, Defendant does not produce any evidence

19   showing that Maxim restated its financial statements for any reason other than being compelled to

20   do so under the securities laws and SEC regulations.  Considering the costs that the restatements

21   imposed on Maxim, it appears highly unlikely that the Company would not have issued the

22   restatements if it did not have to.

23          Finally, Defendant contends that he should not have to forfeit his bonuses and stock-sale

24   profits because Gifford and Byrd did not have to forfeit theirs, and selective enforcement of

25   Sarbanes-Oxley would violate Defendant's Due Process rights.  (Defendant's Opposition at 22.)

26   Defendant relies on a zoning dispute case in which the court cited a Ninth Circuit opinion for the

27   proposition that "[t]he due process clause also includes a substantive component which guards

28                                                          21

United States District Court

For the Northern District of California

against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." Tyson v. City of Sunnyvale, 920 F. Supp. 1054, 1062 (N.D. Cal. 1996) (internal citation and quotation marks omitted).  In Tyson, the court rejected the plaintiffs' substantive due process argument because they failed to show that the City Council did not have any possible rational basis for its rejection of a re-zoning application.  Similarly here, Defendant has not shown that the SEC lacked any legitimate basis for seeking a Section 304 penalty against Defendant but not against Gifford or Byrd, nor has he shown that the SEC's decision was based on some impermissible discriminatory motive.  See United States v. Kidder, 869 F.2d 1328, 1335 (9th Cir. 1989) ("[T]he conscious exercise of some selectivity of enforcement is not in itself a federal constitutional violation so long as the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.").

Accordingly, the Court GRANTS the SEC's motion to require Defendant to reimburse Maxim $1,869,639 pursuant to Section 304(a) of the Sarbanes-Oxley Act.

### 5.    Disgorgement

The SEC moves for an order requiring Defendant to disgorge to the United States Treasury all of his performance-related bonuses, less any amounts forfeited to Maxim pursuant to Section 304(a) of the Sarbanes-Oxley Act.  (SEC's Motion at 15-16.)

It is well-established in the Ninth Circuit that a "district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of federal securities laws." SEC v. JT Wallenbrock & Assocs., 440 F.3d 1109, 1113 (9th Cir. 2006); see also SEC v. Rind, 991 F.2d 1486, 1491 (9th Cir. 1993).

Here, the Court finds that the civil monetary penalties provided under the Exchange Act and the forfeiture requirements under the Sarbanes-Oxley Act sufficiently deprive Defendant of his ill-gotten gains and deter any future violations of the securities laws without the need for further disgorgement.  Thus, the Court declines to exercise its equity powers to require Defendant to give back performance-related bonuses beyond those forfeited under the Sarbanes-Oxley Act.

United States District Court

For the Northern District of California

1    Accordingly, the Court DENIES the SEC's motion to require Defendant to disgorge to the

2    United States Treasury.

3    **V.  CONCLUSION**

4    The Court DENIES Defendant's Motions for Judgment or a New Trial.  The Court GRANTS

5    in part and DENIES in part the SEC's Motion as follows:

6    (1)    Defendant shall be enjoined from any future violations of the securities laws or

7    regulations;

8    (2)    Defendant shall be barred from serving as a director or officer of a publicly-traded

9    company for a period of two years from the date of the Judgment;

10   (3)    Defendant shall pay a civil monetary penalty in the amount of $360,000;

11   (4)    Defendant shall reimburse Maxim for bonuses and stock-sale profits in the amount of

12   $1,869,639; and

13   (5)    Defendant is not required to give back performance-related bonuses beyond those

14   forfeited under the Sarbanes-Oxley Act.

15   Judgment shall be entered accordingly.

16

17

18   Dated:  July 21, 2010

     JAMES WARE

19   United States District Judge

20

21

22

23

24

25

26

27

28                                    23

**United States District Court**
For the Northern District of California

1    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2    Bill James Symes bsymes@foley.com
     Christopher Benjamin Campbell christopher.campbell@lw.com
3    Christopher William Johnstone chris.johnstone@lw.com
     Danielle Andrea Lackey danielle.lackey@lw.com
4    David Michael Friedman david.friedman@lw.com
     Erin E. Schneider schneidere@sec.gov
5    Heather Lynn Thompson heather.thompson@lw.com
     Judith L. Anderson andersonju@sec.gov
6    Marc J. Fagel fagelm@sec.gov
     Margaret Tough margaret.tough@lw.com
7    Mark Philip Fickes fickesm@sec.gov
     Risha Nickelle Jamison risha.jamison@lw.com
8    Robert Lootfi Tashjian tashjianr@sec.gov
     Robert S. Leach leachr@sec.gov
9    Steven Mark Bauer steve.bauer@lw.com
     Susan F. LaMarca lamarcas@sec.gov

10

11

12   **Dated:  July 21, 2010**                    **Richard W. Wieking, Clerk**

13

14                                                **By:____/s/ JW Chambers_____**
                                                  **Elizabeth Garcia**
15                                                **Courtroom Deputy**

16

17

18

19

20

21

22

23

24

25

26

27

28